# PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. SECTION 2254

Prisoner's Name:           Robert Earl Butts, Jr.
Prisoner's Number:         870071
Place of Confinement:      Georgia Diagnostic and Classification Prison
                           Jackson, Georgia 30233

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

ROBERT EARL BUTTS, JR.,            )
Petitioner,                        )
                                   )
vs.                                )        Civil Action No.
                                   )
CARL HUMPHREY, Warden,             )        Capital Habeas Corpus
GEORGIA DIAGNOSTIC AND             )        5:13-CV-194
CLASSIFICATION PRISON.             )
_____)

## INITIAL PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

W. Ray Persons
Ga. Bar No. 573525
Philip E. Holladay
Ga. Bar No. 361008
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30308
T. 404-572-4600
F. 404-572-5139
rpersons@kslaw.com
pholladay@kslaw.com

COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

HISTORY OF PRIOR PROCEEDINGS .......................................................................5

STANDARDS FOR GRANTING RELIEF UNDER 28 U.S.C. § 2254 .......................7

CLAIMS FOR RELIEF ............................................................................................9

    Claim One:  Petitioner was deprived of his right to the effective assistance of counsel at all stages of his pretrial, trial, motion for a new trial, and direct appeal proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and *Strickland v. Washington*, 466 U.S. 688 (1984), and Related Precedent..................................................................................................................9

    Claim Two:  The Trial Court's Improper Rulings And Other Errors Deprived Petitioner Of A Fair Trial And Reliable Sentencing In Violation Of The First, Fourth, Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution. ...........................30

    Claim Three:  Misconduct By The Prosecutor Deprived Petitioner Of His Constitutional Rights To Due Process And A Fair Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution.....................................38

    Claim Four:  Misconduct On The Part Of The Jurors Violated Petitioner's Rights Under The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution..................................................................................................................42

    Claim Five:  A Death Sentence In This Case Is Disproportionate Punishment, And Such An Arbitrary Application Of The Death Penalty Violates The Eighth And Fourteenth Amendments To The United States Constitution. ...................................................43

    Claim Six:  The Death Penalty In Georgia Is Imposed Arbitrarily And Capriciously And Amounts To Cruel And Unusual Punishment, Violating Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And In Violation Of Society's Evolved Standards Of Decency.......................53

    Claim Seven:  Execution By Lethal Injection Is Cruel And Unusual Punishment, And Petitioner's Sentence Violates His Rights Under The Eighth And Fourteenth Amendments To The United States Constitution. ...................................................55

    Claim Eight:  Petitioner's Trial Was Fraught With Procedural And Substantive Errors That Cannot Be Harmless When Viewed As A Whole Since The Combination Of Errors Deprived Him Of The Fundamentally Fair Trial Guaranteed Under The Fifth, Sixth, Eighth, And Fourteenth Amendments.....................................................................60

PRAYER FOR RELIEF .............................................................................................64

Petitioner, Robert Earl Butts, Jr. ("Petitioner"), by and through undersigned counsel, invokes this Court's jurisdiction pursuant to 28 U.S.C. § 2254.

1.      The allegations in this Petition are in the form dictated by the Model Form for Use in Applications for Habeas Corpus under 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in United States District Courts. Petitioner seeks this Court's protection and intercession because the Georgia state courts have violated, and unreasonably and arbitrarily refused to correct violations of, Petitioner's rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, resulting in Petitioner's unconstitutional sentence of death. Petitioner requests that this Court afford him all protections promised by the federal habeas corpus statutes, the Rules Governing § 2254 Cases in the United States District Courts, the Criminal Justice Act, and all other pertinent statutes, court rules, and case law. Petitioner respectfully requests that this Court issue an Order granting his Petition for a Writ of Habeas Corpus.

2.      This Petition pleads Petitioner's claims for relief and alleges the Constitutional errors raised. In conformity with the model form and prevailing practice, this Petition does not make detailed legal argument, address procedural issues or affirmative defenses that the Respondent may choose to assert, or analyze in detail the state court decisions under 28 U.S.C. § 2254(d) and (e). Petitioner shall respond in a Memorandum of Law to any procedural issues the Respondent

raises as affirmative defenses and shall submit briefing on the merits of the claims properly before the Court, which will include legal analysis under § 2254(d) and (e).

3.      This Petition states claims that have been raised in state courts in exhaustion of state remedies.  It is being filed on this date in order to comply with the limitations period of the Anti-Terrorism and Effective Death Penalty Act.  The investigation and research of Petitioner's case continues, however, and he may seek permission of the Court to amend, correct, or modify the claims based on continued investigation and research.

4.      Petitioner is indigent and was so found by the Georgia courts during trial, direct appeal, and state post-conviction proceedings.  Petitioner requests leave to proceed *in forma pauperis* in this proceeding via motion filed herewith.

5.      Petitioner seeks relief in the form of an order granting the writ of habeas corpus as to his conviction and death sentence, and granting all other relief that the Court may deem just, proper, and equitable.  Petitioner submits that the state court convictions, death sentence, and affirmances on direct appeal and state habeas resulted from violations of the Petitioner's rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  In general, Petitioner asserts that the state courts' findings below are contrary to and/or involved an unreasonable application of clearly established federal law, as

- 4-

determined by the United States Supreme Court; involved an unreasonable

determination of the facts in light of the evidence; and/or involved the

unreasonable or arbitrary denial of relief.

## HISTORY OF PRIOR PROCEEDINGS

6.      Petitioner is a person in the custody of the State of Georgia under the

terms of verdicts and sentences entered after a jury trial in the Superior Court of

Baldwin County.  Petitioner was convicted on November 20, 1998 of malice

murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a

firearm during the commission of a crime, and possession of a sawed-off shotgun.

Mr. Butts was sentenced to death for malice murder; life imprisonment for armed

robbery; ten years for hijacking a motor vehicle; five years for possession of a

firearm during the commission of a crime; and five years for possession of a

sawed-off shotgun.  The felony murder conviction was vacated by operation of

law.  Petitioner is incarcerated at the Georgia Diagnostic Prison in Jackson,

Georgia.

7.      Mr. Butts' convictions and death sentence were affirmed by the

Supreme Court of Georgia on April 30, 2001.  *Butts v. State*, 273 Ga. 760, 546

S.E.2d 472 (2001).  Mr. Butts filed a Petition for Writ of Certiorari in the United

States Supreme Court, which was denied.  *Butts v. Georgia*, 534 U.S. 1086 (2002).

Mr. Butts filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County on August 30, 2002.

8.    On September 11-13, 2007, the state habeas court, Judge Penny Haas Freesemann presiding in the Superior Court of Butts County, held an evidentiary hearing at the courtroom of the Georgia Diagnostic & Classification Prison in Jackson, Georgia.  The hearing was primarily devoted to Mr. Butts' claims of ineffective assistance of counsel, focusing primarily on evidence that should have been presented in the sentencing phase of his capital trial.  Mr. Butts submitted numerous documents, including the affidavit testimony of several of his family members and teachers.  Mr. Butts also presented the live testimony of many of these individuals, as well as testimony from his trial counsel, Robert Westin and Cassandra Montford-Ford; the trial investigator, Cathy Crawford; his appellate counsel, Greene Berry Moore and Christopher Huskins; the prosecutor who handled his case, Fred Bright; and law enforcement officer, Detective Richard Horn.  Dr. John Hagedorn, a gang expert, and Jan Vogelsang, a mitigation expert, also testified.  Respondent presented documentary materials and cross-examined the witnesses presented by Mr. Butts.

9.    Following the hearing and close of evidence, the parties submitted post-hearing briefs and proposed findings of fact and conclusions of law.  On April 7, 2011, Judge Freeseman signed an order denying Mr. Butts' petition as to

both his convictions and sentence of death.[1]  On May 2, 2011, Mr. Butts filed a

timely notice of appeal.  On July 15, 2011, Mr. Butts filed an Application for

Certificate of Probable Cause to Appeal (the "Application").  The Supreme Court

of Georgia denied the Application on January 22, 2013.

## STANDARDS FOR GRANTING RELIEF UNDER 28 U.S.C. § 2254

10.    This Court's power to grant Petitioner relief from his unconstitutional

convictions and sentence of death is defined by the provisions of the Anti-

Terrorism and Effective Death Penalty Act as codified in 28 U.S.C. §§ 2254(d) and

(e).  Pursuant to those provisions, this Court must first determine that a habeas

corpus petitioner has demonstrated a constitutional violation.  If the Court is

satisfied that a petitioner's claim has merit, the Court then looks to the state court

decision on that claim to determine whether the state court addressed the merits of

the federal constitutional claim, adjudicated the merits on a complete record, and

issued a reasoned opinion with respect to the merits.  If these criteria are met, then

this Court next determines whether the facts were found in a reasonable manner

under 28 U.S.C. § 2254(d)(2).  If so, the Court should nevertheless grant relief

under 28 U.S.C. § 2254(d)(1) if the state court decision was contrary to or

manifested an unreasonable application of clearly established federal constitutional

---

[1] The Order was filed on April 11, 2011.

law.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *[Terry] Williams v. Taylor*, 529 U.S. 362, 384 (2000).

11.    A state court decision can be contrary to clearly established federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court decision unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  A state court's application of federal law is unreasonable when it is "objectively unreasonable," and not only incorrect or erroneous.  *Id.* at 411; *Wiggins*, 539 U.S. at 520-21. "Clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

12.    With respect to each and all of the constitutional violations alleged herein, Petitioner's capital trial violated his constitutional rights and resulted in an unconstitutional sentence of death.  Likewise, the Georgia Supreme Court's rulings were both contrary to and an unreasonable application of clearly established federal law.

## CLAIMS FOR RELIEF

**Claim One:  Petitioner was deprived of his right to the effective assistance of counsel at all stages of his pretrial, trial, motion for a new trial, and direct appeal proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and *Strickland v. Washington*, 466 U.S. 688 (1984), and Related Precedent.**

13.     All other claims and allegations in this Petition are incorporated in this Claim by reference.

14.     Counsel's deficient performance and unreasonable actions and omissions at both the guilt and sentencing phases of Petitioner's trial prejudiced the outcome of both phases.

15.     The Sixth Amendment affords all citizens facing criminal charges the right to have effective assistance of defense counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command." *Id*. at 685.  Rather, a defendant is deprived of his constitutional right to effective assistance of counsel if he is denied representation that satisfies prevailing professional norms.  *Id*. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms").  To demonstrate that his counsel was constitutionally ineffective,

Petitioner "must show that counsel's performance was deficient and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

16. It is now beyond dispute that effective assistance requires the thorough investigation of a client's case, including any mitigating evidence that could be provided. More than twenty years ago, the Eleventh Circuit declared that effective investigation of all matters relevant to a defendant's case is a necessary component of the Sixth Amendment right to effective assistance of counsel: "At the heart of effective representation is the independent duty to investigate and prepare [the client's case]." *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982); *see also Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986) (ineffective assistance of counsel found where defense failed to interview all potential alibi witnesses). This principle has been repeatedly followed by federal courts with respect to counsel's failure to conduct a reasonable investigation and present evidence at both the guilt-innocence phase and at the penalty phase.[2] Such

---

[2] *See Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) ("Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client."); *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2003) (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance); *Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004) (reversing conviction because trial counsel failed to conduct adequate pretrial investigation); *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) ("In the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances"); *United States*

evidence is especially critical in a circumstantial evidence case such as this one, as "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

17. Counsel also has a heightened duty to investigate and prepare for the sentencing phase in a capital trial. At a capital sentencing hearing, the defendant has already been convicted of murder, and the sole issue is whether the defendant should live or die. "The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant." *Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th Cir. 1991). The United States Supreme Court explained that:

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental

---

*ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003) (reversing conviction when counsel failed to investigate); *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) (reversing conviction and death sentence because trial counsel failed to perform an adequate investigation); *Hardwick v. Crosby*, 320 F.3d 1127, 1162–63 (11th Cir. 2003) ("The Eleventh Circuit has enunciated the rule that effective representation, consistent with the sixth amendment, also involves 'the independent duty to investigate and prepare'") (quoting *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984)); *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004) ("Trial counsel provides deficient performance if he fails to investigate a defendant's medical history when he has reason to believe that the defendant suffers from mental health problems"); *Brownlee v. Haley*, 306 F.3d 1043, 1045 (11th Cir. 2002) ("Brownlee plainly received ineffective assistance of counsel at sentencing in light of his attorneys' failure to investigate, obtain, or present to the jury any evidence in mitigation of the death penalty").

> problems, may be less culpable than defendants who have no such
> excuse.

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation

omitted); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (consideration of

offender's life history is a "constitutionally indispensable part of the process of

inflicting the penalty of death").

18.    To counter the State's case for death, defense counsel, to be effective,

must give the jury a reason to spare the defendant's life.  Typically, defense

counsel adduces evidence of the defendant's background and character that might

"reduce [a defendant's] moral responsibility . . . to a level at which capital

punishment would strike [a] juror as excessive."  *Emerson v. Gramley*, 91 F.3d

898, 907 (7th Cir. 1996).  It is only when the sentencing jury has the opportunity to

consider all available mitigation evidence, and the State's case for death has thus

been subject to full adversarial testing, that "we can be sure that the jury has . . .

made a reliable determination that death is the appropriate sentence."  *Penry v.

Johnson*, 532 U.S. 782, 797 (2001) (internal quotation marks and citation omitted).

19.    In five decisions from the United States Supreme Court applying

clearly established federal constitutional law, the Court noted both the significance

of capital defense counsel's role *in sentencing proceedings* and the constitutional

expectations required to discharge capital defense counsel's burden.  *Williams v.

Taylor*, 529 U.S. 362 (2002); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v.*

*Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009); *Sears v. Upton*, 130 S.Ct. 3259 (2010).  In each of these opinions, the Court focused on the duty of capital counsel to conduct a thorough investigation into potentially mitigating evidence regarding their client's background.  When counsel fails to fulfill "their obligation to conduct a thorough investigation of the defendant's background," the defendant's right to effective assistance of counsel has been violated.  *Williams*, 529 U.S. at 396.

20.     In *Williams*, the Court reaffirmed in the clearest possible terms that capital defense counsel's duty to provide effective assistance of counsel must be measured by reference to the *unique requirements of capital sentencing*, and that counsel's duty therefore must generally encompass a thorough investigation of the defendant's life history.  *See Williams*, 529 U.S. at 398-99; *see also Strickland*, 466 U.S. at 691 (explaining counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").  In *Williams*, the petitioner was convicted of robbery and murder, and the state presented evidence about his violent and lengthy criminal history, including evidence about violent assaults on elderly victims, one of whom was in a vegetative state.  *Williams*, 529 U.S. at 402-03.  The only evidence presented in mitigation was from Williams' mother and two neighbors -- one of whom was

asked to testify for the first time the morning of her testimony -- that the defendant was a "nice boy." *Id*. at 369.

21.     If trial counsel in *Williams* had done any reasonable investigation, trial counsel would have obtained "extensive records graphically describing Williams' nightmarish childhood" and would have learned that Williams was "borderline mentally retarded." *Id*. at 398.  To the Supreme Court, this evidence "might well have influenced the jury's appraisal of his moral culpability."  For failing to investigate and present this evidence, trial counsel in *Williams* provided constitutionally inadequate assistance of counsel, requiring that the petitioner's sentence be vacated.

22.     In *Wiggins v. Smith*, the Supreme Court reiterated its holding in *Williams* that capital defense counsel has an affirmative duty to conduct a reasonable investigation of his or her client's background to determine whether there is evidence that could help mitigate the charges in the penalty phase of the trial.  *Wiggins*, 539 U.S. at 534.  The Court emphasized that this duty stems from the American Bar Association (ABA) Guidelines, which the Court embraced as the prevailing standards of performance for counsel.  *See Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) ("The *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules

and standards to be used in defining the 'prevailing professional norms' in

ineffective assistance cases").  According to those guidelines,

> [i]nvestigations into mitigating evidence should comprise efforts to
> discover all reasonably available mitigating evidence and evidence to
> rebut any aggravating evidence that may be introduced by the
> prosecutor . . . among the topics counsel should consider presenting
> are medical history, educational history, employment and training
> history, family and social history, prior adult and juvenile correctional
> experience, and religious and cultural influences.

*Id*. at 486 (citing *Wiggins*, 539 U.S. at 524); *Williams*, 529 U.S. at 396 (relying on

ABA Standards for Criminal Justice in finding counsel ineffective).  In *Wiggins*,

the Court made clear that capital defense counsel must "conduct a thorough

investigation of the defendant's background" for "all reasonably available

mitigating evidence."  *Wiggins*, 539 U.S. at 524 (quoting *Williams*, 529 U.S. at

396, and American Bar Association Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases 11.4.1 (1989)).

23.     The Supreme Court confirmed its dedication to these important

constitutional principles in *Rompilla v. Beard*, 545 U.S. 374 (2005).  In *Rompilla*,

the defendant was convicted of repeatedly stabbing a man to death and setting him

on fire.  *Rompilla*, 545 U.S. at 377.  Rompilla's trial counsel performed some

investigation into the defendant's background.  *Id*. at 381.  They spoke to the

defendant and his relatives in an attempt to gather mitigating information for the

sentencing hearing, but neither the defendant nor his relatives were particularly

useful sources of information.  *Id.* ("This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase").

24.     Despite this investigation, the Supreme Court found that Rompilla's counsel provided constitutionally ineffective assistance because they failed to investigate or obtain the readily available records from his prior convictions, which would have indicated that he suffers from schizophrenia, organic brain damage and other disorders.  *Id.* at 390-91.  Because the undiscovered mitigating evidence was sufficiently compelling to "undermine confidence in the outcome actually reached at sentencing," the Supreme Court reversed Rompilla's death sentence.  *Id.* at 393.

25.     Similarly, in *Porter v. McCollum*, 130 S. Ct. 447 (2009), the Supreme Court found that trial counsel's failure to present evidence of "Porter's mental health or mental impairment, his family background, or his military service . . . did not reflect reasonable professional judgment."  *Id.* at 453.  The Court also held that these failures resulted in prejudice sufficient to undermine confidence in the outcome of Porter's sentencing.  *Id.* at 455.  Specifically, "it was not reasonable [for the Florida Supreme Court] to discount entirely the effect that [the

neuropsychologist's] testimony might have had on the jury or the sentencing judge," and it was likewise unreasonable to discount the relevance of Porter's abusive childhood and military service. *Id.* In short, just like in Petitioner's case here, "there was too much mitigating evidence that was not presented to now be ignored." *Id.* (internal citation and quotation omitted).

26.     Even more recently in *Sears*, 130 S.Ct. 3259 (2010), the Supreme Court emphatically drove home the point that the failure to present the "significant mitigation evidence that a constitutionally adequate investigation would have uncovered" constituted ineffective assistance. *Id.* at 3259.  In *Sears*, counsel did present some mitigating evidence in the penalty phase, but he failed to present evidence of Sears' cognitive impairments and childhood difficulties. *Id.* Significantly, and highlighting the state courts' errors here, the evidence that Sears' counsel failed to present bears a striking resemblance to the evidence Petitioner's trial counsel failed to present in this case, including evidence of Sears' home life, learning disabilities, "frontal lobe abnormalities," head injuries, drug and alcohol abuse, and psychiatric expert testimony. *Id.* at 3262-63.

27.     Misapplying *Strickland* and its progeny, the state habeas court denied Sears' petition for post-conviction relief on the ground that "it could not speculate as to what the effect of additional evidence would have been." *Id.* at *1.  The court reasoned that "[b]ecause counsel put forth a reasonable theory with supporting

evidence, . . . [Sears] failed to meet his burden of proving that there is a reasonable

likelihood that the outcome at trial would have been different if a different

mitigation theory had been advanced." *Id*. at 3261.  The Georgia Supreme Court

summarily denied review.

28.    The United States Supreme Court vacated the judgment for two

reasons.  First, it noted that the state court "placed undue reliance on the assumed

reasonableness of counsel's mitigation theory." *Id*. at 3264.  The Court explained

that even if a strategy might be reasonable, the defendant may nevertheless be

prejudiced by counsel's failure to conduct an adequate mitigation investigation

before deciding upon that strategy.  *Id*.

29.    Second, the state court misapplied the prejudice prong of *Strickland*.

*Id*.  The Supreme Court noted that

> We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below.  . . . To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding-and reweig[h] it against the evidence in aggravation.

*Id*. at 3266 (internal citations and quotations omitted).  Thus, because the state

court should have "taken into account the newly uncovered evidence of Sears'

'significant' mental and psychological impairments, along with the mitigation

evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation," the Supreme Court vacated the judgment. *Id*. at 3267.

30.     The Eleventh Circuit has also emphasized that counsel is constitutionally required to use readily available evidence to broaden the scope of an investigation. *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008). In *Williams*, another case with facts that are remarkably similar to Petitioner's, the court granted Williams habeas relief and found his trial counsel ineffective for failing to adequately investigate Williams' background for mitigation evidence. *Id*. at 1345. Trial counsel had ready access to three sources of information for the sentencing phase: 1) a psychiatric report prepared by the defense psychologist which noted Williams' personality disorder and depression; 2) the PSI report which briefly noted Williams' description of his father as a "long-term alcoholic" who "frequently abused" his family; and 3) his interview with Williams' mother, who briefly testified about the abuse Williams' father inflicted on their family. *Id*. at 1339. Drawing heavily from *Wiggins*, the court concluded "that trial counsel's failure to broaden the scope of their investigation beyond [the readily available] sources was unreasonable under prevailing professional norms." *Id*. at 1339.

31.     These cases did not announce new law.  Indeed, federal courts have long held that an attorney in a capital case has a duty to conduct a reasonable investigation for possible mitigating evidence.[3]

32.     Under the standards for ineffective assistance of counsel set forth by the United States Supreme Court, the performance of Trial Counsel and Appellate Counsel denied Petitioner effective assistance of counsel on the following grounds.

    a.     Trial Counsel unreasonably failed to negotiate a plea agreement with the district attorney in a case that was not suited to be a death penalty case in comparison with other murder cases.

    b.     Trial Counsel failed to make adequate and timely requests for funds from the court to secure investigative and expert support so that counsel could have conducted a thorough pretrial investigation into and presentation of available defenses at both phases of trial.

---

[3]     *See Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) ("[W]e consider it indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation into potential mitigating circumstances . . . .") (internal quotation marks and citation omitted); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) (professional norms require defendant's lawyers "to collect as much information as possible about [the defendant] for use at the penalty phase of his state court trial"); *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigation evidence."); *Coleman v. Mitchell*, 268 F.3d 417, 450 (6th Cir. 2001) (case law "has strongly established defense counsel's Sixth Amendment duty to independently investigate in preparation for the penalty phase of a capital trial").

c.      Trial Counsel failed to conduct an adequate examination of

potential jurors with regard to their understanding of the presumption of

innocence, potential bias regarding the death penalty and gangs, and other

issues during voir dire to ensure Petitioner's right to a fair trial and reliable

sentencing.

d.      Trial Counsel and Appellate Counsel failed adequately to

challenge the venue of the trial in Baldwin County.

e.      Trial Counsel failed adequately to challenge the trial court's

improper excusal of certain jurors for hardship reasons.

f.      Trial Counsel failed adequately to challenge the trial court's

improper voir dire of potential jurors.

g.      Trial Counsel unreasonably failed to challenge the trial court's

refusal to excuse certain jurors (particularly those affiliated with the Georgia

Department of Corrections (the "DoC"), given the victim's job as a DoC

employee).

h.      Trial Counsel failed adequately to challenge the District

Attorney's improper voir dire.

i.      Trial Counsel generally failed adequately to protect Petitioner's

right to a jury pool and jury that properly represented the community and

could provide Petitioner the fair trial and reliable sentencing to which he was entitled under the United States Constitution.

     j.    Trial Counsel unreasonably failed to voir dire the jury on their knowledge of gangs and gang activity in Baldwin County and how that would affect them as potential jurors.

     k.    Trial Counsel unreasonably failed to object to the jurors being allowed to watch television, knowing that they may have the opportunity to watch newscasts with coverage of this trial.

     l.    Trial Counsel unreasonably admitted to the jury that the State had proven the existence of a statutory aggravating circumstance.

     m.    Trial Counsel unreasonably failed to request a Charge of the Court on the theory of "mere presence".

     n.    Trial Counsel unreasonably failed to reserve the right to object to the Charge to the jury.

     o.    Trial Counsel unreasonably failed during the guilt phase to prepare and present testimony of critical witnesses, such as co-defendant Marion Wilson.  This testimony would have further supported a "mere presence" defense.

p.      Trial Counsel unreasonably failed to request that the trial judge

recuse herself because of having adjudicated the defendant as a juvenile

previously.

q.      Trial Counsel on numerous occasions unreasonably praised the

District Attorney and his assistants in front of the jury, referred to the

District Attorney as a good friend and colleague, referred to the close

working relationship between the State and Defense Counsel, and generally

portrayed to the jury a "conciliatory" atmosphere.

r.      Trial Counsel unreasonably failed to object to inflammatory

and improper prosecution statements during opening statement and also

failed to object to the prosecutor's improper comments during closing

argument.

s.      Trial Counsel unreasonably failed to object to the admission of

several items of evidence and testimony offered by the State during the guilt

and sentencing phases of trial.  Timely objections would have ensured that

certain improper evidence was not received and considered by the jury.

t.      Trial Counsel unreasonably failed to object to the introduction

of numerous photographs which were prejudicial.

u.      Trial Counsel unreasonably failed to file pretrial motions to

protect Petitioner's right to a fair trial and sentencing, including discovery

motions that would have provided defense counsel with an opportunity to learn of, prepare for, and seek the exclusion of putative expert testimony regarding Petitioner's alleged membership in the Folks gang.

v.      Trial Counsel unreasonably failed to object to and provided no rebuttal at all to the prosecution's inflammatory use of testimony regarding gang membership and activities despite the availability of clear legal precedent that could have prevented the introduction of any gang evidence at both phases of Petitioner's trial.  *See Dawson v. Delaware*, 503 U.S. 159, 166 (1992).

w.      Trial Counsel unreasonably failed to raise a challenge under relevant Georgia state evidentiary rules and legal precedent, including *Green v. State*, 266 Ga. 237, 239, 466 S.E.2d 577, 579-80 (1996), and the United States Supreme Court precedents and guidelines relating to the reliability of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny as to the reliability and admissibility of putative expert testimony regarding gangs.  Respondent's purported gang expert was not adequately qualified, and in any event, the testimony he gave was entirely speculative and conjectural.  Moreover, counsel failed to challenge the gang testimony as improper under *Dawson v. Delaware*, 503 U.S. 159, 166 (1992), even though there was no evidence suggesting that the victim's

murder was tied to gang activity.  Counsel also failed to object to opinion testimony regarding gang activities unrelated to Petitioner that was offered by lay witnesses, with no showing of expert qualifications.  Petitioner was prejudiced in that the sentencing phase was infected by improper gang testimony that could not have survived a proper challenge, thereby undermining the reliability of the resulting death sentence.

x.     Trial Counsel unreasonably failed to object properly to items of improper evidence and testimony offered by the State in aggravation at the sentencing phase of trial.  For example, counsel failed to object to unfairly prejudicial gang-affiliation testimony by a purported expert.

y.     Trial Counsel unreasonably failed to object to the introduction of evidence of "gang paraphernalia" by the State in the sentencing phase.

z.     Trial Counsel unreasonably failed to object to testimony concerning gangs and gang activity in Baldwin County during the sentencing phase.

aa.    Trial Counsel unreasonably failed to object to improper testimony during the sentencing phase of alleged "bad acts" of the defendant while incarcerated prior to the trial in this case.

bb.     Trial Counsel unreasonably failed to object to testimony which improperly created a sense of sympathy for the victim as well as testimony which improperly portrayed the victim as non-aggressive and gentle.

cc.     Trial Counsel failed to make adequate or timely objection to the prosecutor's improper and prejudicial comments at closing argument at the guilt and sentencing phases of trial including the prosecutor's improper reference to petitioner as "the biggest liar of them all" and a "criminal." Counsel thereafter failed adequately to litigate a motion for mistrial based on this improper argument.

dd.     Trial Counsel failed to adequately research Georgia law regarding convictions based on circumstantial evidence, the result of which was a failure to present the proper legal basis for why Petitioner's conviction could not be obtained as a matter of law, under O.C.G.A. §24-4-6. Multiple Georgia cases suggest that such a motion would have been successful.

ee.     Trial Counsel failed to adequately investigate and litigate the suppression of Petitioner's taped statements to law enforcement, which were then admitted and denied Petitioner a fair trial and reliable sentencing.

ff.     Trial Counsel failed to adequately redact Petitioner's taped statements to law enforcement, thus allowing the jury to hear prejudicial and inflammatory evidence.

gg.    Trial Counsel failed adequately to investigate and to present mitigation evidence during the sentencing phase.

hh.    The mitigation case presented by counsel consisted of a polygraph examiner who testified Wilson was the shooter; eight pages of testimony from Sheriff Sills from the penalty phase of Wilson's trial highlighting Petitioner's juvenile convictions; and autopsy materials from previous executions by electrocution.  This was ineffective, as a matter of law, particularly in light of the readily-available information uncovered during the state habeas proceeding, and it prejudiced the outcome of the trial.

ii.    Trial Counsel failed to conduct an adequate pretrial investigation into Petitioner's family life and background to uncover and present to the jury evidence in mitigation of punishment.  As a result, the jury failed to hear compelling evidence, such as that contained in petitioner's DFCS files and other records, as well as the testimony of numerous witnesses, in mitigation of punishment as to the extent of Petitioner's physical abuse and neglect during childhood, his deprived and impoverished background, his lack of a father figure or role model, violence and filthy conditions in the home, and his exposure to drug and alcohol abuse.

jj.     Trial Counsel unreasonably failed to interview or call numerous witnesses whose testimony would have been relevant at both phases of trial. Counsel presented no picture of Petitioner's background and failed to call any witnesses who could present the jury with testimony of Petitioner as a unique human being.  Numerous witnesses were available who would have provided the jury with accurate and compelling testimony about Petitioner's life and the circumstances of the crime.  This testimony would not have been cumulative and would have had critical significance in mitigation of punishment.  Such testimony would have been consistent with defense counsel's strategy at both phases of trial.

kk.     Trial Counsel failed to present adequate testimony about the available information going to Petitioner's upstanding character traits including his positive efforts to overcome adversity and hardship and his generosity and kindness to others.

ll.     Trial Counsel offered no testimony of family members of the defendant, which testimony could have be considered as mitigating evidence and a plea for mercy by the jury.

mm.   Trial Counsel failed to secure the services of necessary experts, including, but not limited to, a mitigation expert.

nn.     Trial Counsel and Appellate Counsel failed to secure the services of a sociologist or other expert on gang and youth violence issues, leaving Petitioner with no rebuttal to the highly prejudicial gang testimony that counsel failed to challenge.

oo.     Appellate Counsel failed to investigate, develop, and present available mitigation evidence.

pp.     Appellate Counsel failed to conduct any independent investigation into the evidence presented at the sentencing phase.  By asserting ineffectiveness based on the existing record, appellate counsel was unable to show what trial counsel could have presented to the jury.  This failure was tantamount to a total absence of representation on these critical and constitutionally mandated requirements.

qq.     Trial Counsel failed to argue in the sentencing phase that a sentence of death was disproportionate and therefore precluded by *Enmund v. Florida*, 458 U.S. 782 (1982), and its progeny.

rr.     Trial Counsel failed to object to leading questions throughout both phases of trial.

ss.     Trial Counsel unreasonably failed to present closing arguments that adequately and meaningfully discussed the evidence and set forth reasons for the jury to acquit or to impose a sentence less than death.

tt.     Trial Counsel unreasonably let the jury know he was appointed to represent the defendant.

uu.     Trial Counsel's motion for new trial and direct appeal were prejudicially deficient.

vv.     Trial Counsel's unreasonable actions and omissions prejudiced the outcomes of both the guilt and sentencing phases of trial.

33.     But for Trial and Appellate Counsel's ineffective representation, there is a reasonable probability that the result of each one or both phases of the trial and appeal would have been different.  *See Strickland v. Washington*, 466 U.S. 668 (1984).

**Claim Two:  The Trial Court's Improper Rulings And Other Errors Deprived Petitioner Of A Fair Trial And Reliable Sentencing In Violation Of The First, Fourth, Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution.**

34.     All other claims and allegations in this Petition are incorporated in this Claim by reference.

35.     Errors made by the Trial Court include, but are not limited to, the following:

a.     The Trial Court excused potential jurors for improper reasons under the rubric of "hardship."

b.    The Trial Court improperly failed to strike for cause several venire-persons whose attitudes towards the death penalty would have prevented or substantially impaired their performance as jurors.

c.    The Trial Court erred by phrasing its voir dire questions in a manner that suggested to jurors who gave neutral responses that they were or should be in favor of the death penalty.

d.    The Trial Court erred in its rulings on motions to challenge prospective jurors for cause based on their attitudes about the death penalty and stated biases, engaged in improper voir dire, and allowed fair and impartial jurors to be struck for cause. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 (1985).

e.    The Trial Court improperly restricted voir dire relating to several relevant areas of inquiry, including the credibility of law enforcement officials and the jurors' attitudes regarding race.

f.    The Trial Court erred in denying the Petitioner's juror strikes for cause.

g.    The Trial Court erred in empanelling on the petit jury persons employed by the Department of Corrections.

h.    The Trial Court erred in failing to adequately supervise the jury during its view of the crime scene.

i.      The Trial Court erred by allowing the jury to be able to watch television.

j.      The Trial Court erred in allowing the State to introduce irrelevant and highly inflammatory evidence about gangs.

k.      The Trial Court erred in allowing expert testimony about gangs without requiring the prosecution to demonstrate the qualifications of the purported gang expert or the basis for his speculative testimony.

l.      The Trial Court erred in admitting materially inaccurate and prejudicial evidence and arguments during the sentencing phase to the effect that Petitioner was a member of a gang and regarding gang activity in general.  The prosecution made no link between Petitioner's alleged gang membership and the motivation for the victim's murder, as required by *Dawson v. Delaware*, 503 U.S. 159, 166 (1992).  Accordingly, the court should have excluded as unduly prejudicial the putative expert testimony on gangs and the evidence regarding Petitioner's alleged membership in a gang.

m.      The Trial Court erred in admitting various items of prejudicial, unreliable, unsubstantiated, and irrelevant evidence tendered by the State during both phases of trial.

n.      The Trial Court erred in failing to require the State to disclose

certain items of evidence of an exculpatory or impeaching nature to the

defense.

o.      The Trial Court erred in improperly admitting gruesome

photographs of the victim that were not relevant to any contested issue.

p.      The Trial Court erroneously permitted the prosecution to

introduce substantial inflammatory and prejudicial victim impact testimony

violating Petitioner's Constitutional rights.

i.  In a case like the present one, given the extent and detail of the

prosecution's evidentiary presentation regarding the victims

and their families, there was no way to avoid "comparative

judgments," regardless of the State's intent.  In such a

circumstance, to avoid precisely what the Court in *Payne v.*

*Tennessee*, 501 U.S. 808 (1991), condemned, the Trial Court

was duty-bound to take extra precautions, including to hold a

pre-trial hearing and to enter an order limiting the scope of the

State's "victim impact" presentation.  In Petitioner's case,

however, the Trial Court allowed the prosecution to present

"victim impact" evidence that went well beyond any reasonable

interpretation of the bounds of *Payne*. *See Turner v. State*, 486
S.E.2d 839 (Ga. 1997).

ii.   Georgia law authorizes the admission of evidence regarding
"the victim's personal characteristics and the emotional impact
of the crime on the victim, the victim's family, or the
community in a death penalty trial but such evidence is
admissible only *subsequent* to an adjudication of guilt." *Lucas
v. State*, 274 Ga. 640, 643 (2001).  Despite its admissibility, the
court must "use great caution in ensuring the rights of the
defendant are secured." *Id.*  In fact, a trial court cannot allow
evidence of family members' opinion and characterizations of
the crime, the defendant, or the appropriate sentence. *See
Booth v. Maryland*, 482 U.S. 496 (1987); *United States v.
Brown*, 441 F.3d 1330, 1351 (11th Cir. 2006).

iii.  In addition, the victim impact testimony clearly established a
comparison between the worth of the Petitioner and the victims.
While the *Payne* court stated that such evidence "is not offered
to encourage comparative judgments of this kind – for instance,
that the killer of a hardworking devoted parent deserves the
death penalty", 501 U.S. at 823, this comparison was

nevertheless drawn.  The Trial Court should have excluded this type of testimony and evidence.

iv.   Instead, the Trial Court ignored established limitations regarding the admissibility of "victim impact" evidence to the prejudice of Petitioner.  Admitting this prejudicial, inflammatory victim impact testimony violated Petitioner's constitutional rights during the sentencing phase of the trial. *See* U.S. Const. Amends. VI, XIV.

q.   The Trial Court erred in failing to grant the defense motions for directed verdicts due to lack of evidence sufficient to support guilt and/or the statutory aggravating factors, and in failing to direct verdicts of acquittal or life sentence on its own motion.

r.   The Trial Court erred in allowing evidence of prior alleged "bad acts" and adjudications of the defendant as a juvenile during the sentencing phase.

s.   The Trial Court erred in allowing improper testimony of alleged "bad acts" of the defendant while incarcerated prior to the trial of this case.

t.   The Trial Court erred in failing to charge the jury on mere presence in the guilt-innocence phase.

- 35-

u.     The Trial Court erred in allowing the prosecution to introduce improper, unreliable and irrelevant evidence in aggravation at sentencing, as well as evidence of which the defense had not been provided adequate notice.

v.     The Trial Court erred in failing to require the State to disclose certain items of evidence in a timely manner so as to afford the defense an opportunity to conduct an adequate investigation.

w.     The Trial Court erred by failing to suppress Petitioner's taped statements to law enforcement, which were then admitted, thus denying Petitioner a fair trial and reliable sentencing.

x.     The Trial Court erred by failing to ensure that Petitioner's taped statements to law enforcement were properly redacted, thus allowing the jury to hear prejudicial and inflammatory evidence.

y.     The Trial Court erred by excluding exculpatory hearsay evidence during the guilt phase of trial, thereby prejudicing Petitioner's defense by undermining his ability to present a persuasive "mere presence" defense.

z.     The Trial Court erred in giving confusing instructions to the jury during the sentencing phase.

aa.     The Trial Court erred in denying defendant's motion to exclude members of the Department of Corrections, police department, and members of other law enforcement agencies from sitting in the Court room in uniform.

bb.     The Trial Court erred in denying defendant's motion to prevent prejudicial security measures.

cc.     The Trial Court erred in denying defendant's Motion for an Order allowing evidence at sentencing regarding execution by electrocution.

dd.     The Trial Court erred in denying defendant's Motion for a New Trial on all grounds raised therein.

ee.     The Trial Court made other improper rulings and otherwise conducted the trial in such a way as to deprive Petitioner of a fair trial and reliable sentencing, in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

ff.     The Trial Court erred in that the trial judge should have recused herself because of having previously adjudicated the defendant as a juvenile.

gg.     The Trial Court erred by denying the Petitioner's Motion for Change of Venue.

**Claim Three:  Misconduct By The Prosecutor Deprived Petitioner Of His Constitutional Rights To Due Process And A Fair Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution.**

36.    All other claims and allegations in this Petition are incorporated in this Claim by reference.

37.    The State suppressed information favorable to the defense at both phases of the trial, and the materiality of the suppressed evidence undermines confidence in the outcome of the guilt/innocence and penalty phases of Petitioner's trial and Petitioner's direct appeal in violation of *Brady v. Maryland*, 373 U.S. 667 (1965), and *Kyles v. Whitley*, 115 S.Ct. 1555 (1995).  The State has a continuing obligation to disclose favorable evidence, which extends through post-conviction proceedings, and the State may be continuing to withhold favorable evidence from Petitioner.  *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992)**.**

38.    The State took advantage of Petitioner's ignorance of the undisclosed favorable information by arguing to the fact-finder that which it knew or should have known to be false and/or misleading.  *United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977).

39.    The State allowed its witnesses to convey a false impression to the fact-finder, and there is a reasonable likelihood that the false impression could have affected the fact-finder.  *Giglio v. United States*, 405 U.S. 150 (1972).

40.     The State knowingly or negligently presented false testimony in pretrial and trial proceedings, and there is a reasonable likelihood that the false testimony could have affected the judgment of the trial court/fact-finder at both phases of the trial.  *United States v. Agurs*, 427 U.S. 97, 103 (1976).

41.     This pervasive State misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

42.     The State put on false and misleading testimony about Petitioner's gang involvement and suppressed information that would have impeached their witnesses regarding gangs.  See *Brady v. Maryland*, 373 U.S. 667 (1965); *Napue v. Illinois*, 360 U.S. 264 (1959).

43.     The prohibition against cruel and unusual punishment imposed by the Georgia and United States Constitutions requires that the capital trial and sentencing proceeding be fair and reliable.  *See*, *e.g., Garner v. Florida*, 430 U.S. 349 (1977); *Woodson v. North Carolina*, 428 US. 280 (1976).  A death sentence predicated in part on evidence or argument that is materially inaccurate violates due process and the prohibition against cruel and unusual punishments.  *See Johnson v. Mississippi*, 406 U.S. 578 (1988); *Duest v. Singletary*, 907 F.2d 472, 483 (11th Cir. 1992); *Devier v. Zant*, 3 F.3d 1445 (11th Cir. 1993).  At the trial of the other person alleged to have participated in the crime, Marion Wilson, the prosecution argued during the sentencing phase that Wilson fired the shotgun that

killed Donovan Parks; in the later trial of Petitioner, however, the same prosecutor argued that Butts fired the shotgun.  To execute Petitioner on the basis of this record violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

44.     Petitioner's rights to due process and a fair trial were violated by improper and prejudicial remarks by the prosecution in its opening statement to the jury and in its closing arguments in both the guilt/innocence phase and sentencing phase of trial.  For example, the prosecution argued matters outside the evidence, engaged in highly prejudicial theatrics, and made other statements calculated to inflame the jury's passions so that they would render a verdict and sentence based on emotion and not the facts and law.

45.     Petitioner's rights to association, due process, and a fair trial were further violated by the prosecution's use of highly inflammatory evidence pertaining to gang activity without any evidentiary basis for linking the Parks murder with gang activity, as required under *Dawson*, *supra*.

46.     The Trial Court's refusal to excuse for cause numerous potential jurors who were biased against Petitioner and/or whose views regarding the death penalty would have substantially impaired their ability to fairly consider a sentence less than death and to fairly consider and give weight and meaning to all proffered mitigating evidence, denied Petitioner his constitutional rights as guaranteed by the

Fifth, Sixth and Fourteenth Amendments to the United States Constitution and relevant case law.  But for these errors, the outcome would have been different at all stages of the proceedings.

47.     A criminal defendant has a fundamental right to an impartial jury that will perform its legal duty.  A cornerstone of this constitutional right is the court's duty and power to remove biased and improper venire members from the jury pool for cause.  *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt,* 469 U.S. 412 (1985).  In a capital case, the trial court is constitutionally required to strike for cause any potential jurors who are predisposed toward the death penalty to the point that their ability to consider a sentence other than death is substantially impaired.  *Morgan v. Illinois*, 504 U.S. 719 (1992).  This includes jurors who, for any reason, are incapable of or unwilling to consider and give weight to mitigating circumstances as that concept is broadly defined by the United States Supreme Court.  *See Lockett v. Ohio*, 438 U.S. 586 (1978).

48.     In this case, the Trial Court refused to strike for cause numerous jurors who were biased against Petitioner, and/or were incapable of giving proper consideration to mitigating evidence and/or a sentence less than death.

49.     The Trial Court's failure to remove each of these jurors denied Petitioner his constitutional rights as guaranteed by the Fifth, Sixth and Fourteenth

Amendments to the United States Constitution. Thus, Petitioner's conviction and sentence should be vacated.

### Claim Four:  Misconduct On The Part Of The Jurors Violated Petitioner's Rights Under The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution.

50.     All other claims and allegations in this Petition are incorporated in this Claim by reference.

51.     Petitioner was denied his federal constitutional right to trial by a fair and impartial jury.  Misconduct by the jurors included, but was not limited to, the following:  Jurors improperly considered matters extraneous to the trial; Jurors held improper racial attitudes that affected the deliberations of the jury; Jurors gave false or misleading responses on voir dire; Jurors held improper biases that infected their deliberations; Jurors were improperly exposed to the prejudicial opinions of third parties; Jurors had improper communications with third parties; Jurors had improper communications, including, but not limited to, with jury bailiffs; and Jurors improperly prejudged Petitioner at both the guilt/innocence and penalty phases of Petitioner's trial.[4]  *See e.g.*, *Spencer v. Georgia*, 500 U.S. 960

---

[4] To the extent that Petitioner's counsel failed to protect Petitioner's rights in this regard, counsel's performance was unreasonably deficient, and Petitioner was prejudiced by the deficiencies of his counsel.  To the extent that the trial court was implicated in or aware of any of the jury misconduct, and yet failed to advise Petitioner or correct the misconduct, the court's actions constitute an independent violation of Petitioner's rights.  To the extent that the State, through any of its

(1991) (Kennedy, J., concurring in denial of cert.) (racial epithets used in jury room); *McCleskey v. Kemp*, 481 U.S. 279 (1987) (racial animus of decision makers); *Moore v. State*, 172 Ga.App. 844, 324 S.E.2d 760 (1984) (jury consideration of extraneous legal research); *Jones v. Kemp*, 706 F.Supp. 1534 (N.D.Ga. 1989) (jury consideration of extraneous religious information); *Turner v. Louisiana*, 379 U.S. 466 (1965) (improper communications with bailiffs); *Rushen v. Spain*, 464 U.S. 114 (1983) (improper communications with trial judge); *United States v. Scott*, 854 F.2d 597, 700 (5th Cir. 1988) (failure to respond truthfully on voir dire); *Radford v. State*, 263 Ga. 47, 425 S.E.2d 868 (1993) (improper communications with bailiffs); *Turpin v. Todd*, 268 Ga. 820, 493 S.E.2d 900 (1997) (same).

### Claim Five:  A Death Sentence In This Case Is Disproportionate Punishment, And Such An Arbitrary Application Of The Death Penalty Violates The Eighth And Fourteenth Amendments To The United States Constitution.

52.     All other claims and allegations in this Petition are incorporated in this Claim by reference.

53.     Petitioner's sentence of death is disproportionate in violation of Petitioner's constitutional rights when compared with sentences sought and imposed on others who have committed similar crimes.  The disproportionate

---

entities, was implicated in or aware of any of the jury misconduct, the State's action (or failure to act) also deprived Petitioner of his constitutional rights.

imposition of the death penalty denied Petitioner due process, in violation of Petitioner's rights as guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution and relevant case law.  To the extent Trial Counsel failed to raise this claim at trial or to litigate it effectively, counsel was ineffective. To the extent Appellate Counsel failed to raise this claim on direct appeal or to research, brief and/or argue it effectively, Appellate Counsel was likewise ineffective.

54.    Since *Furman v. Georgia*, 408 U.S. 238, 310, 313 (1973) (Stewart and White, JJ., concurring), the United States Supreme Court has required states that permit capital punishment to institute procedures that would protect against the "wanton" and "freakish" imposition of the death penalty and would provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *See also Parker v. Dugger*, 498 U.S. 308 (1991). In Georgia, a proportionality review is a statutory requirement in addition to being a federal constitutional requirement.  Under O.C.G.A. § 17-10-35(c) (2007), the Supreme Court of Georgia must determine with regard to a sentence of death if it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.  "The review concerns whether a death sentence is 'excessive per se' or 'substantially out of line' given the crime and the evidence regarding the defendant and whether the crime is in a category of crimes that 'have

so consistently ended with sentences less than death that the death penalty in one case would be clearly disproportionate." *Walker v. State*, 653 S.E.2d 439, 447 (Ga. 2007); *Gissendaner v. State*, 272 Ga. 704, 716-717 (2000). In fact, proportionality review was one of the pillars of reliability in sentencing that the United States Supreme Court used in 1976 to uphold the re-constituted Georgia death penalty statute. *See Gregg v. Georgia*, 428 U.S. 153 (1976).

55.    The goal of proportionality review is that similarly-situated defendants receive similar sentences and that the process be rational and not capricious.

56.    The proportionality review conducted in the State of Georgia is constitutionally infirm, both in general and as applied. The mandate against disproportionate sentencing does not merely require that the Georgia Supreme Court be able to find other instances in which the death penalty is applied to similar facts, but rather, to view the Georgia system as a whole to see that sentences are proportionate across the spectrum.

57.    To conduct an equitable proportionality review, it is critical that the Georgia Supreme Court review other similarly-situated defendants in cases where life sentences resulted.

58.    The proportionality review in Petitioner's direct appeal consisted of a boilerplate listing of cases allegedly similar to Petitioner's conviction.  *See Butts v. State*, 273 Ga. 760, 772, 546 S.E.2d 472, 485 (2001).

59.    The following is a list of all the cases cited by the Court (*see* 271 Ga. at 823-24) as being similar to Petitioner's case, along with an explanatory description:  *King v. State*, 273 Ga. 258, 539 S.E.2d 783 (2000) (affirming death penalty for defendant who shot and killed store clerk during robbery); *Esposito v. State*, 273 Ga. 183, 538 S.E.2d 55 (2000) (affirming death penalty for defendant who abducted elderly victim, robbed her, and beat her to death with tree limbs, then drove to Texas where he abducted an elderly couple, robbed them, and beat them to death with a tire iron); *Wilson v. State*, 271 Ga. 211, 525 S.E.2d 339 (1999) (affirming death penalty for Petitioner's co-defendant) *Lee v. State*, 270 Ga. 798, 514 S.E.2d 1 (1999) (affirming death penalty for defendant who shot and killed victim); *Whatley v. State*, 270 Ga. 296, 509 S.E.2d 45 (1998) (affirming death penalty for defendant who shot and killed a store owner during a robbery); *Bishop v. State*, 268 Ga. 286, 486 S.E.2d 887 (1997) (affirming death penalty for defendant who beat a victim to death after stealing the victim's car); *Jones v. State*, 267 Ga. 592, 481 S.E.2d 821 (1997) (affirming death penalty for defendant who beat a man to death while stealing his truck; the defendant's accomplice in the truck theft did not receive the death penalty); *Carr v. State*, 267 Ga. 547, 480

- 46-

S.E.2d 583 (1997) (affirming death penalty for defendant who stabbed a man to

death during a robbery; the defendant's accomplice in the robbery did not receive

the death penalty); *McClain v. State*, 267 Ga. 378, 477 S.E.2d 814 (1996)

(affirming death penalty for defendant who beat a man to death during a robbery);

*Greene v. State*, 266 Ga. 439, 469 S.E.2d 129 (1996) (affirming death penalty for

defendant who stabbed a man to death during a robbery); *Crowe v. State*, 265 Ga.

582, 458 S.E.2d 799 (1995) (affirming death penalty for defendant who beat a man

to death during a robbery); *Mobley v. State*, 265 Ga. 292, 455 S.E.2d 61 (1995)

(affirming death penalty for defendant who shot a man to death during a robbery);

*Christenson v. State*, 262 Ga. 638, 423 S.E.2d 252 (1992) (affirming death penalty

for defendant who shot a man to death during an attempted robbery, defendant

later resentenced to life without parole); *Meders v. State*, 261 Ga. 806, 411 S.E.2d

491 (1992) (affirming death penalty for defendant who shot a man to death during

a robbery); *Ferrell v. State*, 261 Ga. 115, 401 S.E.2d 741 (1991) (affirming death

penalty for defendant who shot his grandmother to death while robbing her);

*Stripling v. State*, 261 Ga. 1, 401 S.E.2d 500 (1991) (affirming death penalty for

defendant who killed two restaurant employees during a robbery); *Cargill v. State*,

255 Ga. 616, 340 S.E.2d 891 (1986) (affirming death penalty for defendant who

shot two people during a robbery; the defendant's accomplice did not receive the

death penalty); *Ingram v. State*, 253 Ga. 622, 323 S.E.2d 801 (1984) (affirming death penalty for defendant who shot victim during a robbery).

60.     In this case, the State argued that, Petitioner should be sentenced to death because he was the shooter.  But the State had already convicted Wilson and he had been sentenced to death, based on the State's argument that he was the actual murderer -- the shooter.  *Wilson v. State*, 526 S.E.2d 339 (Ga. 2001).

61.     Thus, the similarity of these cases to Petitioner's case is limited to the fact that the cases involved intentional killings committed during the commissions of armed robberies or motor vehicle hijackings.  In all of the cases, the death penalty was imposed only on the defendant who actually committed the murder. In fact, the co-defendants in *Jones*, *Carr*, and *Cargill*, who were active participants in the underlying robberies, received only life sentences.  After convicting Wilson and obtaining the death penalty, the State should not have sought the death penalty for Petitioner.

62.     Moreover, a sentence of death in this case is disproportionate under *Cabana v. Bullock*, 474 U.S. 376, 386 (1986) and *Enmund v. Florida*, 458 U.S. 782 (1982).  As explained above, the State's sole basis for seeking the death sentence was its argument that Petitioner was the triggerman even though the State had already convicted and sentenced Wilson to death because he was the murderer.

- 48-

Accordingly, there is no constitutional justification for imposing a sentence of
death against Petitioner.

63.     The crimes for which Petitioner was convicted do not reflect a
conscience materially more depraved than other cases in which the death penalty
was neither sought nor imposed, especially considering that substantial mitigating
evidence was never presented to the jury and that virtually no physical evidence
linking Petitioner to the crimes was ever found.  There are numerous cases that are
similar to Petitioner's in all respects, including the age, prior record, life and
character of the accused which have resulted in lesser punishment than death:

    a.      Andrew Tyrone Miller murdered his wife after she kicked him
out of the house for having affairs with other women in their bed while she
was at work.  On the day of the murder, Miller came to the house, packed up
his clothes, and Miller and his wife left in his wife's car.  Miller's wife's
body was found in the driver's seat of her car on a rural dirt road.  Miller had
shot her in the head, neck, chest, and abdomen with a 9mm pistol.  In a
previous incident involving Miller and his wife, Miller had broken into the
marital home, strewn his wife's clothes about, and shot at her.  Miller was
sentenced to life in prison for malice murder and five years each, to run
consecutively, for other related crimes, including possession of a firearm by
a convicted felon.  *See Miller v. State*, 275 Ga. 32 (2002).

b.      Rodney McWhorter went with his friend Jarrells and Jarrells' girlfriend, to a neighboring county to sell drugs.  After Jarrells and his girlfriend checked into a motel, McWhorter checked into another nearby motel.  The next afternoon a maid found the bodies of Jarrells and his girlfriend murdered in bed.  There was no evidence of an altercation. Clothes were strewn about, and Jarrells' pants were missing.  After the murders, McWhorter was observed with a large sum of money and a bag of drugs which belonged to Jarrells.  McWhorter bragged that his crimes would appear in the media.  Witnesses heard McWhorter say that he could not leave the "girl" as a witness, and he had not wanted to kill her.  McWhorter was convicted of murder and armed robbery, and was sentenced to two consecutive terms of life imprisonment for the murders and a consecutive twenty-year term of imprisonment for the armed robbery.  *See McWhorter v. State*, 271 Ga. 461 (1999).

c.      Scotty Lee Stansell and his wife had been married for two years, had a six-month old infant, but their marriage was failing and they were considering divorce.  Shortly before his wife's murder, Stansell had cut his wife's shirt off, because he did not like what she was going to wear.  He threatened to beat his wife and told his wife's sister that if his wife did not shut up or leave with her sister, that he "just might kill her."  Stansell and

Merritt, a friend with whom he was planning to attend a concert the night of the murder, decided not to attend the concert that night, but instead drove around drinking beer and talking to women.  Stansell had dropped off the couple's infant child with a friend, and when he arrived back at the friend's house, he discovered his wife there.  The couple argued, then parted ways. Later in the evening, Stansell and his friend returned to Stansell's home and found Stansell's wife there.  Stansell told his wife about the women that they had seen that night.  Merritt said he didn't have a girlfriend, and Stansell's wife, whom Merritt had previously dated, said that she would be his girlfriend.  Stansell then picked up a rifle, swung it between Merritt and his wife, and then fired at his wife.  Stansell was convicted of malice murder and aggravated assault and sentenced to life imprisonment for malice murder.  *See Stansell v. State*, 270 Ga. 147 (1998).

        d.      Clarence Smith and his girlfriend had dated for two years. Three months after they broke up, she began dating another man.  Two weeks before the murder, Smith threatened to kill them both.  On the morning of the murder, Smith broke into the apartment where his ex-girlfriend and her new boyfriend were sleeping.  Smith shot the boyfriend eleven times with a 9mm pistol.  After killing her boyfriend, Smith hit his former girlfriend in the head with the pistol, leaving a wound that required

ten stitches and kicked her in the side which required at least three stitches.

When she escaped by running to her sister's apartment, Smith left.  The

police found him hiding in a shed behind another ex-girlfriend's house.

Smith was found guilty of malice murder and sentenced to life imprisonment

plus ten years for aggravated assault, to be served consecutively.  *See Smith*

*v. State*, 270 Ga. 123 (1998).

64.     In these cases, the defendants' crimes were similarly situated to

Petitioner's crimes, but Petitioner received a far more disproportionate sentence of

death as compared to other more culpable defendants who received life

imprisonment despite committing more aggravated crimes with less mitigating

evidence.

65.     The constitutional mandate against disproportionate sentencing does

not merely require that state supreme courts be able to find other instances in

which the death penalty is applied to similar facts, but rather, to view the state

system as a whole to ascertain that sentences are proportionate across the spectrum.

There have been many other murders more aggravated than the one for which

Petitioner has received a sentence of death in which a far lighter sentence was

imposed.  To conduct an equitable proportionality review, it is critical that the

Georgia Supreme Court review other similarly situated defendants in cases where

life sentences resulted.  The goals of a proportionality review are that similarly

situated defendants receive similar sentences, that the process be rational and not capricious and that the ultimate sentence that the State can exact from a criminal be reserved for the most severe of murders.

66.     Even assuming Petitioner had committed the crimes for which he was convicted, Petitioner's death sentence on this record is clearly disproportionate compared to other more culpable defendants who received life imprisonment despite committing more aggravated crimes with less mitigating evidence. Petitioner's death sentences, therefore, violates the Fifth and Fourteenth Amendments to the United States Constitution.  Thus, Petitioner's death sentence should be vacated.

**Claim Six:  The Death Penalty In Georgia Is Imposed Arbitrarily And Capriciously And Amounts To Cruel And Unusual Punishment, Violating Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And In Violation Of Society's Evolved Standards Of Decency.**

67.     All other claims and allegations in this Petition are incorporated in this Claim by reference.

68.     Petitioner's sentence of death was imposed arbitrarily and capriciously, and pursuant to a pattern and practice of discrimination in the administration and imposition of the death penalty in Georgia, thereby rendering Petitioner's sentence of death unlawful and in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.  The grounds for this claim include, but are not limited to, the following:

a.      Georgia's statutory death penalty procedures, as applied, do not result in fair, nondiscriminatory imposition of the death sentence, and therefore violate the Eighth Amendment to the United States Constitution;

b.      The death penalty is imposed arbitrarily, capriciously, and discriminatorily in the State of Georgia, and was so imposed in Petitioner's case;

c.      Georgia cases similar to that of Petitioner with regard to the nature and circumstances of the offense, prior record, culpability, and life and character of the accused, have resulted in lesser punishments than death;

d.      Georgia cases more aggravated than Petitioner's case with regard to the nature and circumstances of the offense, prior record, culpability, and life and character of the accused, have resulted in lesser punishments than death;

e.      There is no constitutionally-permissible way to distinguish the few cases in which the death penalty has been imposed, and Petitioner's case in particular, from the many similar cases in which a lesser punishment has been imposed;

f.     In both the United States and the State of Georgia, the death

penalty has been and continues to be imposed discriminatorily against males,

poor persons, and people of color (African-American persons in particular).

g.     There exists in Georgia a pattern and practice of prosecuting

authorities, courts, and juries to discriminate on the basis of race, gender,

and poverty in deciding whether to seek or impose the death penalty in cases

similar to that of Petitioner, thereby making the imposition of the sentence of

death against Petitioner a violation of his rights under the Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution.

**Claim Seven:  Execution By Lethal Injection Is Cruel And Unusual Punishment, And Petitioner's Sentence Violates His Rights Under The Eighth And Fourteenth Amendments To The United States Constitution.**

69.     All other claims and allegations in this Petition are incorporated in

this Claim by reference.

70.     As Georgia's protocols and procedures for executing prisoners by

lethal injection are inconsistent with the evolving standards of decency that mark

the progress of a maturing society, they constitute cruel and unusual punishment

under the Eighth and Fourteenth Amendments to the United States Constitution.

*Trop v. Dulles*, 356 U.S. 86 (1958).

71.     The Eighth Amendment prohibits the unnecessary and wanton

infliction of pain.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  It also forbids

methods of execution that pose substantial risks for serious harm to the prisoner.
*Baze v. Rees*, 553 U.S. 35, 50 (2008); *see also in re Kemmler*, 136 U.S. 436, 447
(1890)  ("Punishments are cruel when they involve torture or a lingering death…").
The prohibition against "serious" harm includes a prohibition against punishments
that cause a "foreseeable risk [of] gratuitous and unnecessary pain."  *Hill v.
McDonough*, 547 U.S. 573, 580 (2006); *Farmer v. Brennan*, 511 U.S. 825, 842,
847 (1994) (stating that the Eighth Amendment is violated by prison officials when
they know of a risk of serious harm and proceed without taking reasonable
measures to abate the risk).

72.    A plurality of the Supreme Court of the United States has held that a
petitioner can prevail in a challenge to lethal injection as a method of execution if
he demonstrates "a substantial risk of serious harm."  *Baze v. Rees*, 553 U.S. 35,
50, 1534 (2008).  Since *Baze*, the Court has also indicated that the legality of the
method of obtaining lethal injections drugs is relevant to this inquiry.  *Brewer v.
Landrigan*, 131 S.Ct. 445 (2010), citing *Baze*, 553 U.S. at 50.

73.    Petitioner respectfully asserts that the protocols and procedures for
executing a prisoner by lethal injection as adopted by the Georgia Department of
Corrections are unconstitutionally defective in numerous regards, including, *inter
alia*, that they include inadequate safeguards to ensure the efficacy of the
substances that it will use to end his life.  In March of this year, the Georgia

Legislature adopted a measure that makes all information about the nature and origin of Georgia's lethal injection drugs a "confidential state secret."  This action follows a series of missteps for the Georgia Department of Corrections ("the GDC") as it attempted to obtain drugs for use in lethal injections despite widespread shortages.  In March of 2011, the Drug Enforcement Administration seized Georgia's entire stock of sodium thiopental after learning that the GDC had illegally imported it.  Georgia has also repeatedly and abruptly altered its lethal injection procedures, once changing its protocol on the very eve of an execution because it realized that its supply of a lethal injection drug had expired some two weeks earlier.

74.    Georgia recently declared that it will adhere to its current one-drug execution protocol -- which calls for a lethal injection of pentobarbital, a barbiturate and controlled substance -- despite the fact that no FDA-approved supply of pentobarbital is available for use in judicial executions, as its sole manufacturer prohibits its sale for that purpose.  Indeed, Georgia's only means of obtaining pentobarbital is to have it manufactured by a compounding pharmacy – a process that it not approved or regulated by the FDA.  Accordingly, there are significant risks that the pentobarbital Georgia acquires will be illegally-obtained and unsafe for use in judicial executions.

75.     Petitioner further asserts that Georgia's protocols and procedures do not contain the safeguards necessary to ensure that the personnel administering the lethal chemicals do so without mutilating his body and causing him conscious suffering or a lingering death.  These protocols and procedures also fail to establish minimum qualifications required of the personnel performing the procedure.  The procedure accordingly carries a grave risk of errors that would result in the unnecessary infliction of conscious suffering and severe physical and psychological pain upon the dying prisoner, and falls short of the requirements of the Eighth Amendment.

76.     Petitioner has challenged the lethal injection protocol in Georgia since the inception of his state habeas proceedings.  The state habeas court found this claim non-cognizable and held in the alternative that, based upon *Baze*, the claim was "without merit."  State Habeas Order at 13.  Mr. Butts respectfully submits that this refusal by the state courts to grant relief for this claim is contrary to or an unreasonable application of Supreme Court authority.  While the Supreme Court in *Baze* relied upon specifically enumerated safeguards of the Kentucky Procedures to find that a substantial risk of harm was not present in that state's administration of lethal injection, the Court refrained from automatically deeming constitutional the procedures of other states, stressing that only "[a] state with a lethal injection protocol substantially similar to the protocol we upheld today would not create a

risk that meets this standard." *Baze*, 553 U.S. at 61. Georgia protocol and procedures bear no resemblance to those of Kentucky and lack many of the safeguards upon which that Court based its ruling.  As Georgia's protocols and procedures differ substantially from those found constitutional by the Supreme Court in *Baze*, that case cannot be used to preclude a finding by this Court that death by lethal injection in the State of Georgia violates both the Eighth and Fourteenth Amendments. Accordingly, the state court's decision is entitled to no special treatment pursuant to §2254(d).

77.    To the extent that Petitioner's Appellate Counsel failed to raise this claim on direct appeal or research, brief and argue it effectively, they provided ineffective assistance of counsel.

78.    As Georgia's use of lethal injection as a method of execution is inconsistent with the evolving standards of decency that mark the progress of a maturing society, it constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.  *Trop v. Dulles*, 356 U.S. 86 (1958).   Habeas relief should follow.

**Claim Eight:  Petitioner's Trial Was Fraught With Procedural And Substantive Errors That Cannot Be Harmless When Viewed As A Whole Since The Combination Of Errors Deprived Him Of The Fundamentally Fair Trial Guaranteed Under The Fifth, Sixth, Eighth, And Fourteenth Amendments.**

79.    All other claims and allegations in this Petition are incorporated in

this Claim by reference.

80.    In *Matthews v. Eldridge*, the United States Supreme Court stated:

> [Our] decisions underscore the truism that "[d]ue process," unlike
> some legal rules, is not a technical conception with a fixed content
> unrelated to time, place and circumstances.  *Cafeteria Workers v.
> McElroy*, 367 U.S. 886, 895 (1961).  *"[D]ue process is flexible and
> calls for such procedural protections as the particular situation
> demands*."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).
> Accordingly, resolution of the issue whether the administrative
> procedures provided here are constitutionally sufficient requires
> analysis of the governmental and private interests that are affected.
> *Arnett v. Kennedy*, 416 U.S. at 167-58 (Powell, J., concurring in part);
> *Goldberg v. Kelly*, 397 U.S. 254, 263-266 (1970); *Cafeteria Workers
> v. McElroy*, 367 U.S. at 895. More precisely, our prior decisions
> indicate that identification of the specific dictates of due process
> generally requires consideration of three distinct factors:  First, the
> private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail."  *See, e.g.*, *Goldberg*, 397 U.S. at 263-71.

81.    *Matthews* dealt with the fundamental question of the necessity of

requiring formal hearings on disputed issues affecting a citizen's basic liberties.

The Supreme Court's analysis of the considerations regarding the necessity of

procedural safeguards is highly enlightening and instructive. *Matthews* teaches that it is simply not enough for the Government to provide "a process" to dispose of disputed matters. Rather, the process must be fair to all parties and must be flexible enough to accommodate the particular litigation involved. A capital defendant has a "constitutional right to a fair trial regardless of . . . [the crime]." *Heath v. Jones,* 941 F.2d 1126, 1131 (11th Cir. 1991).

82.     Petitioner did not receive the fundamentally fair trial to which he was entitled under the Eighth and Fourteenth Amendments. The process itself failed him. It has failed because the sheer number and types of errors involved in his trial, when considered as a whole, virtually dictated the sentence that he would receive.

83.     The flaws in the system that sentenced Petitioner to death are many. They have been pointed out not only in this Petition for Writ of Habeas Corpus, but also in Petitioner's direct appeal, motion for new trial, and Amended Petition for a Writ of Habeas Corpus in Georgia state court; and while there are means for addressing each individual error, the fact is that addressing these errors on an individual basis will not afford adequate safeguards against an improper conviction and improperly imposed death sentence -- safeguards that are required by the United States Constitution.

84.     The United States Supreme Court has consistently emphasized the uniqueness of death as criminal punishment.  Death is "an unusually severe punishment, unusual in its pain, in its finality, and in its enormity."  *Furman*, 408 U.S. at 287 (Brennan, J., concurring).  It differs from lesser sentences "not in degree but in kind.  It is unique in its total irrevocability."  *Id.* at 306 (Stewart, J., concurring).  The severity of the sentence "mandates careful scrutiny in the review of any colorable claim of error."  *Zant v. Stephens*, 462 U.S. 862, 885 (1983).  Thus, greater caution and safeguards must be utilized to ensure the constitutional validity of each death sentence:

> Death is a different kind of punishment from any other which may be imposed in this country . . . .  From the point of view of the defendant, it is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action.  It is of vital importance to the defendant and to the community that any decision to impose the death sentence be and appear to be based on reason rather than caprice or emotion.
> *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (citations omitted).

85.     This same principle was posited in *Woodson v. North Carolina*, 428 U.S. 280 (1976):  "Death, in its finality, differs more from life imprisonment than 100-year prison term differs from one of only a year or two.  *Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case*."  *Id.* at 305 (emphasis added).

86.     This rationale has been applied to *both* the sentencing and guilt-innocence phases of a capital defendant's trial:  "To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotions," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination.  *The same reasoning must apply to rules that diminish the reliability of the guilt determination*."  *Beck v. Alabama*, 447 U.S. 625, 638 (1980) (emphasis added).

87.     Petitioner contends that numerous violations occurred at both stages of his trial.  The errors in Petitioner's trial should not only be considered separately, but also carefully scrutinized in the aggregate.  Respondent cannot meet its burden to prove that the individual errors in Petitioner's trial did not affect his verdict and sentence.  Equally as importantly, Respondent cannot show that the accumulated weight of these errors did not have an overwhelmingly prejudicial effect on the outcome of Petitioner's capital trial.  When the separate infractions are viewed in their totality, it is clear that Petitioner did not receive the fundamentally fair trial to which he was entitled under the Eighth and Fourteenth Amendments.

88.     The failure of defense counsel to prepare for and present an adequate defense of his client's life, the trial court's numerous errors and misconduct on the

part of the prosecution and the jurors, virtually dictated the verdict and sentence in this case. Petitioner is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this Court:

1.      Review the claims alleged in this petition on the merits;

2.      Issue a Writ of Habeas Corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

3.      Permit Petitioner, who is indigent, to proceed *in forma pauperis;*

4.      Grant Petitioner, who is indigent, sufficient funds to secure the expert and investigative assistance necessary to prove the facts as alleged in this petition;

5.      Grant Petitioner the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts as alleged in this petition;

6.      Allow discovery pursuant to Rule 6, Rules Governing Section 2254 Cases in the United States District Court;

7.      Conduct a hearing at which proof may be offered concerning the allegations of this Petition;

8.      Allow Petitioner to amend this Petition after the assistance of experts and discovery, and in the event of any other changes in law or facts relevant to his case;

9.      Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the record and allegations raised by this petition;

10.     Allow Petitioner to respond to any procedural or affirmative defenses asserted by Respondent and to any other arguments that the Respondent may raise in this action; and

11.     Grant such other relief as may be just and proper.


Respectfully submitted this 30th day of May 2013.


                                        _s/ Philip E. Holladay_
                                        W. Ray Persons
                                        Philip E. Holladay
                                        KING & SPALDING LLP
                                        1180 Peachtree Street NE
                                        Atlanta, Georgia 30308
                                        T. 404-572-4600
                                        F. 404-572-5139


                                        COUNSEL FOR PETITIONER
                                        Robert Earl Butts, Jr.

<u>VERIFICATION</u>

STATE OF GEORGIA

COUNTY OF BUTTS

Before me, the undersigned authority, personally appeared ROBERT EARL BUTTS, JR., who, being first duly sworn, says that he has personal knowledge of the allegations in the foregoing pleading, and that the allegations and statements contained therein are true and correct to the best of his knowledge.

_Robert Butts_
_____
ROBERT EARL BUTTS, JR.

Sworn to, and subscribed before me,
this the 29 day of May, 2013.

_____
Notary Public
My Commission expires: 10/05/2015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

ROBERT EARL BUTTS, JR.,     )
Petitioner,                    )
                               )
vs.                            )            Civil Action No.
                               )
CARL HUMPHREY, Warden,    )            Capital Habeas Corpus
GEORGIA DIAGNOSTIC AND    )
CLASSIFICATION PRISON.      )
_____)

## NOTICE OF ELECTRONIC FILING AND CERTIFICATE OF SERVICE

This is to certify that on May 30, 2013, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system.  I also certify that

I have served the foregoing document and this notice of electronic filing on

Respondent this day by electronic mail and U.S. Mail to:

> Beth Burton
> Senior Assistant Attorney General
> 40 Capitol Square, SW
> Atlanta, Georgia  30334-1300
> bburton@law.ga.gov

Respectfully submitted,

*s/ Philip E. Holladay*
W. Ray Persons
Philip E. Holladay
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30308

T. 404-572-4600
F. 404-572-5139


COUNSEL FOR PETITIONER
Robert Earl Butts, Jr.