IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ROBERT EARL BUTTS, JR.,                    :
                                           :
              Petitioner,                  :
                                           :
       vs.                                 :
                                           :   CIVIL ACTION NO. 5:13-CV-194 (MTT)
WARDEN, Georgia Diagnostic and             :
Classification Prison,                     :
                                           :
              Respondent.                  :
_____:

## <u>ORDER</u>

**ROBERT EARL BUTTS, JR.** was sentenced to death for the murder of Donovan

Corey Parks.   He petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.   Although he alleges numerous errors on the part of the state courts that

considered his claims, he raises four principal contentions:   (1) trial counsel were

ineffective for failing to investigate and present mitigating evidence during the penalty

phase of his trial, and appellate counsel handled this issue ineffectively on appeal; (2) trial

counsel were ineffective when they failed to rebut or object to evidence of gang activity;

(3) the trial court failed to give a "mere presence" instruction to the jury; and (4) the

prosecutor's argument that Butts was the triggerman was inconsistent with his argument

in Butts's co-defendant's trial, who was also sentenced to death.   After considering these

claims, and other alleged constitutional errors,[1]  the Court determines that it must deny

habeas relief.

---

[1] The Court instructed Butts to brief all outstanding issues that he wished to pursue and this Order addresses only those claims that he argued in his briefs.   Any claim not briefed is deemed abandoned. *Blankenship v. Terry*, 2007 WL 4404972 at *41 (S. D. Ga. Dec. 13, 2007) (explaining that claims not briefed are abandoned because "mere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence, *litigate*—on a petitioner's behalf").

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A. Facts

The Georgia Supreme Court summarized the facts of this case in Butts's direct

appeal:

> [O]n the night of March 28, 1996, Butts and Marion Wilson, Jr., drove in Butts's automobile to a local Wal–Mart store and began searching for a victim.   Butts entered the store wearing a coat, under which he likely concealed the murder weapon.   A witness observed Butts and Wilson standing behind Donovan Corey Parks in a checkout line.   The cashier for that checkout line also remembered Butts being in her line.   The store's receipts showed that Butts purchased a pack of chewing gum immediately after Parks made his purchase of pet supplies.
>
> A witness overheard Butts asking Parks for a ride.   After Parks moved items in his automobile to make room for Butts and Wilson, Butts sat in the front passenger seat and Wilson sat in the back seat behind Parks. According to a witness to whom Butts confessed, Butts revealed the shotgun a short distance away, and Parks was ordered to stop the automobile.   Wilson dragged Parks out of the automobile by his tie and ordered him to lie facedown on the pavement.   Butts then fired one fatal shot to the back of Parks's head with the shotgun.   Witnesses nearby heard the shot, believing it to be a backfiring vehicle.
>
> After murdering Parks, Butts and Wilson drove to a service station in Gray, Georgia, where they refueled Parks's automobile and where Wilson was filmed by the service station's security camera.   Butts and Wilson then drove to Atlanta in an unsuccessful attempt to exchange Parks's automobile for money at a "chop shop."   The pair purchased two cans of gasoline, drove to a remote location in Macon, Georgia, and set fire to Parks's automobile.   They then walked to a nearby public phone, where Butts called his uncle and arranged a ride for himself and Wilson back to the Wal–Mart to retrieve Butts's automobile.
>
> Investigators had recorded the license plate numbers of the vehicles parked in the Wal–Mart parking lot on the night of the murder, and Butts's automobile was among them.   A shotgun loaded with an uncommon type of ammunition was found under Wilson's bed during a search, and a witness testified that Butts had given the weapon to Wilson to hold temporarily.   Two of Butts's former jail mates testified that he had admitted to being the triggerman in the murder.

*Butts v. State*, 273 Ga. 760, 761-62, 546 S.E.2d 472, 477-78 (2001).

## B. Procedural history

On November 20, 1998, a jury found Butts guilty of malice murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun.   *Id.* at 761 n.1, 546 S.E.2d at 477 n.1.   On November 21, 1998, the jury found beyond a reasonable doubt that the murder was committed during the commission of the capital felony of armed robbery and he was sentenced to death.   *Id.*

Butts filed a motion for new trial, and a hearing was held on August 13, 1999. (Doc. 10-11).[2]   On August 18, 1999, the Court denied the motion.   (Doc. 8-5 at 81). Butts filed a notice of appeal on August 20, 1999.   (Doc. 8-1 at 6).   Also on August 20, 1999, the Court relieved trial counsel, Robert Westin and Cassandra Montford-Ford, of their representation and appointed Guy Notte[3] and Christopher Huskins to represent Butts on direct appeal.   (Doc. 8-5 at 83).

Because Butts raised claims of ineffective assistance of trial counsel, the Georgia Supreme Court, on February 25, 2000, remanded the case to the trial court for an evidentiary hearing on these claims.   (Docs. 10-13 at 37-49; 10-15).   The trial court held that hearing on August 22, 2000 and on October 4, 2000 denied Butts's motion for new trial.   (Docs. 10-16; 10-17 at 14).

Butts filed a notice of appeal, and on April 30, 2001, the Georgia Supreme Court affirmed his conviction and sentence.   (Doc. 10-17 at 2); *Butts*, 273 Ga. at 761, 546

---

[2]  Because all documents have been electronically filed, this Order cites to the record by using the document number and electronic screen page number shown at the top of each page by the Court's CM/ECF software.

[3]  Notte was subsequently replaced by J. David McRee on October 13, 1999, and McRee was replaced by Green Berry Moore, III on October 21, 1999.   (Doc. 10-17 at 4-7).

S.E.2d at 477.   The United States Supreme Court denied his petition for certiorari on January 7, 2002 and denied his motion for rehearing on March 4, 2002.   *Butts v. Georgia*, 534 U.S. 1086 (2002); *Butts v. Georgia*, 535 U.S. 922 (2002).

Butts filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on August 30, 2002.   (Doc. 11-4).   After conducting an evidentiary hearing, the state habeas court denied relief in an order filed April 11, 2011.   (Docs. 13-1 to 16-5; 16-23).   Butts filed a notice of appeal and an application for certificate of probable cause to appeal ("CPC application") with the Georgia Supreme Court.   (Docs. 16-24; 16-25).   In an order dated January 22, 2013, the court summarily denied his CPC application.   (Doc. 16-28).

On May 31, 2013, Butts filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court.   (Doc. 1).   The Respondent filed his answer, and the Court denied Butts's motion for discovery and an evidentiary hearing.   (Docs. 6, 22).   Both parties have now briefed exhaustion, procedural default, and the merits of Butts's various claims.   (Docs. 24, 27, 29, 32, 33).

## II.   STANDARD OF REVIEW

### A.  Exhaustion and procedural default

Procedural default bars federal habeas review when a habeas petitioner has failed to exhaust state remedies that are no longer available or when the state court rejects the habeas petitioner's claim on independent state procedural grounds.   *Michigan v. Long,* 463 U.S. 1032, 1040-42 (1983) (explaining that an adequate and independent finding of procedural default will generally bar review of the federal claim); *Frazier v. Bouchard,* 661 F.3d 519, 524 n.7 (11th Cir. 2011); *Ward v. Hall,* 592 F.3d 1144, 1156-57 (11th Cir. 2010).

There are two exceptions to procedural default.   If the habeas respondent establishes that a default has occurred, the petitioner bears the burden of establishing "cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice."   *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) (citing *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977); *Marek v. Singletary*, 62 F.3d 1295, 1301-02 (11th Cir. 1995)).   A petitioner establishes cause by demonstrating that some objective factor external to the defense impeded his efforts to raise the claim properly in the state courts.   *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010) (quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).   A petitioner establishes prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different.   *Id.*   Regarding what is necessary to establish the narrowly-drawn fundamental miscarriage of justice exception, the Eleventh Circuit has stated:

> To excuse a default of a guilt-phase claim under [the fundamental miscarriage of justice] standard, a petitioner must prove "a constitutional violation [that] has probably resulted in the conviction of one who is actually innocent."   To gain review of a sentencing-phase claim based on [a fundamental miscarriage of justice], a petitioner must show that "but for constitutional error at his sentencing hearing, no reasonable juror could have found him eligible for the death penalty under [state] law."

*Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996) (citations omitted).

### B.  Claims that were adjudicated on the merits in the state courts

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard of review.   This Court may not grant habeas relief with respect to any claim that has been adjudicated on the merits in state court unless the state court's decision was (1) contrary to clearly established Federal law; (2) involved an unreasonable application of

clearly established Federal law; or (3) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d)(1)-(2); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011).   The phrase "clearly established Federal law" refers to the holdings of the United States Supreme Court that were in existence at the time of the relevant state court decision.   *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions."   *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing *Williams*, 529 U.S. at 404-05).

> Under § 2254(d)(1), "[a] state court's decision is 'contrary to'... clearly established law if it 'applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a [different] result….'"

*Michael v. Crosby,* 430 F.3d 1310, 1319 (11th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'"   *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)).   An "unreasonable application" and an "incorrect application" are not the same:

> We have explained that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.   Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.   Rather, that application must be objectively unreasonable.   This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotation marks omitted).

Pursuant to 28 U.S.C. § 2254(d)(2), district courts can "grant habeas relief to a petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)).   A state court's factual finding is not unreasonable simply because the federal habeas court might have made a different finding had it been the first court to interpret the record.   *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)).   Also, a state court's factual determination is "presumed to be correct," and this presumption can only be rebutted by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

### III.   PETITIONER'S CLAIMS

**A.  Claim One:   Butts was deprived of his right to the effective assistance of counsel at all stages of his pretrial, trial, motion for new trial, and direct appeal proceedings.**

Butts makes several ineffective assistance claims:   (1) trial and appellate counsel failed to investigate, develop, and present mitigating evidence; (2) trial and appellate counsel were ineffective in their handling of evidence of gang activity; and (3) trial counsel failed to argue in the sentencing phase that a sentence of death was disproportionate and, therefore, precluded by *Enmund v. Florida*, 458 U.S. 782 (1982).[4]

---

[4]  In addition, Butts argues that trial counsel failed to object to irrelevant and prejudicial victim impact

1. <u>The clearly established federal law</u>

*Strickland*[5] is "the touchstone for all ineffective assistance of counsel claims."
*Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).   "A convicted defendant's
claim that counsel's assistance was so defective as to require reversal of a conviction or
death sentence has two components.   First, the defendant must show that counsel's
performance was deficient.…   Second, the defendant must show that the deficient
performance prejudiced the defense."   *Strickland*, 466 U.S. at 687; *Wong v. Belmontes,*
558 U.S. 15, 16 (2009).   To establish deficient performance, Butts must show that
"counsel's representation fell below an objective standard of reasonableness."
*Strickland*, 466 U.S. at 688.   The Court must apply a "'strong presumption' that counsel's
representation was within the 'wide range' of reasonable professional assistance."
*Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).   "To overcome that
presumption, [Butts] must show that counsel failed to act 'reasonabl[y] considering all the
circumstances.'"   *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*,
466 U.S. at 688).   To establish prejudice, Butts must show "a reasonable probability that,
but for counsel's unprofessional errors, the result of the proceeding would have been
different."   *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability
sufficient to undermine confidence in the outcome."   *Id.*   When determining if prejudice
exists, "it is necessary to consider *all* the relevant evidence that the jury would have had

---

evidence and trial counsel failed to request a jury instruction on mere presence.   The Court addresses
these two claims as part of Butts's claim that the trial court made improper rulings and other errors that
deprived him of a fair trial.   Butts also argues that trial counsel failed to object to the prosecution's
presentation of inconsistent arguments.   This claim is reviewed with Butts's claim that misconduct by the
prosecutor deprived him of a fair trial.

[5] *Strickland v. Washington*, 466 U.S. 668 (1984).   Although the *Strickland* test was announced in the
context of an ineffective assistance of trial counsel claim, the same test applies to claims of ineffective
assistance of appellate counsel.   *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).

before it if [Butts's counsel] had pursued the different path–not just the mitigation evidence [Butts's counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it."   *Wong,* 558 U.S. at 20 (citing *Strickland*, 466 U.S. at 695-96, 700); *see also Porter v. McCollum*, 558 U.S. 30, 40-41 (2009).

Federal courts must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'"   *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)). Butts must do more than satisfy the *Strickland* standard.   "He must also show that in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'"   *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).   That is, "[t]he question is not whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."   *Richter*, 562 U.S. at 105.

### 2. Claims that trial and appellate counsel failed to investigate, develop, and present mitigating evidence

Butts argues that trial counsel's most glaring deficiency was their failure to investigate his family life and background so they could develop and present mitigating evidence during the sentencing phase of his trial.   (Doc. No. 24 at 47).   He also alleges that appellate counsel's failure to raise adequately trial counsel's defective performance and resulting prejudice constituted ineffective assistance during his motion for new trial and direct appeal.

Multiple state courts have addressed these ineffective assistance claims.   Thus, "it is useful at the outset to explain which state-court decisions we look to for purposes of

AEDPA review."   *Hittson v. GDCP Warden*, 759 F.3d 1210, 1231 (11th Cir. 2014).

Looking first at trial counsel, Butts argued on direct appeal that trial counsel were

ineffective for not presenting mitigating testimony and pleas for mercy from family

members.   (Docs. 10-22 at 9-10, 41; 24 at 47).   The Georgia Supreme Court rejected

this claim on the merits and the state habeas court found the claim was *res judicata*.

*Butts*, 273 Ga. at 769-70, 546 S.E.2d at 483; (Doc. 16-23 at 5).   The state habeas court's

conclusion that this claim was *res judicata* does not bar federal habeas review.[6]   *Cone v.*

*Bell*, 556 U.S. 449, 465-67 (2009); *Owens v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 915

n.23 (11th Cir. 2009).

The state habeas court found the following trial counsel ineffective assistance

claims were procedurally defaulted because they were not raised on direct appeal, and

Butts failed to establish cause and prejudice or a miscarriage of justice to excuse the

default:   trial counsel's failure to secure a neuropsychologist and have

neuropsychological and neurological testing performed; trial counsel's failure "to conduct

an adequate pretrial investigation into [Butts's] family life and background to uncover and

present to the jury evidence in mitigation of punishment"; and trial counsel's failure "to

present a picture of [Butts's] background and fail[ure] to call any witness who could

present the jury with testimony of [Butts] as a unique human being."   (Doc. 16-23 at 8,

14).

---

[6] The Court reviews this claim as part of Butts's broader claims that trial and appellate counsel were ineffective when they failed to investigate, develop, and present mitigating evidence.   When the Georgia Supreme Court denied this particular ineffective assistance of trial counsel claim, it had only the limited evidence presented at the motion for new trial evidentiary hearing to review.   This Court, however, considers the expanded record before the state habeas court.   *Ferrell v. Hall*, 640 F.3d 1199, 1224-25 (11th Cir. 2011) (allowing for review of the "radically expanded record of mitigating evidence" when addressing a trial counsel ineffective assistance claim through an ineffective assistance of appellate counsel claim).

This Court cannot review claims the state habeas court found to be procedurally defaulted unless Butts establishes cause for, and actual prejudice from, the default or establishes that failure to review the claim would result in a fundamental miscarriage of justice. *Lucas v. Warden*, 771 F.3d 785, 801 (11th Cir. 2014). Butts argues that inadequate assistance of counsel on direct appeal establishes cause to overcome the default. (Doc. 24 at 49).

An ineffective assistance of appellate counsel claim may, "if both exhausted and not procedurally defaulted, … constitute cause" to excuse procedural default. *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Hill v. Jones*, 81 F.3d 1015, 1031 (11th Cir. 1996)). Butts's ineffective assistance of appellate counsel claims[7] meet this criteria. The state habeas court addressed these claims on the merits and, thereafter, Butts raised his ineffective assistance of appellate counsel claims in his CPC application, which the Georgia Supreme Court summarily denied. (Docs. 16-23 at 17; 16-25 at 2, 30-43; 16-28). This denial is the final state court determination of Butts's ineffective assistance of appellate counsel claims and, under recent Eleventh Circuit precedent, the only question for this Court is whether there was any reasonable basis for the Georgia Supreme Court to deny relief. *Hittson*, 759 F.3d at 1232-33 (explaining that post-*Richter*, *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), no longer applies and federal courts reviewing under § 2254(d) are not required to "look through" the Georgia Supreme Court's summary denials of CPC applications to the reasons given in the "'last reasoned decision' by the state court.") (quoting *Ylst*, 501 U.S. at 804); *Lucas*, 771 F.3d at 792 (reasoning of the

---

[7] State habeas counsel argued that appellate counsel were ineffective for failing to raise various errors made by trial counsel; failing to investigate and present mitigating evidence at the motion for new trial hearing; and failing to obtain a mitigation and/or gang expert to testify at the motion for new trial hearing. (Doc. 16-23 at 16).

state habeas court is irrelevant and petitioner must show there was no reasonable basis

for the Georgia Supreme Court to deny relief).[8]

The state habeas court found that appellate counsel performed deficiently:

The Court finds that appellate counsel's failure to conduct an independent mitigation investigation constitutes deficient performance especially in light of the fact that appellate counsel alleged that trial counsel was ineffective in failing to present mitigating evidence.   In raising such a claim, a reasonably competent attorney would have looked beyond trial counsel's investigation to determine whether trial counsel's performance was reasonable.

(Doc. 16-23 at 17).   Respondent does not contest this finding, and this Court agrees that

appellate counsel's complete failure to conduct any mitigation investigation amounted to

---

[8] This procedure, which calls for the federal courts to ignore the reasons given by the state habeas court for denying relief and hypothesize reasons why the Georgia Supreme Court could have denied the CPC application, has been called into question.   In *Hittson v. Chatman*, 135 S. Ct. 2126 (2015) (Ginsburg and Kagan, JJ., concurring in denial of certiorari), Justice Ginsburg stated, "[t]he Eleventh Circuit plainly erred in discarding *Ylst*."   *Id.* at 2127.   She explained that the instruction given in *Ylst,* that federal courts reviewing an unexplained state court order upholding a prior reasoned judgment "should presume that [the] 'later unexplained order[] upholding that judgment or rejecting the same claim rest[s] upon the same ground,'" was not disturbed by *Richter*.   *Id.* (quoting *Ylst*, 501 U.S. at 803).   Thus, federal courts are to look at the last reasoned decision from the state court (the decision from the state habeas court in this case) and determine whether it "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented."   28 U.S.C. § 2254(d).   The courts are not to "hypothesize reasons that might have supported the [Georgia Supreme Court's] unexplained order."   *Hittson*, 135 S. Ct. at 2127.   Three days after the Supreme Court denied certiorari in *Hittson,* it decided *Brumfield v. Cain*, 135 S. Ct. 2269 (2015).   In *Brumfield,* the Court observed that when "conducting the § 2254(d)(2) inquiry, we, like the courts below, 'look through' the Louisiana Supreme Court's summary denial of Brumfield's petition for review and evaluate the state trial court's reasoned decision …."   *Id.* at 2276 (citing *Johnson v. Williams*, 133 S. Ct. 1088, 1094, n.1 (2013) and *Ylst*, 501 U.S. at 806).   The Court confirmed what Justice Ginsburg said in *Hittson*:   *Richter* applies only "where there is no 'opinion explaining the reasons relief has been denied.'" *Brumfield*, 135 S. Ct. at 2283 (quoting *Richter*, 562 U.S. at 98).   On July 30, 2015, the Eleventh Circuit granted en banc review in *Wilson v. Warden, Ga. Diagnostic Prison*, No. 14-10681.   The question for review is whether a federal habeas court is required to look through a state appellate court's summary decision that is an adjudication on the merits to the reasoning in a lower court decision when deciding whether the state appellate court's decision is entitled to deference under 28 U.S.C. § 2254(d).   In short, there is a good chance that the Eleventh Circuit will abandon *Hittson* and return to *Ylst.*   Accordingly, the Court has reviewed the factual findings and legal conclusions given by the state habeas court when that court's order provides the last reasoned analysis of a claim.   The Court has determined that the state habeas court's factual findings were reasonable and the legal conclusions were not contrary to, or unreasonable applications of, Supreme Court precedent.   28 U.S.C. § 2254(d).   Having found the state habeas court's bases for denying relief were reasonable, the Court necessarily finds that there were "arguments or theories [that] … could have supported" the Georgia Supreme Court's denial of relief. *Richter*, 562 U.S. at 102.

deficient performance.[9]

However, the state habeas court concluded no prejudice resulted from appellate counsel's deficient performance.   (Doc. 16-23 at 17-18).   The court found "that the best evidence of what appellate counsel would have discovered in an independent mitigation investigation [was] the evidence presented in the instant proceeding by present counsel." (Doc. 16-23 at 17-18).   The court determined that, had that evidence been presented, there was "no reasonable probability that the result of the Motion for New Trial or the direct appeal would have been different."   (Doc. 16-23 at 18).   The question is whether this ruling is contrary to *Strickland*, or unreasonable either legally or factually.

To answer this question, this Court, like the state courts, must analyze trial counsel's actions.   This effectively means that the procedural default of most of Butts's ineffective assistance of trial counsel claims has little practical effect on this Court's analysis.   It is necessary to review these ineffective assistance of trial counsel claims because they are central to (1) Butts's claim that appellate counsel were ineffective when they failed to raise trial counsel's ineffectiveness and (2) his argument that he has

---

[9]  Christopher Huskins was appointed on August 20, 1999 and Green Berry Moore, III was appointed on October 21, 1999.   (Doc. 8-5 at 83; 10-17 at 4-7).   Moore was lead appellate counsel, responsible for all issues except those involving voir dire and the jury, for which Huskins was responsible.   (Doc. 13-2 at 38). Moore and Huskins raised several ineffective assistance claims, including that trial counsel were ineffective for failing to offer mitigating evidence and pleas for mercy from family members.   *Butts*, 273 Ga. at 762-63, 765-70, 546 S.E.2d at 478-84; (Doc. 10-13 at 9-11).   Because appellate counsel alleged ineffective assistance of trial counsel, the Georgia Supreme Court, on February 25, 2000, remanded that the case to the trial court so it could conduct an evidentiary hearing.   (Doc. 10-15).   To prepare for the hearing, Moore reviewed trial counsel's files, read the trial transcript, spoke with Westin, and spoke with Butts once or twice. (Doc. 13-2 at 40, 50).   Huskins could not recall speaking with Butts or Westin or conducting any type of investigation beyond reading the trial transcript.   (Doc. 13-2 at 73).   Neither appellate counsel conducted any additional investigation to determine whether there was mitigating evidence that trial counsel should have presented.   (Doc 13-2 at 41).   Instead, Moore just selected issues from the trial transcript that he thought trial counsel should have handled differently.   (Doc. 13-2 at 53-54, 58-61).   The motion for new trial hearing took place on August 22, 2000 and no witnesses other than Westin were called to testify. (Doc. 10-16).   Thus, during the year leading up to the evidentiary hearing, appellate counsel did little more than briefly speak with Butts and Westin, review Westin's file, and review the trial transcript.   (Doc. 13-2 at 40-56).   Without conducting any type of mitigation investigation, there was no way for appellate counsel to specify what evidence trial counsel should have presented.

established cause and prejudice necessary to entitle him to judicial review of these procedurally defaulted claims.

When a petitioner alleges that appellate counsel were ineffective for failing to raise ineffectiveness of trial counsel claims, the Eleventh Circuit has recognized that, "the state court could not effectively review appellate counsel's performance in challenging trial counsel's effectiveness in mitigation without re-examining trial counsel's performance as well." *Ferrell v. Hall*, 640 F.3d 1199, 1224-25 (11th Cir. 2011); *DeYoung v. Schofield*, 609 F.3d 1260, 1283 n.22 (11th Cir. 2010) (reasoning that "[r]ather than wade through [the] complexities" of whether ineffective assistance of appellate counsel excused procedural default of trial counsel ineffectiveness claims, the court would "discuss the merits of [petitioner's] trial counsel claims, as that alone resolves the case").

> In other words, whether appellate counsel failed to properly challenge trial counsel's mitigation inquiry focuses on essentially the same corpus of evidence and the same legal questions underlying trial counsel's effectiveness—which strategies did trial counsel pursue, were those strategies reasonable under the circumstances, and what kinds of penalty phase evidence was developed, or could reasonably have been developed.

*Ferrell*, 640 F.3d at 1225.   The state habeas court recognized this and explained that, although Butts's "ineffective assistance of trial counsel claims are procedurally barred or procedurally defaulted, the [c]ourt considers the conduct of trial counsel as part of its analysis of [Butts's] ineffective assistance of appellate counsel."   (Doc. 16-23 at 5 n.2, 14).

Thus, in the context of considering whether the state habeas court reasonably concluded no prejudice resulted from appellate counsel's deficient performance when litigating the ineffectiveness of trial counsel, this Court must review trial counsel's performance.

The record reveals the following:

    a.  Trial counsel's experience

Cassandra Montford-Ford was the first attorney[10] appointed to represent Butts. (Doc. 13-15 at 41).   She had been practicing law since 1991 and had been a sole practitioner in the Ocmulgee Judicial Circuit since 1993, handling family law matters and bankruptcies, as well as appointed misdemeanor and felony criminal cases.   (Doc. 13-15 at 30-34).   Between 1993 and the time of Butts's trial, she was appointed to handle one to two criminal cases per week and no more than two of the criminal cases went to trial each year.   (Doc. 13-15 at 35, 38).   While she had handled numerous felony cases, she had never handled a murder case.   (Doc. 13-15 at 123-24).   Montford-Ford met with Butts approximately three times and attended his commitment hearing prior to the trial court's July 25, 1996 appointment of Robert Westin as lead counsel.   (Docs. 8-1 at 24; 13-15 at 41-42).

Westin graduated law school in 1979 and had been practicing criminal law in the Ocmulgee Judicial Circuit for approximately 17 years at the time of Butts's trial.   (Doc. 10-16 at 29).   He was known as the "*de facto* public defender" in Wilkinson County, handling more than 90 percent of the criminal cases in that county.   (Doc. 10-16 at 30, 32).   Westin was lead or co-counsel in approximately 15 to 20 jury trials per year and, over his legal career, had been involved in approximately 350 to 400 jury trials total, 175 to 200 of which were criminal jury trials.   (Doc. 10-16 at 32).   Prior to his appointment to represent Butts, Westin had handled 16 to 18 murder cases.   (Doc. 10-16 at 31).   He had been second-chair in five capital cases, and none of those five defendants were

---

[10]  The date of Montford-Ford's appointment is unclear.  (Doc. 13-15 at 41).   Her appointment would have occurred between April 4, 1996, the date arrest warrants were issued, and July 25, 1996, the day Robert Westin was appointed.   (Doc. 8-1 at 8-17, 24)

sentenced to death.   (Docs. 10-16 at 35-39; 13-1 at 102).[11]

Butts alleges that the state habeas court's determination that Butts "was represented by a death-qualified, experienced death penalty litigator" was unreasonable because Westin and Montford-Ford had never been lead counsel in a death penalty case. (Doc. 16-23 at 19).   As noted, Westin had substantial experience trying criminal cases. (Doc. 10-16 at 29-33).   He "literally tried at least half and probably more of" his third capital case.   (Doc. 10-16 at 42).   Westin was assisted by Montford-Ford, who had been handling criminal cases since 1993, and a paralegal, Cindy Crawford, who had helped prepare several death penalty cases in the past.   (Docs. 10-16 at 41-42; 13-15 at 33-34). There is no clearly established Supreme Court precedent holding that if trial counsel in a death penalty case does not have a certain amount of experience he is *per se* ineffective. *Strickland*, 466 U.S. at 681 (explaining that experience is just one factor to consider when determining whether counsel's strategic choices were reasonable).   The Court knows of no requirement that counsel have previous experience as lead counsel in a capital case. Clearly, the state habeas court's determination that Butts was represented by experienced trial counsel was reasonable.

> b.   Trial counsel's mitigation investigation

In Westin's previous death penalty cases, he "was always the mitigation man" and "was involved in mostly the sentencing phase of the case."   (Doc. 13-1 at 102-03).   His role shifted in Butts's case, and he did not focus solely on mitigation but took "overall control of the case," making "organizational decisions, how to approach the case, [and deciding] … the trial strategy."   (Doc. 13-1 at 103-04).

---

[11] After Butts's trial, but prior to the state habeas evidentiary hearing, Westin handled three more death penalty cases, and in none of the three did his client receive a death sentence.   (Doc. 13-1 at 97-98).

Trial counsel hired Crawford to assist in preparation for trial.[12]   (Doc. 13-26 at 22-23).   Crawford had assisted Westin on at least three of his previous death penalty cases.   (Docs. 10-16 at 42; 13-27 at 18).   Prior to Butts's trial, Crawford had worked on approximately 600 criminal cases, including at least four capital cases.   (Doc. 13-27 at 17-19).

Westin testified that although he hoped Butts would not be convicted of murder, they still focused "[a] great deal of" effort on the sentencing phase.   (Doc. 13-1 at 55). Westin, Montford-Ford, and Crawford met every weekend to work on Butts's case. (Docs. 13-2 at 3).   Westin testified that he reviewed the American Bar Association handbook on death penalty cases and the Southern Center for Human Rights Manual. (Doc. 13-1 at 53-54).   He also contacted Michael Mears and Palmer Singleton, who were with the Southern Center for Human Rights, to discuss the case and to get assistance preparing for trial.   (Docs. 13-1 at 128; 13-22 at 67).   Westin reviewed the district attorney's file and interviewed witnesses listed in the file.   (Doc. 13-1 at 105-06).

Westin, Montford-Ford, and Crawford met with Butts on numerous occasions. (Docs. 10-16 at 39-41; 13-15 at 49).   Crawford had Butts complete a form regarding his personal history and background.   (Docs. 13-1 at 68; 15-19 at 2-16).   Westin explained that he never suspected Butts suffered from any mental illness or any mental deficiency. (Doc. 13-1 at 111).   Thus, he thought using the form was appropriate, and he believed

---

[12] It is unclear exactly when Crawford was hired.   At the time she was deposed on March 30, 2007, she did not have any of her files regarding Butts's case because they were all destroyed when her office burned in March 2004.   (Doc. 13-26 at 2, 16).   The record shows that trial counsel's motion for funds for paralegal and investigative services was filed June 23, 1997.   (Doc. 8-1 at 101-02).   On June 26, 1997, the trial court held an *ex parte* hearing and granted $8,000.00 for trial counsel to use as they "deem[ed] fit."   (Doc. 8-7 at 3).   The trial court's order granting "funds for support staff, paralegal services, investigative services, and psychological testing" was not filed until September 30, 1998.   (Doc. 13-28 at 53).   However, billing records show that trial counsel had a conference with Crawford on September 4, 1996 regarding her "becoming [the] paralegal on [Butts's] case" and she actually first interviewed Butts on September 6, 1996. (Docs. 13-26 at 22-23; 13-28 at 30).

Butts could provide correct information in response to the questions.   (Doc. 13-1 at 110).
On the questionnaire, Butts reported he received normal medical attention while growing
up; the family always had food; he spent a lot of time at his grandmother's house; his "real
father [was] never around"; and he had never been physically or sexually abused.
(Docs. 13-1 at 111; 15-19 at 2-16).

Crawford spoke with Butts's family members, including his half-brothers and his
younger half-sister, Tameica Butts.[13]   (Doc. 13-26 at 122-23).   Crawford spoke with
Butts's uncle, Earnest Waller, briefly on one occasion.   However, Waller was intoxicated
at the time, and when she returned to ask additional questions, she was told that he did
not wish to speak with her.   (Doc. 13-26 at 133-34).   Montford-Ford testified that she
stayed in touch with family members but, by the time of her February 12, 2007 deposition,
she could not recall anything specific about his family or the conversations she had with
them.   (Doc. 13-15 at 57).   Westin spoke with Butts's younger half-brother, Dominique
Hurt, and Butts's uncle, Ernest Waller.   (Doc. 13-1 at 121-22).    According to Westin,
Butts's mother, Laura Butts, refused to participate in the case.   (Doc. 10-16 at 46).   He
called her a "nonplayer," explaining she would not visit his office, refused to talk to
members of the defense team, would not attend hearings, and did not attend Butts's trial.
(Doc. 13-1 at 63).   Laura's testimony at the state habeas evidentiary hearing supported
Westin's recollection.   Following Butts's arrest, she met with Montford-Ford once after a
pretrial hearing and met with Westin once or twice for five or ten minutes.   (Doc. 13-6 at
123, 132).   Laura testified she managed to "sober[] up" in time to attend only one day of

---

[13]  As noted, Crawford's files were destroyed in 2004.   (Doc. 13-26 at 16).   When she gave her deposition on March 30, 2007, almost nine years after Butts's trial, she had difficulty remembering exactly what tasks she performed in Butts's case.   Thus, the extent of Crawford's mitigation investigation is unclear.   (Doc. 13-26 at 34, 44, 49-50, 54, 57, 106, 114).

her son's trial—the day he was sentenced.   (Doc. 13-6 at 124, 133-34).   Trial counsel

was unable to locate Butts's father, Robert Butts, Sr.   (Doc. 10-16 at 45-46).   Westin

testified that Butts's maternal great-aunt, Doris Cooper, and maternal grandmother, Mary

Frances Waller, stayed in constant contact with trial counsel, provided background

information, and attended every day of Butts's trial.   (Docs. 10-16 at 46; 13-15 at 58-59).

On the questionnaire that Butts completed, he listed his former girlfriend, Angela

Simmons, and Westin spoke with her. (Docs. 13-1 at 115; 15-19 at 6).   Butts listed

Antonio Redding as a friend, and Crawford spoke with him, as well as other members of

the FOLKS gang, on several occasions.   (Docs. 13-26 at 52-55, 61; 15-19 at 5).

Westin testified he spoke with all of Butts's previous employers and co-workers.

(Docs. 10-16 at 57; 13-22 at 3-4).   He explained that Butts had six or seven jobs in the

past, all of which he had lost due to his inability to get along with people.   (Doc. 10-16 at

56-58).   For example, Butts lost one job because he got into a fight with a customer.

(Doc. 10-16 at 57).

Trial counsel reviewed Butts's school records,[14]  medical records, employment

records, juvenile and adult criminal records, records from the Baldwin County Department

of Family and Children Services ("DFACS"), records from the Georgia Department of

Human Resources ("DHR"), records from the Oconee Psychoeducational Center, and jail

records.   (Docs. 13-1 at 70; 13-2 at 8-12; 13-15 at 129-30; 13-16 at 3; 14-15 at 38 to

14-23 at 90).   Trial counsel also reviewed records of Butts, Sr.'s mental illness and

Laura's alcoholism and cocaine addiction.[15]   (Docs. 13-2 at 12-13, 27; 14-24 at 1-30).

---

[14]  According to Westin, Butts's school records revealed that he was an average student until he lost interest in his education at age 15 or 16.   (Doc. 13-2 at 9).   At that time he was placed "in the alternative school a couple of times and finally just quit after failing the tenth grade twice."   (Doc. 13-2 at 9).
[15]   During the August 22, 2000 motion for new trial hearing, Westin testified that family members reported

On September 4, 1998, the State moved for Butts to undergo a mental evaluation

and he was examined by Dr. Jerold Lower on September 22, 1998.   (Docs. 8-3 at

115-17; 10-9 at 66).   On November 10, 1998, Lower reported to trial counsel, the district

attorney, and the trial court that

> [f]ormal intellectual testing yielded a score which falls at the bottom of the
> mild range of mental retardation, in the lowest one thousandth of the
> general population.   The psychomotor testing also yielded one score at the
> bottom of the borderline range and one score at the bottom of the critical
> range, indicating possible organic impairment of the central nervous
> system.   However, in my opinion this testing is invalid.   School records
> revealed that Mr. Butts, in his first year of high school, earned passing
> grades in all except one of his courses (which appeared to constitute a
> standard high school curriculum).   This is markedly inconsistent with the
> test results or with a diagnosis of retardation….
>
> My strong impression is that Mr. Butts was definitely not attempting to give
> his best performance on the intellectual test and that his score in no way
> reflects his true ability.   Moreover, on the psychomotor tests I had the
> distinct impression that his errors were primarily the result of carelessness
> and lack of involvement in the task.

(Doc. 10-9 at 68-69).   Lower opined that Butts "suffers from a long-standing personality

disorder characterized by … poor judgment and impulse control, disregard for social

mores, [and an] inability to form close relationships or become involved in others …

complicated by a great deal of substance abuse."   (Doc. 10-9 at 69).   According to

Lower, this personality disorder would be "quite resistant to modification."   (Doc. 10-9 at

70).   Lower found Butts was competent to stand trial, was not suffering from any mental

---

Butts, Sr. had psychological "issues," and that led him to get records from Central State Hospital.   (Doc. 10-16 at 45-46).   He explained that Butts, Sr. had been in and out of Central State Hospital as a long-term patient and had "some significant issues."   (Doc. 10-16 at 45-46).   Seven years later, at the September 2007 state habeas evidentiary hearing, Westin at first testified that he was not aware of Butts Sr.'s psychological problems, and he did not obtain any records of such.   (Doc. 13-1 at 71).   However, when his testimony from the motion for new trial was read to him, Westin recalled getting Butts Sr.'s mental health records.   (Doc. 13-2 at 13).   The transcript from a June 26, 1997 pretrial hearing confirms that Westin knew Butts's "family has a history of treatment at Central State Hospital," and Westin's notes showed Butts Sr. was "in 1/2 way house @ Central State."   (Docs. 8-8 at 42; 15-6 at 57).   Thus, it appears Westin investigated Butts, Sr.'s mental health.   However, the Court cannot locate Butts, Sr.'s Central State Hospital records in the record.

disorder that would have prevented him from knowing right from wrong at the time of the crime, had no major disorder of mood or thought, and was not mentally ill or mentally retarded.   (Doc. 10-9 at 69-70).

Trial counsel had Butts examined by psychologist James E. Stark.   (Doc. 15-12 at 3-4).   Stark reported to trial counsel that:   Butts had low-average intelligence; was antisocial and impulsive; was frequently in trouble with society or the law; lacked self-control; was hostile toward, and very suspicious of, others; did not have "any organic brain dysfunction"; might occasionally have had psychotic episodes; and was "quite impulsive."   (Doc. 15-12 at 3-4).   Stark's diagnosis was "mood disorder with occasional psychotic episodes" with "[u]nderlying … antisocial and possibly schizotypal personality disorder."   (Doc. 15-12 at 4).

Butts contends this pre-trial investigation was inadequate.   (Doc. 24 at 51). When preparing a capital case, trial counsel "'has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.'"   *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001) (quoting *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994)).   "Counsel has 'no absolute duty to investigate particular facts or a certain line of defense,' although in some circumstances, 'a complete failure to investigate may constitute deficient performance of counsel.'"   *DeYoung*, 609 F.3d at 1283 (quoting *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 787 (11th Cir. 2003)).   Nor is counsel "required to pursue every path until it bears fruit or until all hope withers."   *Chandler v. U.S.*, 218 F.3d 1305, 1318 (11th Cir. 2000) (citation and quotation marks omitted).   In this case, the state habeas court found "that trial counsel's investigation into [Butts's] background was reasonable and thorough."

(Doc. 16-23 at 32).

Butts argues this finding is unreasonable for several reasons.   He alleges that the state habeas court ignored the fact that trial counsel's sole focus was the guilt phase of the trial and they, therefore, conducted only a cursory mitigation investigation.   (Doc. 24 at 53).   According to Butts, had the state habeas court "scrutinize[d]" Westin's testimony, along with that of Montford-Ford and Crawford, it would have realized that trial counsel interviewed only Butts's mother, grandmother, and aunt.   (Doc. 24 at 64).   The record verifies that trial counsel did consider guilt or innocence to be the "heart" of Butts's case. (Doc. 10-16 at 45).   Additionally, as the state habeas court acknowledged, it was "unclear … which member of the defense team was primarily responsible for the pretrial mitigation investigation."   (Doc. 16-23 at 23).   However, the record shows trial counsel and Crawford spoke with various persons in addition to Butts's mother, grandmother, and aunt, including Butts's half-brothers,[16] half-sister Tameica,[17] uncle,[18] former co-workers and employers, ex-girlfriend, Redding, and other FOLKS gang members.   (Docs. 10-16 at 57-58; 13-1 at 115-16, 122; 13-2 at 17-18; 13-22 at 2-4; 13-26 at 121-23, 133-34; 13-27 at 1, 27).

---

[16] Citing testimony from Westin's February 2007 deposition and September 2007 state habeas evidentiary hearing, Butts alleges Westin "was under the false impression that Mr. Butts had only one sibling, a younger brother…."   (Doc. 24 at 53).   What Westin actually said at the state habeas evidentiary hearing was that he was sure they knew Butts had several half-brothers and half-sisters, he just could not remember them at the time, which was almost nine years after Butts's trial.   (Doc. 13-1 at 65).   Trial counsel were aware of Butts's siblings because Butts listed them on the questionnaire trial counsel had him complete and numerous records obtained by trial counsel showed their names.   (Docs.14-23 at 43, 57, 79, 86; 15-19 at 3).

[17] Crawford recalled Tameica "didn't really have anything to say to [her].   She just wanted [Crawford] to answer all of her questions."   (Doc. 13-26 at 123).

[18] Crawford recalled speaking briefly with an intoxicated uncle, Ernest Waller.   (Doc. 13-26 at 133-34). When she returned on a later occasion to interview him, she was told to leave.   (Doc. 13-26 at 134). Westin testified that he spoke with Ernest Waller, and he "didn't want to testify" at Butts's trial.   (Doc. 13-1 at 122).

Butts argues that trial counsel should have interviewed more family members,[19] his former school teachers, or Laura's various boyfriends.   But "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties."   *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).   Given what trial counsel learned from Butts, family members, co-workers, employers, ex-girlfriend, Redding, two psychologists, and various records, their "'decision not to seek more' mitigating evidence from [Butts's] background 'than was already in hand' fell within the range of professionally reasonable judgments.'" *Id.* at 11-12 (quoting *Strickland*, 466 U.S. at 699).

Butts argues the state habeas court unreasonably ignored the unrebutted testimony from numerous family members and acquaintances who stated that they were never contacted by trial counsel, but had they been, they would have been willing to testify for Butts.   (Doc. 24 at 54).   This Court cannot assume the state habeas court ignored testimony from Butts's family members simply because it did not discuss or cite such testimony in its order.   A state court is not required to "accompany its decision with any explanation, let alone an adequate one."   *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1329 (11th Cir. 2013) (citations omitted).   Fully explained or not, this Court must give the state court's opinion the "benefit of the doubt."   *Lee v. Comm'r Ala. Dep't of Corr.*, 726 F.3d 1172, 1212 (11th Cir. 2013) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The state habeas court obviously believed Westin, Montford-Ford, and Crawford's testimony that they contacted several family members, but they were unable to find any of

---

[19]  Butts faults trial counsel for failing to interview his biological father.   Apparently they were not able to find him.   As discussed, trial counsel knew Butts, Sr.'s was Butts's biological father and that he had mental issues.   (Doc. 10-16 at 45-46).   Westin testified that they were "never able to locate him."   (Doc. 10-16 at 45-56).   It is not clear what Butts, Sr. could have added.   He did not testify or provide an affidavit during the state habeas proceeding.

them willing to testify for Butts.[20]   (Docs. 10-16 at 46-47; 13-1 at 120-21; 13-15 at 106-07;

13-27 at 32-33).   According to Westin:

> [T]here's nothing you would like better in a case like this to have a mom or grandmom or an aunt or somebody get up here and cry and say, he's a good boy.  Made the wrong decision…. And, you know, they wouldn't do it.  I mean they would not do it.  I begged them to do it and they would not.

(Doc. 10-16 at 46-47).

Moreover, Westin worried that family members' testimony might not be helpful:

> [T]heir opinion of him, even these two, the aunt and the grandmother said he was a cold-blooded killer.  His brother looked up to him because he was in a gang, and his mother wouldn't even come to the hearing, she didn't care.  She never came to the pretrial hearing.  She didn't come to the trial.
>
> I mean, I was told by the people who probably knew him better than anybody, probably his real people who raised him, he was going down the wrong road early on and they weren't surprised at all that he was involved in this.

(Docs. 13-22 at 3).   Westin stated that Butts's aunt and grandmother, "who were

probably the closest people to [Butts]" told him "they couldn't get up and say a good thing

about [Butts], they'd have to tell the truth."   (Doc. 13-1 at 120).

Butts acknowledges that trial counsel "collect[ed] a number of records … prior to

trial."  (Doc. 24 at 69).   He claims, however, that they failed to "identify red-flags, gather

additional investigative leads, and … assess the value of the records as evidentiary

---

[20] Butts argues that Laura's testimony at the state habeas evidentiary hearing directly contradicts Westin's testimony that she would not talk to trial counsel, attend hearings, or testify at trial.  (Doc. 24 at 55-56).   At the state habeas evidentiary hearing, Laura stated that she would have testified at trial if she had been asked and if she had been sober.  (Doc. 13-6 at 123-24).   Butts calls this testimony "particularly instructive" and argues that it shows "no one on the defense team ever conducted a substantive interview of her."  (Doc. 24 at 56-58).   He also argues that the fact she testified at the state habeas evidentiary hearing when asked proves she would have testified at Butts's trial if asked.  (Doc. 24 at 57).   It does not.   Butts's trial occurred nine years before the state habeas evidentiary hearing, and Laura admitted she was too intoxicated from alcohol and/or drugs to even show up for his trial until the very last day.  (Doc. 13-6 at 121-23; 130-31).   When her testimony is read as a whole, it supports Westin's recollection that they were unable to get Laura involved in Butts's case—she would not attend meetings, failed to show up for hearings, and would not even talk to them.  (Doc. 13-1 at 63).

exhibits during the penalty phase." (Doc. 24 at 69). Trial counsel obtained most, if not

all, of the records that were submitted by state habeas counsel. (Docs. 13-1 at 70; 13-2

at 5, 8-14; 13-15 at 129-30; 13-16 at 3; 14-15 at 38 to 14-23 at 90). From these records,

trial counsel learned of Laura's drug and alcohol abuse, Butts, Sr.'s mental health issues

and his absence from the home, and Dominique's behavioral problems. (Docs. 10-16 at

45-46; 13-2 at 8-13; 14-23 at 36-90). They knew the records suggested that Butts had

been neglected, but there was nothing in the records about physical or sexual abuse, and

Butts denied any such abuse.[21] (Docs. 13-1 at 111-13; 13-2 at 14-15). School records

verified that Butts was an average student until around age 15 or 16 when he had to be

placed in an alternative school for behavioral problems. (Docs. 13-1 at 112; 14-15 at 47,

49, 77, 87; 14-16 at 6, 28, 32-33; 14-17 at 3, 5, 35-37).

Butts argues that if trial counsel had carefully reviewed the records, they would

have learned that Laura left 13 to 15 year old Butts and his siblings alone for days at a

time while she abused crack cocaine and alcohol. (Doc. 24 at 71). The record shows

trial counsel were aware that Butts's mother "wasn't around very much" and Butts, Sr.

was not involved in Butts's life. (Doc. 13-1 at 113, 122-23). Westin testified that he

knew Laura was a neglectful mother, who "didn't care much about what was going on with

her son." (Doc. 13-1 at 64). He explained,

> the two that I spent the most time with was his grandmother and his aunt
> and you've got to remember, I think this is his mother's mother, okay? …
> I'm almost certain. And so she didn't want to say an awful lot of bad stuff
> about his mother, but it was pretty clear that he didn't have a lot of guidance

---

[21] At the state habeas evidentiary hearing, the only testimony of any type of physical abuse was Laura's statement that one of her boyfriends, Isaac Jones, once threw Butts to the floor, put his knee in Butts's back, and pulled Butts's arms behind his back. (Doc. 13-6 at 118). Butts's half-sister testified that she could not recall any type of physical abuse, and Butts's mitigation expert testified that Butts was not physically abused. (Doc. 13-4 at 76-77, 109-10). Prior to trial, Butts reported that he had not been physically or sexually abused. (Doc. 15-19 at 3-4).

when he was growing up.    It was pretty clear.    Men in and out, didn't know
his father, mother apparently had some problems, criminal, drug, alcohol.    I
know she was just nonexistent during the trial….

(Doc. 13-1 at 122-23).

However, Westin testified that his "impression" and what he was actually told by

Butts and his family members is that Butts's grandmother and aunt, who "were just

wonderful people," "essentially raised … Butts."    (Doc. 13-2 at 14-15).    Butts reported

that he "spent a lot of time at [his grandmother's] house [and] she helped raise him."

(Doc. 15-19 at 5).    The records they obtained verified this.    Butts's school records and

probation file showed his grandmother as the contact person.    (Doc. 13-7 at 24-25).

Additionally, records obtained from DHR and DFACS showed his grandmother, uncle,

and Harold Burton, one of Laura's long-term live-in boyfriends, took care of the Butts

children.    (Doc. 13-7 at 17-18).

In its conclusion regarding trial counsel's sentencing phase investigation, the state

habeas court found:

> The record is clear that trial counsel obtained [Butts's] background records
> and information regarding [Butts's] family members.    Trial counsel were
> aware of the substance abuse problems of [Butts's] mother, the mental
> health problems of [Butts's] father, the behavioral problems of [Butts's]
> brother Dominique, and [Butts's] dysfunctional family life, which trial
> counsel described as neglectful.    [Butts] has failed to establish that trial
> counsel were deficient in their investigation prior to trial.

(Doc. 16-23 at 32-33).    This Court is unable to say that "no 'fairminded jurist' could agree

with" this determination.    *Holsey v. Warden*, 694 F.3d 1230, 1257 (11th Cir. 2012)

(quoting *Richter*, 562 U.S. at 101).    Therefore, the state habeas court's finding that trial

counsel's pretrial mitigation investigation was sufficient was reasonable and cannot be

upset by this Court.

c.  Trial counsel's failure to hire a mitigation expert

According to Butts, the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines") and the capital case training manual ("Manual") published by the Southern Center for Human Rights both stress the need to employ a "mental health clinician or forensic social worker, who could explain the significance of [a defendant's] social and family history."   (Doc. 24 at 95).   Trial counsel did not hire such an expert, and the state habeas court found their failure to do so did not amount to deficient performance.   (Doc. 16-23 at 35 n.9).   Butts argues this ruling constituted an unreasonable application of *Strickland* because the Guidelines and Manual show trial counsel's conduct "'fell below prevailing professional norms.'"   (Doc. 24 at 98) (quoting *Strickland*, 466 U.S. at 688).   Also, he claims the state habeas court's decision was based on the unreasonable factual determination that Westin could develop mitigating evidence without the assistance of a mitigation expert. (Doc. 24 at 98).[22]

The Guidelines and Manual are "are 'only guides' to what reasonableness means, not its definition."   *Van Hook*, 558 U.S. at 8 (quoting *Strickland*, 466 U.S. at 688).   Butts cites no Supreme Court precedent holding that trial counsel *must* retain a mitigation expert, and his reliance on *Wiggins v. Smith*, 539 U.S. 510 (2003), is misplaced.   In *Wiggins*, testimony revealed that it was "standard practice in Maryland in capital cases at the time of Wiggins's trial" to have a social history report prepared.   *Id*. at 524.   "Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report."   *Id*.   Thus, trial

---

[22]  The Court has already determined that Westin, along with Montford-Ford and Crawford, conducted a reasonable mitigation investigation.

counsel's actions fell below "the professional standard that prevailed in Maryland" at the time of Wiggin's trial.   *Id.*   The Court "did not find counsel's failure to utilize a social worker per se ineffective; rather, it was that such failure rendered counsel's performance deficient under the relevant professional standards."   *Newland v. Hall*, 527 F.3d 1162, 1206 (11th Cir. 2008) (citing *Wiggins*, 539 U.S. at 524-25).

Butts proffered no evidence that professional standards in the Ocmulgee Judicial Circuit or Georgia in 1998 required using a mitigation expert.   To the contrary, testimony revealed that mitigation experts were not routinely used in death penalty cases.   Westin stated that he employed mitigation experts in two previous cases in which mental health issues warranted it.   (Doc. 13-1 at 61-62, 67).   However, he had "never been a big … fan of them unless [he] had a specific issue."   (Doc. 13-1 at 68).   He opined that "if you were to talk to a lot of people that have been death penalty qualified, have tried a lot of cases like I have, they would probably agree that they're not all they're cut out to be." (Doc. 13-1 at 68).   District Attorney Fred Bright, who had been a prosecutor in the Ocmulgee Judicial Circuit for 13 years at the time of Butts's trial, testified that he did not believe it was "effective to have both witnesses and an expert who can explain what all those witnesses' testimony means."   (Doc. 13-6 at 35).   He explained that he rarely sees mitigation experts testify in death penalty cases.   (Doc. 13-6 at 33).   In fact, he had been involved in approximately 25 death penalty cases and he could recall only one mitigation expert testifying during sentencing.   (Doc. 13-6 at 33-34).   Of course, the Court is not suggesting that prosecutors can set performance standards for defense counsel.   The point is that neither legal authority nor actual experience supports Butts's argument that a defense lawyer must hire a mitigation expert.

Therefore, the state habeas court's finding that trial counsel did not perform deficiently when they failed to hire a mitigation expert was not factually or legally unreasonable.

### d.   Trial counsel's trial strategy and presentation

Westin testified that trial counsel's mitigation investigation yielded little helpful information.   (Doc. 10-16 at 56-57).   The investigation revealed Butts had a "tough upbringing" as "do a lot of kids," but Westin did not think Butts's "upbringing was extremely different from anybody else's, many other young men."   (Doc. 13-1 at 123). Westin felt that jurors in the Ocmulgee Judicial Circuit were not as sympathetic to the fact that someone had a bad childhood as they may have been at one time.   (Doc. 13-2 at 12-13).   He explained, "there's just been too many high publicity cases where people claim that they were victims and so now somehow that mitigates what they may or may not have done."   (Doc. 13-2 at 13).

Specifically, Westin testified that no former employer would speak favorably about Butts.   (Doc. 13-1 at 119).   Also, no family member was willing to testify for Butts. (Doc. 10-16 at 47).   Westin stated he "[c]ouldn't have drug them up there with wild horses."   (Doc. 13-1 at 123).   Westin could not call jailers to speak favorably about Butts because he had been in a fight with another inmate, threatened to hit a guard, and started a fire in his cell.   (Docs. 10-6 at 33-35; 10-7 at 1-13).   Westin explained that "[o]utside of his aunt and grandma, there was nobody that could say a kind word about him," and even they refused to testify on his behalf.   (Docs. 10-16 at 58; 13-1 at 120).

Instead of using mitigation witnesses, trial counsel opted to use a residual doubt or lingering doubt theory at sentencing.   Their theory of the case was that Wilson, who was

the leader of the FOLKS gang and already serving a death sentence, led Butts down the wrong path, and it was Wilson who actually killed Parks.   (Docs. 13-1 at 57; 13-2 at 16).  "Our strategy from the very beginning in this case was to shift all of … the blame … to Mr. Wilson….   Our … trial strategy from early on was that Mr. Butts was an unknowing and unwilling participant in this really unfortunate event."   (Doc. 10-16 at 8).   The "thrust" was that Butts should be acquitted but, if not, residual doubt should prevent the imposition of the death penalty.   (Doc. 10-16 at 18-19).   Westin explained:

> We had a real shot at – if not an outright acquittal – a verdict of something less than first degree murder….   [W]e felt like even … if we lost in the guilt and innocence phase … and he gets convicted of murder…. residual doubt … was going to flow right through to the sentencing phase and … coupled with Mr. Wilson's prior record, and the fact that he was already on death row, that … was an effective argument to make to this jury that there was just one gunshot and there's already a man on death row for that killing.

(Doc. 10-16 at 18-19).   Westin summed up his strategy for sentencing:   "I was just trying to keep it as simple as I could….   [T]he lowest common denominator, basically, in this case …was who done it … and if he didn't do the shooting, then he shouldn't get the death penalty."   (Doc. 13-2 at 36).

In his opening statement and closing argument during the guilt phase, Westin argued that Butts was guilty of only stealing Parks's car.   (Docs. 9-7 at 61; 10-4 at 21).  He was not guilty of murder because Butts did not know, or have reason to know, that Wilson would murder Parks.   (Doc. 9-7 at 52-57, 61).   He claimed Butts never saw Wilson with a gun on the night of the murder, and, other than asking Parks for a ride, there was nothing linking Butts to Parks's murder.   (Docs. 9-7 at 58-60; 10-4 at 34).   Westin claimed that Butts did not exit the car while Wilson and an unidentified third person in a truck murdered Parks.   (Doc. 9-7 at 51-53).   The jury was told that Wilson had been

found guilty of murdering Parks and sentenced to death.   (Doc. 9-7 at 51, 64).

Through witnesses called during the guilt phase, Westin tried to establish that Wilson owned the murder weapon, but he did not have it in the car on the night of the murder.   Instead, a third person, with whom Wilson had contact that night, had the gun and brought it to Felton Drive, where this other person and Wilson used it to murder Parks while Butts waited in the car.[23]   (Docs. 9-7 at 122, 129-30, 133; 9-8 at 69, 72-73, 82; 10-1 at 127, 130, 10-2 at 14-16, 91).

During the guilt phase, Butts testified[24] that on the night of the murder, he and Wilson were driving around looking for a car to steal because Wilson needed money. (Doc. 10-2 at 116-17).   He explained that Wilson lost all of his money gambling and had no way of making more because his drugs had been stolen.   (Doc. 10-2 at 116).   Wilson hoped to steal a car to sell to a chop-shop in Atlanta.   (Doc. 10-2 at 116-17).   When they were unable to locate a car to steal, Wilson instructed Butts that he should ask someone for a ride so they could steal the person's car.   (Doc. 10-2 at 120).   Butts agreed and they drove to the Wal-Mart where Wilson talked to "some guy" in the parking lot.   (Doc. 10-2 at 121).   Butts entered the Wal-Mart to purchase gum and when he returned, Wilson instructed him to ask Parks for a ride.   (Doc. 10-2 at 123).   Butts did so and when Parks agreed, Butts got in the front passenger seat, Wilson got into the back seat behind Parks, and the other man, to whom Wilson had been speaking, got into the backseat beside Wilson.   This other person exited the car before Parks, Wilson, and Butts left the

---

[23]  The State countered this version of events with evidence that Butts told two of his fellow inmates that he was the one who actually shot Parks.   (Doc. 9-14 at 43-45, 102).

[24]  Westin stated that Butts wanted to testify on his own behalf, and Westin agreed with his decision, thinking it would provide an opportunity to "humanize" Butts.   (Doc. 13-20 at 29).   Westin spent 12 to 15 hours preparing Butts to testify.   (Docs. 10-16 at 47; 13-20 at 29).

parking lot in Parks's car.   (Doc. 10-2 at 124).   As Wilson directed Parks to turn onto Felton Drive, a truck drove up behind Parks's vehicle and flashed its lights.   (Doc. 10-2 at 125).   Wilson told Parks to stop the car because he thought he knew the driver of the truck.   (Doc. 10-2 at 125).   When Parks stopped, Wilson exited the car, opened the driver's side door, "snatched [Parks] out [of] the car by his tie," and drug him to the back of the car.   (Doc. 10-2 at 125-26).   While Butts remained in Parks's car, he overheard someone say "give us all your money," and then heard a gunshot.   (Doc. 10-2 at 126). Butts testified that he never got out of the car, and he never saw Wilson with a gun the night of the murder.   (Doc. 10-2 at 117, 127).   After hearing the gunshot, Butts claimed that he was "scared," "upset," "sick at the stomach," and afraid of Wilson.   (Doc. 10-2 at 128-29).[25]

During the sentencing phase, the State presented evidence of Butts's criminal history.   In March and April 1994, when he was 16, Butts committed three burglaries and one attempted burglary.   (Doc. 10-5 at 36-44, 59-65, 108-10).   Although Butts agreed to return the items he had stolen, he never did.   (Doc. 10-5 at 65).   He failed to report to his probation officer on a regular basis, showing up only two or three times between August 1994 and May 1996.   (Doc. 10-5 at 123).   In March 1996, his probation officer filed a petition to revoke Butts's probation because of his failure to report and pay restitution. (Doc. 10-5 at 126-28).   His probation was not revoked because Butts was employed at the time and the court wanted to give him an opportunity to pay restitution to the burglary victims.   (Doc. 10-5 at 127-28).   He never did.   He paid only $50.00 of the $1,223.23 restitution he owed.   (Doc. 10-5 at 121).

---

[25] After Butts's testimony and closing arguments, it took the jury approximately one hour and five minutes to find him guilty on all counts.   (Doc. 10-5 at 11, 15).

In January 1995, 17 year old Butts pumped gas into his car and drove off without paying.   (Doc. 10-5 at 132).

In October 1995, Milledgeville police officers responded to a call that shots were being fired in the vicinity of the Milledgeville Manor Apartments ("the Manor").[26]   (Doc. 10-6 at 13).   When an officer stopped Butts and several other men in the area, Butts threw down a matchbox and started to walk away.   (Doc. 10-6 at 13-14).   At gunpoint, the officer ordered him to stop and retrieved the matchbox, which contained crack cocaine.   (Doc. 10-6 at 14).   Officers frisked Butts and found a loaded .380 caliber semi-automatic handgun.   (Doc. 10-6 at 16).   Butts was charged with violation of the Georgia Controlled Substances Act, possession of cocaine, and carrying a concealed weapon.   (Doc. 10-6 at 17).

In November 1995, Butts was fined $500.00 and placed on 12 months probation for shoplifting.   (Docs. 10-5 at 151-52; 10-6 at 7-9).

In January 1996, Butts pled nolo contendre to driving under the influence.   (Doc. 10-5 at 140-42).

Also at sentencing, the State presented evidence that police found cocaine and a holster in Butts's car when it was searched following his arrest for Parks's murder.   (Doc. 10-7 at 17-19, 38).   They also found FOLKS gang paraphernalia in Butts's home, room, and car.   (Docs. 10-5 at 67, 69, 73-74, 86; 10-7 at 29 32, 34-37).

The State also presented evidence that after Butts was jailed for Parks's murder, he had been in a fight with another inmate, threatened a guard, started a fire in his cell,

---

[26] The Milledgeville Manor Apartments are referred to in various places in the record as "the Manor." (Docs. 9-8 at 71; 9-11 at 143; 10-2 at 144-45).   It is a low income housing project that is "notorious" for gang-related and non-gang-related crime.   (Doc. 13-3 at 29-30).

and wrote OG[27] on his tennis shoes.   (Docs. 10-6 at 33-35; 10-7 at 1-13).

Through cross-examination of the State's sentencing phase witnesses, trial counsel established that none of the gang paraphernalia found in Butts's home had his name on it, and that it may have belonged to one of his siblings; Butts's name was not on the list of known gang members, and, until Park's murder, the authorities had no information that Butts was involved in gang activity; Wilson was the leader of the local FOLKS gang; and, while Butts was not a model inmate, he was not the worst prisoner jailers had encountered.   (Docs. 10-5 at 103-04; 10-6 at 1, 40; 10-7 at 42-43).

Trial counsel presented the testimony of an expert polygraphist, Georgia Bureau of Investigation ("GBI") special agent David Rush.   (Doc. 10-7 at 54).   Rush testified that he performed a voluntary polygraph examination of Wilson.   (Doc. 10-7 at 61-62).   Rush testified that "[i]t was [his] opinion, based on the polygraph exam that Mr. Wilson was the shooter."   (Doc. 10-7 at 67).

Trial counsel had Sheriff Howard Sills read a portion of his testimony from Wilson's trial.   (Doc. 10-7 at 78).   In this testimony, Sills stated that Butts had committed no violent felonies in the past.   (Doc. 10-7 at 80, 84).   His criminal records consisted mainly of misdemeanor convictions, and his only prior felonies were violation of the Georgia Controlled Substances Act, possession of a firearm during commission of a crime, and concealing a weapon; all of which stemmed from his October 1995 arrest.   (Doc. 10-7 at 80-81).

In his closing argument, Westin told the jury that they did not have to sentence Butts to death just because the State proved Parks was robbed and murdered.   Instead, they should consider the "principle ... called residual doubt."   (Doc. 10-7 at 109).   He

---

[27]  OG stands for "original gangster" in gang terminology.   (Doc. 10-7 at 12-13).

argued Butts was young and mistakenly let Wilson lead him into this situation.   While

Butts was culpable, "his culpability may not rise to the level of execution."   (Doc. 10-7 at

112).   Westin told the jury that the following facts made it more likely that Wilson, not

Butts, was the shooter:   the murder weapon was found at Wilson's home; Wilson was a

violent person with an "extensive criminal history," while Butts's criminal career was brief

and consisted of mainly misdemeanors; Wilson was the leader of the FOLKS gang, but

Butts was not even known to be a gang member; and there was testimony that Butts was

in a daze following the murder.[28]   (Doc. 10-7 at 110-13).

The state habeas court found that trial counsel, after conducting the defense

investigation, made a strategic decision "to present a mitigation theory of residual doubt"

instead of evidence of Butts's family life or background.   (Doc. 16-23 at 32).   The court

found this strategy was reasonable.   (Doc. 16-23 at 31-33).   Next, the state habeas

court determined that trial counsel's actual presentation of evidence and argument to

support the residual doubt theory was reasonable.   (Doc. 16-23 at 34-35).   Butts argues

that these findings were factually and/or legally unreasonable.   (Doc. 24 at 83-95).

Westin testified that trial counsel made the "conscious decision" to use residual

doubt:

> Q.   You collected all of this information and evidence on [Butts's]
> background, and you previously stated that you made a conscious decision
> not to put it up.   What was your reason for that?
>
> A.   Most of it really wasn't positive. The only spin today that I can put on it
> that would be positive is that because his mother had some, a lot of issues
> and neglected him and unfortunately he didn't, either the aunt and the
> grandmother came in too late, but for whatever reason, he was, I could have
> used that spin, he was a victim because he was brought up in a neglected
> household, was able to run the streets, nobody could control him, he didn't
> have a father figure, he was a victim, society made him what he was.   But

---

[28] The jury returned a death sentence in approximately 48 minutes.   (Doc. 10-7 at 136).

that almost gives up the point that he wasn't the killer.   You see what I'm saying?   On the one hand you're trying to get this jury to say, to understand our position, that he didn't shoot Mr. Parks, but if you're saying that he was a victim, they made him do this, then you're sort of counterproductive, if that makes any sense.

But I will say this.   I laid awake … hours upon hours upon hours, and I talked it through with myself, I talked it through with my staff or the people that were working for me, [Crawford], [Montford-Ford], the aunt, the grandmother.   This wasn't a decision I made by myself but it was a conscious decision to do it just as it was done, no more and no less.   It probably could have been done better but –

Q.   And that conscious decision was to focus on residual doubt during mitigation?

A.   Residual doubt.   I felt like if we could carry the fact over from the – I mean, if he was convicted, which there was a high probability, there is no question about that, I mean, he's a party to the crime …, but it's better than being the shooter in this case.   And I felt like the jury might give him the benefit of the doubt since … Wilson had already had been convicted.   They already had their man.   He was already up here on death row, and there was only one shot fired.   So, that was how we, that's how I approached it.

(Doc. 13-2 at 22-23).

Despite this testimony, Butts argues that one phrase Westin said in his closing argument—"taking into account what I believe I could easily infer to you as a lack of any family structure"—shows Westin did not strategically choose to exclude such evidence.

(Docs. 10-7 at 122; 24 at 35).   Westin ended his closing argument by saying

I stand here hat in hand.   Robert cannot stand here.   Unfortunately, he has to rely on – on me.   I may not have done a very good job talking for him and on his behalf.   But I'm the only one here who can talk for him.   And I'm going to just do some real talking right now.   I'm standing here hat in hand, asking you to think about all of the–the facts and circumstances of this case; all of the dynamics involved; what may have happened and what may not have happened; taking into account the youth of this young man; taking into account what I believe I could easily infer to you as a lack of any family structure; taking into account his—his getting with older men—other young men, but older than him who were influencing him down a very bad road; taking into account the lure of being—trying to be older than we really are. Very common.   Taking all that into consideration and weighing it

against—weighing it right along with the fact that whatever happens to
Robert as a result of your sentence will not change the pain that anyone in
this courtroom's feeling.   And I am asking you, hat in hand, to find a reason,
if you would, just do that one favor for me, think about it, and give life a
chance.   Thank you.

(Doc. 10-7 at 121-22).

Looking at the phrase, "taking into account what I believe I could easily infer to you

as a lack of any family structure," in context, the Court cannot find it undermines Westin's

assertion that he deliberately chose to use residual doubt instead of background

evidence during sentencing.   Rather, Westin's closing argument as a whole, along with

the evidence presented during both phases of trial, all support trial counsel's "strategy …

to shift all of that attention—to actually shift the blame in this case to Mr. Wilson."   (Doc.

10-16 at 8).   Certainly, this phrase alone would not allow the Court to say that no

"fairminded jurist" could agree with the state habeas court's factual finding that trial

counsel strategically chose to use residual doubt instead of background evidence.   *See*

*Richter*, 562 U.S. at 101 (holding factual finding unreasonable only if no "fairminded jurist"

could agree with it); *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998)

(explaining that "[t]he question of whether an attorney's actions were actually the product

of a tactical or strategic decision is an issue of fact, and a state court's decision

concerning that issue is presumptively correct").

Butts argues that "Westin's claim … that 'residual doubt' was a carefully thought

out strategy … is … undermined" by Westin's concession during his closing that the State

had proven the existence of the alleged statutory aggravating circumstance—that the

murder was committed during the commission of an armed robbery.[29]   (Doc. 24 at 88).

---

[29]  Butts also argues that, in addition to casting doubt on whether trial counsel were deliberately pursuing a strategy of residual doubt, Westin's concession that the statutory aggravating factor had been proven

After telling the jury that the State had proven the killing took place during an armed robbery, Westin told the jury that their "inquiry goes much deeper." (Doc. 10-7 at 109). He told them that they did not have to sentence Butts to death "simply because [they] … found a statutory aggravating circumstance." (Doc. 10-7 at 109). Instead, they should consider that Wilson was likely the triggerman because the gun was found at his home, he was the leader of the FOLKS gang, and he was a violent person with an extensive criminal record. (Doc. 10-7 at 110-11). Westin asked the jury not to impose the ultimate penalty of death if they thought Wilson was the shooter and if they believed Butts's culpability did "not rise to the level" of execution. (Doc. 10-7 at 112). Thus, conceding that the jury could find Parks was killed during the commission of an armed robbery did not undermine trial counsel's strategy to put as much blame as possible on Wilson and make the jury believe Wilson was the actual shooter.

When making the factual determination that Westin strategically chose to use residual doubt, the state habeas court quoted Westin's testimony from the motion for new trial hearing. (Docs. 10-16 at 19; 16-23 at 20). Westin testified that Wilson's criminal record was part of the reason he chose to use residual doubt, and he "brought in Mr.

---

amounted to ineffective assistance. (Doc. 24 at 88). On appeal, the Georgia Supreme Court denied this claim. *Butts*, 273 Ga. at 770, 546 S.E.2d at 484. The court held that "[b]ecause the jury had just found Butts guilty of armed robbery beyond a reasonable doubt in the guilt phase, it was reasonable for counsel to concede that point and to argue for a sentence less than death based on other factors." *Id.* Without citation to authority, Butts argues this finding was unreasonable because "[i]t is simply per se unreasonable, if trial counsel's strategy was allegedly residual doubt, to concede to the jury the presence of an aggravating factor." (Doc. 24 at 89). Trial counsel informed the jury that the court would instruct them that they did "not have to sentence Robert to death simply because [they] … found a statutory aggravating circumstance." (Doc. 10-7 at 109). Instead, they should consider "residual doubt" regarding whether Butts was the actual shooter. (Doc. 10-7 at 109-11). Westin implored them to consider that it was more likely that Wilson, not Butts, shot Parks and, therefore, Butts's "culpability [did] not rise to the level of that most final of all sentences." (Doc. 10-7 at 112). The Georgia Supreme Court's decision—that trial counsel were not ineffective when they argued for a sentence less than death based on these "other factors"—was not legally or factually unreasonable. *Butts*, 273 Ga. at 770, 546 S.E.2d at 484. Indeed, if anything is "per se unreasonable," it is Butts's argument that Westin should have argued to jurors, who had found Butts guilty of armed robbery based on essentially undisputed evidence that an armed robbery had occurred, that there was no robbery.

Wilson's prior record; … [and] read from the sentencing phase of Mr. Wilson's trial, that he had shot at least two people that I recall; shot a dog."   (Docs. 10-16 at 19; 16-23 at 20). Butts correctly points out that trial counsel did not present Wilson's record to the jury. (Doc. 29 at 42).   Butts argues Westin was trying to "bolster his allegedly tactical decision to pursue a strategy of residual doubt" by misstating the evidence that he presented at the sentencing phase and the state habeas court unreasonably "rubber stamp[ed]" his testimony.   (Doc. 29 at 42).   Notwithstanding the inaccuracy of Westin's recollection of what he presented during sentencing, the state habeas court's factual finding that Westin made the strategic decision to pursue residual doubt remains supported.   Westin testified that he chose residual doubt because they were unable to locate family members who would testify for Butts, there was no physical evidence linking Butts to the murder weapon, Wilson was older than Butts and was a gang leader, and Wilson had already been found guilty of murdering Parks and was on death row.   (Doc. 10-16 at 18-19). The Court finds that the state habeas court's ultimate conclusion that Westin made the strategic choice to use residual doubt rests on sufficient factual bases apart from any unreasonable finding regarding what Westin ultimately presented at the sentencing hearing.[30]   *Pineda v. Warden, Calhoun State Prison*, 2015 WL 5521565, at *2 (11th Cir. 2015) (determining that the state court's ultimate conclusion was entitled to deference because it was based on adequate facts in spite of one incorrect and unreasonable factual finding); *Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011) (questioning whether the state court's ultimate determination rests on a sufficient factual basis apart

---

[30]   Perhaps a better argument would be that trial counsel were ineffective for failing to present Wilson's record during sentencing.   In a September 4, 1998 pretrial hearing, trial counsel discussed their desire to present Wilson's criminal record, including his juvenile record, during sentencing.   (Doc. 8-10 at 92-95).   It is unclear why Wilson's record was not presented.   However, Butts did not raise this argument before the state courts, and he does not make it here.

from erroneous factual finding).

In addition to finding that trial counsel made a strategic choice to use residual doubt instead of background evidence, the state habeas court found their decision to do so was reasonable.   (Doc. 16-23 at 19-22).   As explained above, trial counsel conducted a thorough investigation into Butts's life history.[31]   They determined that "[t]his was not so much a case where we had a lot of mitigation":   although Butts was neglected by his mother and father, his grandmother and aunt "raised him"; there was no evidence that he was ever physically or sexually abused; the family had adequate food; he received adequate medical care; he was an average student until age 15 or 16, when he "went to alternative school twice … for class disruptions, fights"; employment records revealed he managed to find employment but lost most of his jobs due to fighting with co-workers, supervisors, or customers; and jail records showed he had to be transferred for fighting with other inmates and starting a fire in his jail cell.   (Docs 10-16 at 18, 56-57; 13-1 at 110, 119; 13-2 at 7-9; 14-15 at 38; 14-17 at 37).   While Westin thought that Butts's childhood had been difficult and knew that his mother was addicted to alcohol and drugs, he believed, based on his years of experience in the Ocmulgee Judicial Circuit, that "the bad childhood thing doesn't play as well as it did at one time….   Jurors aren't as sympathetic to … the fact that somebody's just had a, kind of a bad" childhood.   (Doc. 13-2 at 12).   Also, no family members were willing to testify for Butts or about Butts's background.   (Docs. 10-16 at 46-47, 58; 13-1 at 120-23).

---

[31]  Butts argues that even if trial counsel's strategy was to use residual doubt, their choice "was not based on a sound investigation and therefore was unreasonable and deserves no deference."   (Doc. 24 at 86).   The Court has already considered the record and determined that trial counsel's investigation into possible mitigating evidence was reasonable.   (See pages 16 to 26 of this Order).

With these factors in mind, and after discussing the issue on numerous occasions, trial counsel decided to use a residual doubt strategy.   (Doc. 10-16 at 43).   Such decisions, when "made after thorough investigation of law and facts relevant to plausible options[,] are virtually unchallengeable…."   *Strickland*, 466 U.S. at 690.   Also, Westin's "sense of the jury's reaction to testimony or evidence is a sound basis on which to make strategic decisions."   *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994).   To prove trial counsel's strategy was "outside the wide range of reasonable professional assistance," Butts must show "'that the approach taken by defense counsel would not have been used by professionally competent counsel.'"   *Id.* at 1041 (quoting *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988)).   He has not made such a showing.   "At most, he has established that his present counsel would not have pursued the same strategy, a showing which misses the target by a wide mark."   *Id.*

Butts argues that to be reasonable, trial counsel's strategy had to include evidence concerning the impact of Butts's dysfunctional family and background.   However, there is "[n]o absolute duty … to introduce mitigating or character evidence" during the sentencing phase of trial.   *Chandler*, 218 F.3d at 1319.   In fact, the Eleventh Circuit has noted "that residual doubt is perhaps the most effective strategy to employ at sentencing." *Chandler*, 218 F.3d at 1320 n.28 (citing *Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999)).

> [F]ocusing on acquittal at trial and then on residual doubt at sentencing (instead of other forms of mitigation) can be reasonable.   Especially when—as in this case—the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client.

*Id.* at 1320 (citing *Tarver*, 159 F.3d at 715-16).

One of the reasons trial counsel offered for not presenting background evidence is that do so

> almost gives up the point that [Butts] wasn't the killer…. On the one hand you're trying to get this jury to say, to understand our position, that he didn't shoot Mr. Parks, but if you're saying that he was a victim, they made him do this, then you're sort of counterproductive ….

(Doc. 13-2 at 22).   Quoting this testimony, the state habeas court ruled that the Georgia Supreme Court and the Eleventh Circuit have recognized such concerns can reasonably "preclude[ ] the presentation of potentially mitigating evidence of this type."   (Doc. 16-23 at 42-43) (citing *Turpin v. Christenson*, 269 Ga. 226, 244, 497 S.E.2d 216, 231 (1998), *Chandler*, 218 F.3d at 1319, and *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007)). Butts argues this ruling was "unreasonable as a matter of law," and the reasonable strategy would have been for trial counsel to argue residual doubt **and** present evidence of Butts's difficult childhood to explain how he came to make a series of unfortunate choices on the night of Parks's murder.   (Doc. 24 at 89-90).   Butts may, or may not, be correct that combining these two strategies would have been beneficial.   However, trial counsel is not required to present every possible theory that might be helpful to his client. *Dill*, 488 F.3d at 1357.   "[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable."   *Chandler*, 218 F.3d at 1318.   Butts has not made such a showing.

After finding that trial counsel's decision to use residual doubt at sentencing was strategic and reasonable, the state habeas court found that trial counsel's presentation of evidence and argument to support this strategy was reasonable.   (Doc. 16-23 at 35). Starting in the guilt phase of the trial, trial counsel argued and presented evidence that

Butts was not the shooter.   (Docs. 9-7 at 52-57, 61, 122, 129-30, 133; 9-8 at 79, 72-73, 82; 10-1 at 127, 130; 10-2 at 14-16, 91, 126-29).   At sentencing, Rush testified that he administered a voluntary polygraph to Wilson, and, based on the results of that examination, he concluded Wilson was the shooter.   (Doc. 10-7 at 54, 62, 67-68). Sills's testimony from Wilson's trial, which was read into the record, established that Butts did not have a violent criminal history.   (Doc. 10-7 at 79-80).   In closing, trial counsel argued that a "youthful" Butts made a foolish mistake when he was led into this situation by Wilson.   (Doc. 10-7 at 111).   In an effort to convince the jury that Wilson was the triggerman, trial counsel argued Wilson had "a propensity to be a violent person," "a very extensive criminal history," and was known to be "right at the top of the list of the F[OLK] Gang membership."   (Doc. 10-7 at 110-11).   In contrast, Butts had a "brief," nonviolent criminal career, and, prior to Park's murder, was not on local law enforcement's list of gang members.   (Doc. 10-7 at 111-13).   Westin stressed that Butts's culpability, or the "unwarranted actions of [Butts] … under the tutorledge [sic] of Marion Wilson, who … is already on death row," did "not rise to the level of that most final of all sentences."   (Doc. 10-7 at 112, 118).   After careful examination of the record, the Court finds that the state habeas court's determination that trial counsel made a reasonable presentation to support their residual doubt strategy did not involve an objectively unreasonable application of *Strickland*, nor was it based on any unreasonable determination of the facts.

> e.   The prejudice allegedly suffered because trial counsel failed to investigate and present mitigating evidence

Butts presented 16 witnesses at the state habeas evidentiary hearing, eight of whom were family members, friends, teachers, and a guidance counselor who offered

personal background information about Butts and his family.   He also presented

testimony from a former DFACS case worker and an expert "clinical social worker with

expertise in conducting biopsychosocial assessments for the courts in capital cases."[32]

(Doc. 13-4 at 98).

Butts's mother, Laura, testified that her biological father and mother never married,

and she grew up with a verbally and physically abusive stepfather.   (Doc. 13-6 at

100-02).   Laura's brother, Johnny Waller, provided similar testimony.   (Doc. 13-6 at

70-72).   Laura explained that she was suspended from school at least seven times for

fighting and ultimately dropped out of school in the ninth grade.   (Doc. 13-6 at 103-04).

She became pregnant at age 16 and in 1975 gave birth to her first child, Tammy.   (Doc.

13-6 at 104-05, 109).   She never married or lived with Tammy's father.   (Doc. 13-6 at

108).

Although Laura had long been married to Robert Butts, Sr., they lived together for

only 11 months after Butts was born on May 14, 1977.   (Docs. 13-6 at 109-10; 13-13 at

80).   Laura testified that she left Butts, Sr. because of his increasingly bizarre behavior,

and neither she nor her children had any contact with him again.   (Doc. 13-6 at 109-10,

129; 13-13 at 80).   She said that Butts, Sr. had been in and out of mental institutions and

prisons since that time.   (Doc. 13-6 at 110-11).

When Laura left Butt's Sr., she, Tammy, and Butts moved into Riverbend

Apartments in Milledgeville, Georgia.   (Doc. 13-6 at 111-12).   They, along with Laura's

various male companions, lived in this apartment for the next 12 years.   (Doc. 13-6 at

---

[32]  The other witnesses were Westin; Moore; Huskins; Detective Ricky Horn; John Hagedorn, a gang expert;
and District Attorney Fred Bright.   (Doc 13-1 at 10-11).

111).   Jerome Wright, who is the father of Laura's third child, Tamayo,[33] lived with Laura

and her children for two and one-half years before leaving for unknown reasons.   (Doc.

13-6 at 112-13).   Next, Calvin Hurt, Dominique's[34] father, moved in for approximately two

to three years.   (Doc. 13-6 at 114).   Hurt drank heavily and was physically abusive to

Laura.   (Doc. 13-6 at 114).   Next, Harold Burton, Tameica's[35] father, lived with the Butts

family for approximately eight to ten years.[36]   (Doc. 13-6 at 115, 126-27).   When Burton

moved out, Laura became involved with Isaac Jones, a drug dealer, who physically

abused her.   (Doc. 13-6 at 117-18).   Laura recalled one occasion when Jones threw

Butts on the floor, put his knee in his back, and pulled his arms behind his back.   (Doc.

13-6 at 118).   After breaking up with Jones, Laura dated Harold Jimerson, a drug dealer

who was married to someone else during the 12 years he and Laura were together.

(Doc. 13-6 at 119).

        Laura testified that she started abusing alcohol as a teenager and began using

crack cocaine in 1986.   (Doc. 13-6 at 105-06).   The only period of time during which she

did not drink to excess was a six-year span that started after Butts's trial ended.[37]   (Doc.

---

[33]  Tamayo was born on May 16, 1980.   (Doc. 13-11 at 4).

[34]  Dominique Hurt, Laura's fourth child, was born on December 1, 1982.   (Doc. 13-11 at 4).

[35]  Tameica, Laura's fifth child, was born on July 5, 1986.   (Doc. 13-11 at 4).

[36]  It is unclear exactly how long Burton lived with, or was involved with, the Butts family.   In his affidavit,
Burton stated he became involved with Laura in approximately 1985 and lived with the family "on and off" for
approximately nine years.   (Doc. 13-13 at 77).   Jan Vogelsang, Butts's mitigation expert, estimated that
Burton was involved with the Butts family from 1986 until 1995.   (Doc 13-4 at 127).   Laura estimated that
she and Burton lived together for eight years.   (Doc. 13-6 at 126-27).   Tracy Burton, Harold Burton's
sister-in-law, testified that Burton and Laura were together for approximately ten years, until at least 1996.
(Doc. 13-4 at 50).   On the undated questionnaire that Butts completed following Westin's appointment in
July 1996, he indicated that his mother and Burton "broke up about 7 weeks ago."   (Docs. 13-1 at 111;
15-19 at 4).

[37]  Laura's oldest daughter, Tammy, testified that her mother did not drink alcohol between 1997 and 2003.
(Doc. 13-4 at 65).   Tameica testified that she remembered her mother was sober from 1998 until 2004.
(Doc. 13-6 at 65).   Laura testified she was sure she did not stop drinking until after Butts's trial was over.

13-6 at 106).   She stopped using crack cocaine four months before the September 2007

state habeas evidentiary hearing.   (Doc. 13-6 at 106).   Laura stated she consumed

alcohol during all five of her pregnancies,[38] and ended up on welfare after losing various

jobs because of her alcoholism and drug addiction.   (Doc. 13-6 at 105, 113).

According to Laura, when she used crack cocaine, she would stay away from

home for months at a time, spend all of her money on drugs, and pawn whatever she had

to get money for drugs.   (Doc. 13-6 at 108).   Laura explained she left home to smoke

crack cocaine because she was not comfortable taking drugs in front of her children.

(Doc. 13-6 at 108).   When she was absent from the home, the children sometimes were

left alone, but her grandmother Mary Lee Waller, mother Mary Frances Cooper, aunt

Doris Cooper, brother Johnny Waller, or boyfriend Burton frequently kept the children.

(Doc. 13-6 at 126-27).   Laura testified that she went through at least seven detoxification

and rehabilitation programs.   (Doc. 13-6 at 107).

Laura admitted she was never involved in Butts's life.   She never spoke with his

teachers, did not know what school activities or sports he was involved in, did not take him

to church, did not know that he had to repeat the tenth or eleventh grades, did not know

he had dropped out of school, and did not know that he was arrested for burglary and

attempted burglary in 1994 or shoplifting in 1995.   (Doc. 13-6 at 121-22, 130-31).   She

did know that Butts was arrested in 1995 for possession of cocaine, possession of a

firearm during the commission of a crime, and carrying a concealed weapon.   (Doc. 13-6

at 130).   However, she did not go to juvenile court with Butts when he pled guilty to these

---

(Doc. 13-6 at 106).   In fact, she was too impaired to attend any day of his trial except the last.   (Doc. 13-6
at 123-24).

[38] There was testimony that her alcohol consumption did not impact Butts's birth.   (Doc. 13-4 at 118).

charges, and she never spoke with his probation officer.   (Doc. 13-6 at 130).

Tammy, Butts's older half-sister, testified that she could not recall ever living with Butts, Sr., but she knew he was mentally ill and frequently in jail.   (Doc. 13-4 at 59).   Tammy testified that Dominique's father, who lived with them for a period of time, was physically and verbally abusive to Laura and would "whip" or "spank" Butts and Tamayo to discipline them.   (Doc. 13-4 at 62).   Tammy could not recall ever being physically abused by any of her mother's various boyfriends.   (Doc. 13-4 at 76-77).   She testified that Burton lived with their family for "over ten years," and he was "a decent guy" who worked and took care of them when their mother was not home.   (Doc. 13-4 at 65-66).

Tammy testified that after working at various factory jobs, her mother went on welfare and received food stamps.   (Doc. 13-4 at 61-62).   She recalled that her mother always abused alcohol and, in 1985 or 1986, started abusing crack cocaine.   (Doc 13-4 66).   She said Laura and various other people drank alcohol and used drugs in their home.[39]   (Doc. 13-4 at 71-72).   When her mother drank alcohol to excess, she "fussed, cursed, was loud, [and] wanted her way."   (Doc. 13-4 at 64).   After Laura started using drugs, "[s]he would stay away from home for days at the time."   (Doc. 13-4 at 66).   Tammy recalled that either Burton or her grandmother took care of the children when Laura was gone.   (Doc. 13-4 at 66, 68).   She explained that her grandmother and aunt "were always constant providers" for her and her siblings.   (Doc. 13-4 at 78).   In approximately 1990, Tammy moved in with her grandmother.   (Doc. 13-4 at 78).

Tameica, Butts's younger half-sister, testified that she could never depend on Laura because she was under the influence of drugs and alcohol more often than not.

---

[39] Tammy explained that she never saw anyone actually using any drugs.   However, she "saw them come out of the bathroom where they did something with … [a] Coca-Cola can."   (Doc. 13-4 at 71).   She did not "exactly know what particular drug [the can] was used for."   (Doc. 13-4 at 71).

(Doc. 13-6 at 53-54).   She stated that when Laura disappeared for days or weeks at a time, she would go to her grandmother's home, Tracy Burton's[40] home, or stay with Burton.   (Doc. 13-6 at 55, 59-62).   She recalled that after Burton moved out, various men who abused Laura spent time in the Butts's home.   However, she did not recall seeing any of these men use drugs while in the home.   (Doc. 13-6 at 55-57).   She testified that Butts cooked and helped her with homework when Laura was not at home. (Doc. 13-6 at 58).

Johnny, Butts's uncle, described Butts as a quiet child who had no direction or guidance.   (Doc. 13-6 86).   He acknowledged that he also abused drugs and alcohol and would frequent Laura's house to drink and use drugs. (Doc. 13-6 at 83-84).   Johnny explained that when Laura was absent, he, his mother, or Burton cared for the children. (Doc. 13-6 at 79).

Burton testified that he lived with Laura from the mid-1980's until approximately 1991 or 1992.[41]   (Doc. 13-4 at 20-21, 35).   He said Laura was addicted to crack cocaine, was frequently absent from the home for weeks at the time, and would regularly pawn household items to get drug money.   (Doc. 13-4 at 22-24).   Burton testified that he cooked, cleaned, disciplined the children, and made sure they attended school.   (Doc. 13-4 at 24-25).   DFACS records verify that he worked with the school to resolve the children's problems.   (Doc 13-7 at 18).

Burton stated that after he moved from the home, Isaac Jones moved in.   (Doc. 13-4 at 26).   Although Jones was controlling, Burton was not sure if he physically abused

---

[40]  Tracy Burton is Harold Burton's former sister-in-law.   (Doc. 13-4 at 40).

[41]  As explained previously, other witnesses testified that Burton lived with the Butts's family off-and-on until 1996.   See footnote 36 above.

Laura, and Burton did not indicate that Jones abused Butts or his siblings.   (Doc. 13-4 at
26).

Burton confirmed that Butts's grandmother and aunt helped care for the children.
(Doc. 13-4 at 32).   He testified that there was always food to eat, and the children had a
television, Nintendo, radios, and various toys.   (Doc. 13-4 at 32-33).   He said Laura
never physically abused Butts or any of his siblings.   In fact, she did not even like to
spank them.   (Doc. 13-4 at 33).

Tracy Burton, Burton's former sister-in-law, testified that Laura was a good mother
before she became addicted to crack cocaine in 1986.   (Doc. 13-4 at 45, 49).   After she
began using drugs, however, she "would disappear for days and weeks" at a time.   (Doc.
13-4 at 43).   During Laura's absences, Burton or the children's grandmother took care of
the children.   (Doc. 13-4 at 45, 49-50).   Tracy explained that Burton made sure the
children were well fed, attended school, and had clothes and toys.   (Doc. 13-4 at 49-50).
She described Burton as a "great father figure" for Butts and his siblings.   (Doc. 13-4 at
43).

Two teachers, Lois Reeves and Henrietta Taylor, testified.   Reeves, who taught
Butts in the second grade, described him as a nice, but sad, child who needed special
attention.   (Doc. 13-4 at 9-10).   She never saw Butts's mother and thought that Butts
could have done better in school if he had a better support system.   (Doc. 13-4 at 10-11).
Reeves acknowledged having no contact with Butts since he left her second grade class..
(Doc. 13-4 at 14).

Taylor, who taught Butts health in the ninth or tenth grade, described Butts as quiet
and respectful, but noted that he started missing class and became inattentive when he

began associating with the "wrong crowd."   (Doc. 13-3 at 129-31).   Taylor spoke with

Butts and told him that she "was worried that he was headed in the wrong direction."

(Doc. 13-13 at 96).   Because he was living with his grandmother at the time, Taylor

expressed her concerns to Mary Frances.   (Doc. 13-3 at 130; 13-13 at 96).   Taylor

acknowledged her only contact with Butts occurred during this one school year.   (Doc.

13-4 at 5).

Jan Vogelsang, a licensed "clinical social worker with expertise in conducting

biopsychosocial assessments for the courts in capital cases," testified that she conducted

a biopsychosocial assessment of Butts.   (Doc. 13-4 at 98).   She defined a

biopsychosocial assessment as "a professional social work method of gathering

extensive information across a broad spectrum of sources in an effort to … shed light on a

person's behavior."   (Doc. 13-4 at 93).   Vogelsang interviewed Butts's family members;

schoolteachers; a DHR caseworker; Dr. John Hagedorn (an expert on gangs); Wayne

Rogers (an attorney); Dr. George Woods (a neuropsychiatrist in Oakland, California); Dr.

Alex Morton (a doctor at the Medical University of South Carolina); and Dr. Jim Evans (a

psychiatrist retained by Butts's state habeas counsel).[42]   (Docs. 13-4 at 99; 13-7 at

13-14).   She reviewed school records; employment records; affidavits from friends and

family members; mental health and medical records of Butts, Butts, Sr., Laura, and

Dominique; DHR and DFACS records; Department of Corrections and probation records;

depositions; and Lower's and Stark's evaluations of Butts.   (Doc. 13-4 at 99-100).

Although Vogelsang can diagnose patients, she was not asked to diagnose Butts, and

she did not prepare a report or evaluation of Butts.   (Doc. 13-7 at 9, 14).

---

[42]  State habeas counsel did not call Evans to testify at the state habeas evidentiary hearing.

Vogelsang testified about Butts's family history, much of which had already been provided by other witnesses:   Laura grew up watching her mother get physically abused by her drunk stepfather (Doc. 13-4 at 114-15); Butts, Sr. grew up watching his stepfather abuse his mother, who had been diagnosed as a schizophrenic paranoid type (Doc. 13-4 at 116-17, 120); Laura dropped out of school in the ninth grade because she was pregnant and "getting in a lot of fights" (Doc. 13-4 at 115-16); Laura began drinking and was sexually promiscuous at a young age (Doc. 13-4 at 115); Butts, Sr. had a mental breakdown shortly after Butts's birth, quit his employment, and began engaging in bizarre behavior (Doc. 13-4 at 119-20); Butts, Sr. was admitted to Central State Hospital in September 1978 and diagnosed as schizophrenic paranoid type (Doc. 13-4 at 120); Butts, Sr. was admitted to Central State Hospital approximately 30 times in 16 years (Doc. 13-4 at 120); Butts, Sr. was absent from Butts's life (Doc. 13-4 at 108); Laura was a crack addict who disappeared for weeks at a time (Doc. 13-4 at 108-09); when Laura was absent, Butts had to be the primary caregiver for his brother Dominique, who was "severely mentally disturbed" (Doc. 13-4 at 109); and Laura invited a series of violent,[43] drug-abusing men in and out of the home during Butts's childhood (Doc. 13-4 at 109-10).

Voselsang testified that Butts's life grew "increasingly worse" as he progressed through childhood into adolescence.   (Doc. 13-4 at 122-23).   During his early childhood, his home was filled with turmoil, which caused him to be a sad, worried, and withdrawn child.   (Doc. 13-4 at 124-26).   During his middle childhood, Burton moved in with Laura and her children.   (Doc. 13-4 at 127-28).   Burton paid the bills, fed the children, bought the children gifts, and made sure they attended school.   (Doc. 13-4 at 129-30).

---

[43] Vogelsang testified that these men did not physically abuse Butts.   The abuse was directed at Laura. (Doc. 13-4 at 109-10).

Vogelsang testified that although Burton, their grandmother, aunt Doris, and uncle Johnny were present in their lives, the children were frequently left alone and Butts was forced to care for his younger siblings.[44]   (Doc. 13-4 at 128-29).

Vogelsang testified that Laura's relationships with Jones and Jimerson, both of whom were cruel and abusive to Laura, had a detrimental effect on Butts.   (Docs. 13-4 at 133-34; 13-5 at 1).   According to Vogelsang, Jones was involved with Laura from the time Butts was ten until he was 15.[45]   (Doc. 13-5 at 1).   When Butts was 15, Laura became involved with Jimerson, a drug dealer, who introduced Butts to guns.[46]   (Doc. 13-5 at 1).   During this time Laura was in and out of detox facilities, and Butts was forced to be the primary caretaker of Dominique, who suffered from "severe behavioral disorders" and was uncontrollable.   (Docs. 13-5 at 14-15).   According to Vogelsang, Laura started pressuring Butts to sell drugs and/or buy drugs for her.   (Doc. 13-5 at 6-7, 21).   Vogelsang opined that all of this resulted in the erosion of Butts's resilience and "[h]e just gave up."   (Doc. 13-5 at 4).   He started missing school, receiving failing grades; associating with the wrong crowd, drinking alcohol, smoking marijuana, selling crack cocaine, burglarizing homes, and carrying a gun.   (Doc.13-5 at 4-5).

Based on this, Vogelsang opined that Butts suffered from emotional abuse and neglect, which can be difficult to detect.   (Doc. 13-5 at 22-25).   She said this could

---

[44]   According to Vogelsang, Tammy, as the oldest child, was initially responsible for taking care of her siblings.   (Doc. 13-4 at 129).   However, when Tammy moved out of the home and went to live with her grandmother, Butts had to become the primary caretaker of his siblings.   (Doc. 13-4 at 129).

[45]   There is obviously overlap between Laura's relationship with Jones and her relationship with Burton.   If Laura dated Jones from 1987 to 1992, this is during the time Burton lived with the Butts family.   (Doc. 13-4 at 127-29).   According to Vogelsang, at some point between 1987 and 1992, Laura, not her children, moved in with Jones and he introduced her to crack cocaine.   (Doc. 13-4 at 128-29).   During this time, Butts apparently continued to live with Burton.   (Doc. 13-4 at 129).

[46]   Vogelsang testified that on one occasion, Jimerson had 15 year-old Butts use a gun to threaten another man with whom Laura was spending time.   (Doc. 13-5 at 1).   However, on the questionnaire he completed for trial counsel, Butts stated that he had never even met Jimerson.   (Docs. 13-1 at 111; 15-19 at 4).

explain why DHR and DFACS caseworkers failed to remove Butts and his siblings from the home.[47]   (Doc. 13-5 at 26-27).   According to Vogelsang, Butts was not physically abused, but there were always "threats of abuse" or "threats of harm" in the home.   (Doc. 13-7 at 1-2).

On cross-examination, Vogelsang acknowledged Butts knew the difference between right and wrong, yet he chose to hang around the wrong people, violate the conditions of his probation, drink alcohol, and use drugs.   (Doc. 13-7 at 41-43, 47). Vogelsang also acknowledged that Stark diagnosed Butts as having an antisocial personality disorder, and Lower found he had a "longstanding personality disorder," the characteristics of which were "poor judgment, impulse control, disregard for social mores, inability to form close relationships or become involved in others."   (Doc. 13-7 at 46-47).

State habeas counsel also tendered affidavits from childhood friends, family members, teachers, and a guidance counselor stating that Butts was intelligent, well-mannered, sensitive, lonely, nice, quiet, pleasant, polite, friendly, and nonaggressive.   (Doc. 13-13 at 76, 85, 88, 89, 95, 96; 13-14 at 3).

The state habeas court found "[e]ven if this Court were to determine that the failure to present evidence of [Butts's] background and home life … constituted deficient performance on the part of either trial or appellate counsel, the Court finds no prejudice: there is a not a reasonable probability that the result of the trial or appeal would have been different if such evidence had been presented at either stage."   (Doc. 16-23 at 45-46).

---

[47]  Celia Cooper, a former child protective services worker with DFACS in Baldwin, Wilkinson, and Fulton Counties, testified "generally about some of the DFACS policies" in Baldwin County.   (Doc. 13-3 at 119). She explained that case workers are assigned to handle a large number of cases each month and it is difficult to substantiate emotional abuse or neglect.   (Doc. 13-3 at 119-20).   Also, it is a lengthy and tedious process to remove a child from a neglectful or abusive home.   (Doc. 13-3 at 119-25).   However, Cooper had absolutely no recollection of Butts or his family.   (Doc. 13-3 at 119).

The court also determined that Butts did not establish he was prejudiced by trial counsel's failure to hire a mitigation expert.   (Doc. 16-23 at 35 n.9).   Butts argues the state habeas court's decision was unreasonable because the court "failed to weigh the new mitigating evidence against the original aggravating evidence."   (Doc. 24 at 100).   He also maintains that the court's decision is "unreasonable substantively, as no reasonable jurist could deny a reasonable probability that the powerful new mitigating evidence could have altered the outcome."   (Doc. 24 at 101).

Contrary to Butts's assertion, the state habeas court did not fail to "reweigh the evidence in aggravation against the totality of available mitigating evidence."   *Wiggins*, 539 U.S. at 534.   The court provided a detailed analysis of the evidence presented at the state habeas evidentiary hearing.   (Doc. 16-23 at 35-46).   The court determined that the testimonial and documentary evidence presented showed that Laura was frequently absent from her children's lives and used drugs; Butts, Sr. was mentally ill and had no role in Butts's life, and Butts's younger brother Dominique had behavioral problems.   (Doc. 16-23 at 36-37).   It also found that trial counsel knew all this prior to trial.   (Doc.16-23 at 33).   The record supports these findings.

The state habeas court also found that Vogelsang, Butts's mitigation expert, testified about four significant influences in Butts's life:   his mentally-ill father; his drug-abusing, alcoholic, and neglectful mother; his mentally disturbed younger brother; and the use and sale of drugs by Laura's various boyfriends.   (Doc. 16-23 at 36).   The court determined that Vogelsang's testimony was undermined or contradicted in several respects:

- Vogelsang was not licensed in the State of Georgia, and she was not a licensed medical doctor, psychologist, or psychiatrist[48] (Doc. 16-23 at 36);

- When performing her biopsychosocial assessment, she never spoke with Lower or Stark, the psychologists who examined Butts prior to trial, or Nancy Bowers, the school social worker who Vogelsang acknowledged "had an enormous amount of contact with the family"[49] (Doc. 16-23 at 36);

- Although she concluded Butts, Sr.'s mental illness may somehow mitigate Butts's sentence and a large portion of her presentation and evidence concerned his mental illness, Butts's last contact with Butt's, Sr. occurred when he was approximately one year old;[50] (Doc. 16-23 at 36-37);

- While Voglesang testified that ten-year-old Butts was left home alone to be the primary care-taker of his "severally mentally handicapped younger brother,"[51] numerous witnesses testified and documentary evidence showed that Butts's grandmother, aunt, uncle, and Burton took care of Butts and his siblings while their mother was absent[52] (Doc. 16-23 at 37-39); and

---

[48] Butts argues this is the "wrong standard" because "[a] mitigation expert does not need to be licensed as a medical doctor, psychologist, or psychiatrist in order to testify." (Doc. 24 at 110).  The state habeas court did not find that Vogelsang could not testify, and it did not completely discount her testimony because she was not a doctor, psychologist, or psychiatrist.  Her credentials were just one factor the state habeas court considered when it determined that there was not a reasonable probability that her testimony would have resulted in a different sentence for Butts.  *See Sears v. Upton*, 561 U.S. 945, 949 (2010) (noting that the petitioner's expert was a "well-credentialed" psychologist).

[49] Again, Butts argues this is the "wrong standard," and these facts should simply have been used as a basis for cross-examination.  (Doc. 24 at 110).  Butts's point is not at all clear; they were used as a basis for cross-examination.  (Doc. 13-7 at 12-13).  On direct, Vogelsang testified that she gathered "extensive information across a broad spectrum of sources in an effort to … shed light on [Butts's] behavior."  (Doc. 13-4 at 93).  On cross-examination, she admitted that she did not speak with two psychologists who evaluated Butts prior to trial or Bowers, a social worker who was very familiar with the Butts's family.  (Doc. 13-7 at 12-13).  Vogelsang acknowledged that she thought "it was very important to get with" Bowers, but she was unable to do so despite making "every effort."  (Doc. 13-7 at 13).  It was appropriate for the state habeas court to consider her failure to speak with these three individuals, all of whom unquestionably had insight into Butts and/or his family.  Her failure goes toward the weight a jury—or motion for new trial or an appellate court—may have given Vogelsang's testimony.

[50] Butts argues this was an unreasonable factual finding.  However, Laura testified that she left Butts, Sr. approximately 11 months after Butts was born and neither she, nor Butts, had any contact with him after that.  (Doc. 13-6 at 110, 129).

[51] While Vogelsang variously described Dominique as "profoundly disturbed," "severely emotionally disturbed," or "severely mentally handicapped," his initial diagnosis was "minimal brain damage," which was the original term for Attention Deficient Hyperactivity Disorder ("ADHD").  (Docs. 13-4 at 133; 13-5 at 11, 14, 31-32, 36).  He was later diagnosed as having ADHD and a conduct disorder.  (Doc. 13-7 at 31).  Despite these behavioral or conduct disorders, both Bowers and Vogelsang said he was actually a "bright boy."  (Doc. 13-7 at 33).

[52] Tammy testified that her grandmother and aunt "were always constant providers" for her and her siblings.  (Doc. 13-4 at 78).  Tameica testified that Burton or her grandmother kept them when her mother was

- Vogelsang was completely unaware of the facts of the crime Butts was convicted of committing because she "did not go into it."   (Docs. 13-7 at 47).

Notably, Vogelsang's assertions that Butts suffered from emotional abuse, neglect, and abandonment while he lived in an "unsettled home" under a "constant threat of harm or constant threat of violence" were undercut by testimony from Nancy Bowers, who worked with Dominique from 1991 to 1993 while she was employed as a parent worker or social worker with the Oconee Psychoeducational Program.   (Docs. 13-5 at 36; 13-6 at 143; 13-12 at 46-47, 53).   Bowers testified that DFACS investigated the Butts family but did not remove the children because they were not "in any immediate danger." (Docs. 13-13 at 21; 14-29 at 68-72).   She recalled that Butts's grandmother, aunt, and Burton provided financial support and helped take care of the children when Laura was absent or unable to care for them.   (Doc. 13-12 at 70, 72-74, 77).   Bowers testified:

> [T]hat's my memory, that there was a lot of family support.   And that's what we expect when we see an adult, a parent struggling, that family usually steps in.   And that's what we want because we don't want children in foster care.   We want the family to come in and support the children and give them what they need short of their own mother being able to do it or their parents.
>
> And so, that's what we saw a lot going on in this family.   That if she wasn't

---

absent.  (Doc. 13-6 at 55, 60-61).   Johnny Waller, Butts's uncle, testified that he, his mother, or Burton cared for the children when Laura was absent.   (Doc. 13-6 at 79).   Burton testified that he cared for the children when Laura was not there and he acknowledged that Butts's grandmother and aunt helped care for them.   (Doc. 13-4 at 24-25, 32).   Tracy Burton testified that Burton or the children's grandmother took care of them while Laura was away.   (Doc. 13-4 at 45, 50).   Butts's former ninth grade teacher, Taylor, testified that when Butts was in her class, he was living with his grandmother.   (Doc. 13-3 at 130).   Records obtained by trial counsel and submitted during the state habeas evidentiary hearing verified that other family members or Burton cared for the children while Laura was away.   For example, records from the Oconee Psychoeducational Center dated June 16, 1992 showed that his grandmother and uncle were "quite involved with Dominque."   (Doc. 14-29 at 46).   These records described Burton as Laura's fiancé, a "father figure," and a person who provided "great assistance to the school" when school officials were unable to locate Laura.   (Doc. 14-29 at 45-48).   DFACS records dated November 16, 1993 showed that Laura and her children live with her fiancé; "[t]he home is adequate"; "[t]he family seems to function well"; and Laura has support from "her fiancé, other relatives, and numerous community resources."   (Doc. 14-23 at 73).   Additionally, Butts told trial counsel that he spent a considerable amount of time with his grandmother and she helped raise him.   (Doc. 15-19 at 5).

there, and I don't recall her being gone that much, but I do think that she had some rehab issues and -- relapse issues, rather.

(Doc. 13-13 at 41-42).   Bowers explained, "I think we felt very comfortable that the family was taking care of the kids.   And believe you me, I'm an old DFACS worker, so if I had any concern, I would have called that in.   But I don't recall worrying about it at all."   (Doc. 13-12 at 73).

Baldwin County DFACS, DHR, and the Oconee Psychoeducational Program Records from 1993 and 1994[53] substantiate Bower's recollection.   These agencies investigated allegations of possible sexual abuse[54] and medical negligence[55] regarding Dominique.   (Doc. 14-23 at 41).   When DFACS representatives visited the family in June 1993, December 1993, January 1994, and February 1994,[56] the house was clean, the children were being cared for, and "things looked just fine."   (Docs. 13-7 at 27-29; 14-23 at 68-69, 81, 86).   DFACS records from a May 31, 1994 "unannounced" visit and a June 23, 1994 visit[57] showed Laura was present in the home, as were all of her children, Dominique's prescriptions had been filled, and the house was clean.   (Docs. 13-7 at 29-30; 14-23 at 88).   On June 29, 2004, Bowers reported that Laura had failed to fill Dominique's prescriptions only once in the past year and "she didn't think that was reason for concern."   (Doc. 14-23 at 89).   Thus, the case was closed.   (Doc. 14-23 at 89-90).

[53] Trial counsel had obtained all of these records.   (Docs. 13-1 at 16-17; 14-18 to 14-23; 14-29 at 1 to 14-30 at 6).

[54] It was alleged that Dominique might have been sexually abused when he visited his paternal aunt's home.   (Doc. 14-23 at 63, 67).   It was determined that the sexual abuse allegations were "unfounded" and the case was closed on July 2, 1993.   (Doc. 14-23 at 38, 72).

[55] Bowers notified DFACS that Laura was not giving Dominique his ADHD medication as prescribed.   (Doc. 14-23 at 41-42, 77).

[56] These visits were "announced," meaning that prior to the visit, Laura was told when a representative from DFACS would be coming to the home.   (Doc. 13-7 at 29).

[57] It is not clear if this visit was "announced" or "unannounced."   (Doc. 14-23 at 88).

The state habeas court also considered the testimony of Butts's former teachers. (Doc 16-23 at 40).   The court noted that while Reeves testified Butts appeared "sad" when he was in her class, she had not seen him since he was in the second grade—13 years before his trial.   (Doc. 16-23 at 40 n.20).   Also, there was nothing in Butts's school records from that time which suggested any concern about Butts.   (Doc. 16-23 at 40-41 n.20).   Taylor, his ninth grade teacher, testified that Butts started missing school, was always tired, and began hanging around the wrong crowd.   (Doc. 16-23 at 40). Although this led Vogelsang to conclude that Butts's dysfunctional home life finally "wore him down," she acknowledged that another interpretation of Taylor's testimony is that when Butts got a car, he made the choice to skip school, hang around with gang members, use and sell drugs, drink alcohol, steal, and carry concealed weapons.   (Doc. 13-7 at 38-40).   His choice to engage in such behavior, as opposed to any dysfunction occurring at home, could have led him to perform poorly in school.   (Doc. 13-7 at 42-43). Clearly, the state habeas court could reasonably find that Taylor's testimony would not, with any reasonable probability, have changed the outcome.   (Doc. 16-3 at 41).

In conclusion, the state habeas court did not fail to analyze the effect of the new mitigating evidence and reweigh it against the evidence in aggravation.   Nothing in the state habeas court's opinion indicates it "discount[ed] entirely the effect" that the new evidence, including Vogelsang's testimony, would have had on the jury.   *Porter*, 558 U.S. at 43.   Instead, the court determined that had the jury heard all of the new evidence, there is no reasonable probability they would have given Butts a different sentence. After a thorough review of the record, the Court is unable to say that no reasonable jurist could agree with the state habeas court's prejudice determination.

f.   Supreme Court precedent

Butts acknowledges that *Strickland* is the "clearly established Federal Law"

governing the disposition of ineffective assistance of counsel claims.   28 U.S.C. § 2254

(d)(1); (Doc. 24 at 19).   He argues, however, that the state habeas court's decision

cannot be squared with *Strickland's* holding as the Supreme Court has applied the

holding in several later cases:   *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*,

539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558

U.S. 30 (2009); and *Sears v. Upton*, 561 U.S. 945 (2010).[58]   The Court notes initially that

---

[58] Butts also relies on several decisions from the Eleventh Circuit:   *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011); *Johnson v. Sec'y, DOC*, 643 F.3d 907 (11th Cir. 2011); and *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008).   These cases are factually distinguishable.   In *Ferrell*, it was apparent that Ferrell had mental health problems, but trial counsel failed to learn of his severe organic brain damage, bipolar disorder, and temporal lobe epilepsy because they never asked any of his family members about his mental health and unreasonably told their mental health expert to determine only if Ferrell was mentally retarded or if he had any problems that affected the waiver of rights he signed before giving statements to the police.   *Ferrell*, 640 F.3d at 1203, 1227-28.   There is no contention that Butts suffers from brain damage or other serious mental disorder about which his trial counsel failed to learn, or that trial counsel unreasonably limited the scope of Butts's psychological evaluation.   Ferrell's trial counsel spoke with potential witnesses, other than Ferrell's parents, only after the guilt phase of the trial and they failed to learn that Ferrell's father regularly beat him with whips and straps, that he and his family were repeatedly evicted from their homes, and that he often went without food.   *Id.* at 1230.   Here, trial counsel, well in advance of trial, spoke with numerous witnesses, reviewed various records, and had Butts examined by a psychologist.   They knew Butts's father was mentally ill and absent from his life, his mother was a neglectful alcoholic who abused drugs, he was cared for by his grandmother and aunt, his younger brother had a conduct disorder, and he did well in school until the ninth or tenth grades.   In *Ferrell*, trial counsel testified that they chose to use a residual doubt strategy, but they did not present evidence of such or argue residual doubt to the jury.   *Id.* at 1123. Here, trial counsel presented evidence and argument supporting their residual doubt strategy.   In *Johnson*, trial counsel waited until "the eleventh hour" to begin their mitigation investigation.   *Johnson*, 643 F.3d at 932.   Faced with overwhelming evidence of guilt and having been told by Johnson that he was abused by his alcoholic father, trial counsel still waited until after the guilt stage of Johnson's trial was over to attempt to investigate mitigating circumstances.   *Id.*   Johnson's trial counsel could not explain why he failed to talk to Johnson's friends or family members, "other than the obvious fact that he had waited too late to start investigating his client's background."   *Id.* at 933.   That clearly did not happen here.   In *Williams*, trial counsel's sentencing phase preparation consisted of three sources:   speaking only with Williams's mother, obtaining a psychological evaluation, and reviewing a pre-sentence investigation report.   *Williams*, 542 F.3d at 1339.   Williams's trial counsel's sentencing phase strategy "focused on establishing that Williams had a troubled background," so "they had every incentive to develop the strongest mitigation case possible."   *Id.* at 1340 (citing *Wiggins*, 539 U.S. at 526).   "It thus is apparent that counsel's failure to expand their investigation 'resulted from inattention, not reasoned strategic judgment.'"   *Id.* (quoting *Wiggins*, 539 U.S. at 526).   Again, that did not happen here.   Additionally, the mitigating evidence uncovered in *Williams* far exceeds anything presented during the state habeas proceeding in Butts's case: Williams suffered severe beatings several times a week, his father physically assaulted him with "deadly weapons," his mother beat him with belts and "other instruments," he was left unsupervised and allowed to

"[t]hese cares are … relevant only to the extent they might demonstrate that [Butts's] counsel, confronted with circumstances like those presented at the time and place of [Butts's] trial, failed to adhere to the standard of reasonable representation." *Anderson v. Sec'y, Fla. Dep't of Corr.,* 752 F.3d 881, 904 (11th Cir. 2014).   The Supreme Court has faulted lower courts for reading these cases to establish "a 'constitutional duty to investigate' capital cases in a particular, prescribed way." *Id.* at 906 (quoting *Pinholster,* 131 S.Ct. at 1406).   They do not create any "mechanistic rule[s] of law at all for investigation or for presentation of evidence in capital cases." *Chandler,* 218 F.3d at 1317 n.21.   Nor can any of these cases "command the outcome for this case" because the facts here are "materially different, allowing for different outcomes under *Strickland.*" *Id.*

Butts claims the state habeas court's decision is "contrary to" *Williams* because "the state habeas court confronted a set of facts 'materially indistinguishable' from those in *Williams*, and yet reached the opposite result." (Doc. 24 at 115).   The Court disagrees.   In *Williams*, trial counsel did not start preparing for the sentencing phase until one week prior to trial and "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Williams*, 529 U.S. at 395.   Counsel failed to discover records showing Williams had been "severely and repeatedly beaten by his father," his parents were imprisoned for two years for criminal neglect of Williams and his siblings, and, during their incarceration, Williams was forced to endure an abusive foster home. *Id.*   There

---

roam the streets alone at ages four or five; he did not have adequate food to eat or clothes to wear, and he did not receive adequate medical attention for serious injuries. *Id.* at 1331-34.

clearly was no such failure in Butts's case.    As discussed, Butts's trial counsel conducted

a timely, reasonable investigation into his background and obtained most, if not all, of the

records that were tendered to the state habeas court.

As for prejudice, the Virginia Supreme Court in *Williams* read *Lockhart v. Fretwell*,

506 U.S. 364 (1993), "to require a separate inquiry into fundamental fairness even when

Williams [was] able to show that his lawyer was ineffective and that his ineffectiveness

probably affected the outcome of the proceeding."    *Williams*, 529 U.S. at 393.    This was

unreasonable.    *Id.* at 393-94.    So was the Virginia Supreme Court's failure to consider

that mitigating evidence unrelated to future dangerousness might have "alter[ed] the

jury's selection of penalty, even if it [did] not undermine or rebut the prosecution's

death-eligibility case."    *Id.* at 393-94, 398.    The state habeas court committed no such

errors in Butts's case.    Instead, it considered all the mitigating evidence presented and,

applying the correct *Strickland* prejudice test, determined that there was "not a

reasonable probability that the result of the trial or appeal would have been different if

such evidence had been presented at either stage."    (Doc. 16-23 at 45-46).

*Wiggins* is also distinguishable.    There, trial counsel had a presentence

investigation report that showed Wiggins spent most of his childhood in foster care, noted

his "misery as a youth," and quoted him as saying his background was "disgusting."

*Wiggins,* 539 U.S. at 523.    They also had records revealing that Wiggins's mother was a

chronic alcoholic; he was moved from one foster home to another; he had emotional

difficulties; he had frequent, lengthy absences from school; and his mother left him and

his siblings at home alone for days without food.    *Id.* at 525.    Notwithstanding this

information, trial counsel did no further investigation into Wiggins's background.    *Id.* at

526.   The Supreme Court held that trial counsel's limited investigation was unreasonable in light of what the records actually revealed.   *Id.* at 525, 527.   Because Wiggins's trial counsel abandoned their investigation at an "unreasonable juncture" they necessarily failed to make a fully informed decision regarding their sentencing strategy.   *Id.* at 527. Again, there is no indication that Butts's trial counsel prematurely abandoned their investigation.   As discussed above, they spoke with numerous witnesses and obtained records (again, essentially the same records state habeas counsel got), through which they learned Butts's life history.

Moreover, in *Wiggins*, trial counsel told jurors they were "'going to hear that … Wiggins has had a difficult life.'"   *Id.* at 515.   But they presented "no evidence of Wiggins's life history."   *Id.*   In contrast, Butts's trial counsel made a considered decision to focus on residual doubt after they investigated Butts's background and they pursued this theory during both the guilt and sentencing phases of Butts's trial.

Also, the prejudice to Wiggins resulting from trial counsel's ineffectiveness was plain.   Evidence presented at Wiggins's post-conviction hearing showed:   he and his siblings often had to beg for food or eat paint chips and garbage when their alcoholic mother left them home alone for days; his mother had sex with men while the children slept in the same bed; his mother beat him for breaking into the kitchen, which she kept locked; his mother once forced Wiggins's hand against a hot stove burner, burning him so badly he had to be hospitalized; after he was placed in foster care, at age six, the first and second foster mothers physically abused him, and he was repeatedly raped and molested by the father in the second foster home; in a later foster home setting he was "gang-raped . . . on more than one occasion"; and when he entered the Job Corps

program, he was sexually abused by his supervisor.   *Id.* at 517.   Obviously, the mitigating evidence introduced at Wiggins's post-conviction proceeding was much more compelling than the evidence Butts presented during his state habeas evidentiary hearing.   *Grayson v. Thompson*, 257 F.3d 1194, 1230 n.20 (11th Cir. 2001) (noting that *Williams* was "easily distinguished," in part, because the mitigating evidence presented in *Williams* was "far more compelling" than that presented by Grayson).

Finally, no state court had decided whether Wiggins was prejudiced by his counsel's failures, and, therefore, the federal court decided this issue without the constraint of AEDPA deference.   *Wiggins*, 539 U.S. at 534.   This Court is "circumscribed by a state court conclusion with respect to prejudice."   *Id.*   The Court can grant relief only if it finds no fairminded jurist could agree with state habeas court's conclusion that Butts was not prejudiced by trial or appellate counsel's failure to introduce the testimonial and documentary evidence presented during the state habeas evidentiary hearing.   This Court cannot make such a finding.

In *Rompilla*, the Supreme Court held trial counsel were ineffective because they failed to examine a readily available file that contained information about Rompilla's prior conviction for rape and assault when trial counsel knew the prosecutor was going to use the prior conviction as an aggravating factor in seeking a death sentence.   545 U.S. at 383.   There is no allegation of a similar failure here.   *Rompilla* is inapposite.

In *Porter*, no state court had decided whether trial counsel's performance was deficient, so the Supreme Court reviewed that element of his *Strickland* claim *de novo* rather than with AEDPA deference.   558 U.S. at 39.   In any event, the facts of Porter bear no similarity to the facts here.   Porter's trial counsel had only one meeting with

Porter prior to sentencing and "did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family."  *Id.*   Trial counsel "did not even take the first step of interviewing witnesses or requesting records."  *Id.* (citing *Van Hook*, 130 S. Ct. at 18-19).   It cannot be seriously argued that trial counsel's conduct in Butts's case is analogous to the conduct held to be ineffective in *Porter*.

Finally, in *Sears*, the state habeas court found that trial counsel's investigation into mitigating evidence was "'on its face . . . constitutionally inadequate'" because he spent only a "day or less[,] talking to witnesses selected by [Sears's] mother."  *Sears,* 561 U.S. at 952 (citations omitted).   Having found deficient performance, the state habeas court committed two errors in its prejudice analysis:   (1) it unreasonably assumed trial counsel's theory—how a death sentence would impact his family—was reasonable; and (2) it expressly refused to conduct the *Strickland* prejudice analysis because trial counsel had presented some evidence during sentencing.   *Id.* at 953-54.

The state habeas court here committed no such errors.   It found that trial counsel conducted a reasonable investigation and then made a reasonable strategic decision to present a mitigation theory of residual doubt.   (Doc. 16-23 at 19-33, 41-43).   Also, unlike the state court in *Sears*, it did not find a lack of prejudice simply because trial counsel presented some mitigating evidence.   Instead, it considered all of the mitigating evidence presented both at trial and during state habeas proceeding and reweighed it against the evidence in aggravation before deciding that there was no reasonable probability that the additional testimony would have changed the outcome of Butts's sentence.   (Doc. 16-23 at 35-41, 45-46).   This is the appropriate *Strickland* prejudice analysis.

g.  Conclusion

When evaluating appellate counsel's effectiveness, the state habeas court properly analyzed Butts's claim that trial counsel were ineffective for failing to investigate, develop, and present evidence of Butts's background.   Having found that appellate counsel performed deficiently, the state habeas court assumed that effective appellate counsel would have introduced all the evidence presented at the state habeas evidentiary hearing.  (Doc. 16-23 at 17-18).   Applying *Strickland*, the court considered this evidence and concluded there was no reasonable probability that the motion for new trial or appeal would have ended differently.   (Doc. 16-23 at 18).   In other words, had appellate counsel presented the same evidence that state habeas counsel did, there was not a reasonable probability they could have established that trial counsel's performance was deficient or that Butts was prejudiced.   This Court finds the state habeas court's determinations were not contrary to and did not involve an unreasonable application of *Strickland*, nor were they based on any unreasonable factual determinations.   Thus, the Court must deny relief on this claim.

3.  Claims that trial and appellate counsel were ineffective in their handling of evidence of gang activity

Butts makes three ineffective assistance claims in relation to evidence of gang activity:   trial counsel were ineffective when they failed to voir dire prospective jurors about their views on gangs; trial and appellate counsel were ineffective when they failed to investigate and challenge speculative, inaccurate, and prejudicial evidence suggesting Parks's murder was gang-related; and trial and appellate counsel were ineffective when they failed to secure the services of an expert on gang issues.   (Doc. 24 at 124-25).

a.  Trial counsel's failure to voir dire jurors regarding their views on gangs

Appellate counsel argued that trial counsel rendered ineffective assistance when they failed to voir dire jurors regarding their views about gangs.   The Georgia Supreme Court held that

> [t]rial counsel testified in the evidentiary hearing held on remand that he made a strategic decision not to question potential jurors about their views on gangs because he intended to focus attention on Butts's co-perpetrator as a gang member and because he thought drawing premature attention to the issue of gangs would have been counterproductive.   This strategic decision was reasonable and, accordingly, Butts's claim that his trial counsel rendered ineffective assistance in making that decision fails.

*Butts*, 273 Ga. at 765, 546 S.E.2d at 480 (footnote omitted).

Butts argues that the failure to voir dire on gangs "clearly amounts to deficient performance, and the state court findings to the contrary are unreasonable."   (Doc. 24 at 140).   The Court disagrees.   The record supports the Georgia Supreme Court's findings.   Westin testified "[t]here was a great deal of discussion amongst the defense team" regarding how to deal with the gang issue during voir dire.   (Doc. 10-16 at 7).   They feared that raising the issue during voir dire would be "counter-productive" because "from that point forward, [the jurors] would have associated Mr. Butts with a gang," while there was actually very little evidence tying him to the gang.   (Doc. 10-16 at 9).   While the wisdom of trial counsel's decision is debatable, Butts has not shown that no "'professionally competent counsel'" would have refrained from questioning jurors about their views on gangs.   *Spaziano,* 36 F.3d 1028 at 1041 (quoting *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988)).   Thus, he has not shown trial counsel's strategy was "outside the wide range of reasonable professional assistance."   *Id.*   Certainly, he has not shown that no fairminded jurist could agree with the Georgia Supreme Court's

conclusion.   *Holsey*, 694 F.3d at 1257.

Butts faults the Georgia Supreme Court for accepting Westin's "rationales without any scrutiny."   (Doc. 24 at 155).   In effect, he argues the state court engaged in too little analysis when it determined trial counsel's actions were reasonable.   State courts simply are not required to "put forth rationales for their decisions so that federal courts can examine their thinking."   *Wright v. Sec'y, Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002) (citing *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)).   Applying AEDPA deference, this Court cannot find the Georgia Supreme Court's decision legally or factually unreasonable.

> b.   Trial and appellate counsel's alleged failure to investigate and challenge the evidence suggesting Parks's murder was gang–related

Trial counsel investigated Butts involvement with FOLKS.   After Butts told Crawford that he was in FOLKS, she interviewed several gang members, including Antonio Redding.   (Doc. 13-26 at 53-56).   When Crawford informed Butts that FOLKS gang members were denying his involvement, "he would get aggravated … and kind of laugh and say, 'Well, they just don't want to tell you….'"   (Doc. 13-27 at 53).   In his statement to investigators, Wilson said he and Butts were in FOLKS.   (Doc. 14-27 at 90). Westin testified at the state habeas evidentiary hearing that he thought Butts and his younger half-brother were in a gang.   (Doc. 13-2 at 16).   Crawford visited Butts's home and found "gang paraphernalia all over the house."   (Doc. 13-26 at 50).

Investigators had seized various papers containing gang graffiti from the top left dresser drawer in Butts's bedroom and composition notebooks containing gang graffiti in Tamayo's bedroom.   (Doc. 10-5 at 68-70, 86).   They had also photographed the word "FOLKS" that appeared twice on the dresser in Butts's bedroom and various gang graffiti

that appeared in other areas of Butts's home. (Doc. 10-5 at 71-76, 78-85). From Butts's car, they seized a dark blue bandanna and various gang-related drawings. (Doc. 10-7 at 31-38).

Trial counsel moved in limine to exclude this evidence, arguing that any relevance of the evidence was outweighed by its prejudicial impact. (Doc. 8-3 at 99-103). The trial court denied the motion.

During the sentencing phase of Butts's trial, Detective Bobby Langford testified about the gang paraphernalia that was seized from Butts's house following his arrest for Parks's murder. (Doc. 10-5 at 67-87). Detective Ricky Horn testified about the gang paraphernalia that was seized from Butts's car. (Doc. 10-7 at 31-38).

Detective Ricky Horn also testified about gang activity in Milledgeville, Georgia. He testified that he began collecting evidence on Milledgeville gangs in 1989, which is when authorities became aware of gang activity in that area. (Doc. 10-7 at 21). By 1991, Horn saw indications of "more serious, more dangerous gangs," including the FOLKS gang, which originated in Chicago. (Doc. 10-7 at 21-12). Around that time, Horn attended a comprehensive gang seminar sponsored by the United States Attorney's Office, Federal Bureau of Investigation, and the Atlanta Police. (Doc. 10-7 at 22). At the seminar, Horn learned more about gang culture and studied Chicago-based gangs. (Doc. 10-7 at 22). Following the seminar, he performed independent study regarding gangs, including reading periodicals, speaking with other law enforcement agencies throughout the country, and speaking with local persons involved with gangs in Milledgeville. (Doc. 10-7 at 21-23).

Horn testified that an "O.G." is a gang member with some standing in the gang, and members attain standing by performing certain, sometimes criminal, acts.[59]   (Doc. 10-7 at 27).   The more serious crimes afford higher status.   (Doc. 10-7 at 27).   Horn said that FOLKS gang members committed everything from "simple battery up to … murder, armed robbery, [and] aggravated assault."   (Doc. 10-7 at 46).

Appellate counsel argued that trial counsel were ineffective when they "failed to object to the introduction of evidence of 'gang paraphernalia' by the State in the sentencing phase" and when they "failed to object to testimony concerning gangs and gang activity in [Milledgeville] during the sentencing phase."   (Doc. 10-22 at 10).

The Georgia Supreme Court found:

> Butts contends that evidence about the F[OLKS] gang and gangs in general was irrelevant to the issues in the sentencing phase of his trial and that presentation of the evidence violated his freedom of speech and his freedom of association under the Constitution of the United States.   The evidence in question suggested that Butts was involved with the F[OLKS] gang and that the gang required acts of violence for promotion within its ranks.   We conclude that, because the "violent nature of that gang was relevant to the issues to be decided by the jury during the sentencing phase of [Butts's] trial," the contested evidence was not an invitation for the jury to punish Butts based upon his exercise of constitutional rights and, accordingly, that the evidence was admissible.   Finally, although we find no error, we also note that Butts has waived this issue by failing to object at trial.

> Because the evidence about the F[OLKS] gang and gangs in general was not improper, Butts's trial counsel did not render ineffective assistance by failing to object to it.

> Butts argues that an investigator gave testimony during the sentencing phase of Butts's trial about gangs that would have been improperly perceived by the jury as being expert testimony.   This issue is waived because Butts raised no objection at trial.   Furthermore, we find nothing

---

[59]  Captain Russell Blenk testified that when he was escorting Butts to a September 25, 1998 pretrial hearing, he noticed that "O.G. Butts" was written on the top of Butts's right shoe.   (Doc. 10-7 at 12-13).   Blenk explained that "O.G." "is gang terminology for original gangster" and that "FOLKS are right side dominant."   (Doc. 10-7 at 13).

improper in the testimony, as it appears from the transcript that the witness would have qualified easily as an expert on gangs.

Evidence showing that while incarcerated Butts had set a fire, had fought with another inmate, and had "O.G. [Original Gangster] Butts" written on his shoes was not objected to during the sentencing phase of Butts's trial and, therefore, cannot be complained of now on appeal.   Furthermore, we note that the evidence was not improper.

Because the evidence complained of here was not improper, Butts's trial counsel did not render ineffective assistance by failing to object to it.

*Butts*, 273 Ga. at 768-69, 546 S.E.2d at 482-83 (footnotes omitted).

Before the state habeas court, Butts argued that trial counsel ineffectively handled gang evidence in several respects:   (1) trial counsel failed to challenge gang evidence, including their failure to investigate and challenge the testimony of Detective Ricky Horn; (2) "trial counsel failed to file discovery motions that would have provided defense counsel with an opportunity to learn of, prepare for, and seek the exclusion of putative expert testimony regarding Petitioner's alleged membership in the F[OLKS] gang"; (3) "trial counsel provided no rebuttal to the prosecution's inflammatory use of testimony regarding gang membership and activities"; and (4) "trial counsel failed to raise a challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) as to the reliability and admissibility of expert testimony regarding gangs."   (Doc. 16-23 at 7-8, 47).

The state habeas court found that the Georgia Supreme Court had already addressed some of these claims and noted that "[n]othing in the record before this Court, including the testimony of Petitioner's gang expert, Dr. John Hagedorn, leads the Court to conclusions different than those of the Supreme Court."   (Doc. 16-23 at 48).   The state habeas court found some of the claims were procedurally defaulted.   However, the court

ultimately considered claims that trial counsel failed to adequately investigate and challenge the gang evidence when it evaluated the properly raised claims of appellate counsel's ineffectiveness:

> The Court finds that [Butts] has failed to establish any deficient performance on the part of trial counsel with respect to his claims regarding gang evidence, including the failure to investigate and to challenge the state's evidence…. Accordingly, to the extent that such claims are not already barred by the doctrine of res judicata, the Court finds that appellate counsel's failure to raise such claims … did not constitute deficient performance. Even if the Court were to find such deficient performance, the Court finds no prejudice.

(Doc. 16-23 at 54).

Butts argues that the decisions of both the Georgia Supreme Court and the state habeas court are factually and legally unreasonable in several respects.

> 1.   Admissibility of gang evidence, including Horn's testimony

Butts argues that the Georgia Supreme Court's rulings on his gang-related challenges were based on its determination that the "violent nature of [the FOLKS] gang was relevant to the issues to be decided by the jury during the sentencing phase of [Butts's] trial." *Butts*, 273 Ga. at 768, 546 S.E.2d at 482 (citations and quotation marks omitted). That finding, according to Butts, was "based on an unreasonable factual determination." (Doc. 24 at 128). Specifically, he argues that, unlike the situation with his codefendant, the evidence connecting him to FOLKS was tenuous, at best. (Doc. 24 at 128). Because there was no connection between Butts and the gang-related evidence, Butts argues the Georgia Supreme Court unreasonably failed to determine that the slight probative value of the gang-related evidence was far outweighed by its prejudicial effect. (Doc. 24 at 128-29).

Certainly, the evidence that linked Butts to the FOLKS gang was not as strong as the evidence that linked Wilson to the same gang.  *Wilson v. Humphrey*, 2013 WL 6795024, at *24, *35 (M.D. Ga. 2013).   Butts, unlike Wilson, did not confess to authorities that he was a gang member or write letters to his fellow gang members advocating violence.   *Id.*   However, the evidence seized from his bedroom and his car, as well as the shoes he had on his feet, linked him to the FOLKS gang.[60]

While Butts faults trial counsel for failing to object to Horn's testimony, he has not shown that the Georgia Supreme Court's decision that Horn "would have qualified easily as an expert on gangs, and therefore trial counsel were not ineffective for failing to object," was based on any unreasonable factual determinations or that it involved an unreasonable application of *Strickland.*.   *Butts*, 273 Ga. at 769, 546 S.E.2d at 483.   As the Court explained in *Wilson*, both Georgia and federal courts have allowed experienced law enforcement officers, such as Horn, to testify as gang experts.   *Wilson*, 2013 WL 6795024, at *41 (citations omitted).   As an expert, Horn would be allowed to rely on hearsay for his opinions.[61]   *Id.* (citations omitted).

## 2.  Trial counsel's investigation of gang evidence

Butts claims the state habeas court unreasonably found that trial counsel had investigated the gang evidence.   As explained above, trial counsel investigated Butts's

---

[60] Butts maintains that "[u]nderscoring the vast gap between the evidence in the two cases, Mr. Wilson did not even challenge the relevance of the gang evidence to his case and, derivatively, did not challenge the deficiency of his counsel for failing to object to its admissibility."   (Doc. 24 at 130).   This is not correct. Wilson argued that "trial counsel were deficient because they failed 'to protect [him] from irrelevant, unreliable, false, and misleading evidence regarding gangs.'"   *Wilson,* 2013 WL 6795024, at *38.

[61] Also, the Court notes that Westin was aware that trial courts and Georgia appellate courts had ruled gang-related evidence in aggravation admissible during sentencing.   (Doc. 10-16 at 56).   Having attended Wilson's trial, he reasonably thought that the trial court was going to allow Horn to testify in Butts's sentencing phase, just as the trial court had done in Wilson's case.   (Doc. 10-16 at 51, 55).   Knowing that the testimony would be allowed, Westin explained that he thought objecting to the evidence would simply "put … more emphasis on what you know is already going to be a bad part of your case."   (Doc. 10-16 at 11).

involvement with FOLKS and discovered ample evidence that Butts was a member of FOLKS.   Given the wealth of evidence trial counsel discovered that suggested Butts was in FOLKS, trial counsel's investigation was not deficient.

Butts complains that trial counsel did not demand "discovery of any files on the FOLKS gang maintained by the prosecutor's office."    (Doc. 24 at 155).   However, Butts has not explained how trial counsel would have benefited from pre-trial discovery of these files, much less shown a reasonable probability that but for their failure to obtain these files, the result of the trial would have been different.   (Doc. 24 at 155-56); *Strickland*, 466 U.S. at 694.

### 3.   Trial counsel's strategy and performance at trial

Butts complains that trial counsel failed to challenge adequately the State's gang evidence.   However, trial counsel did move to exclude the gang evidence seized from Butts's car and home.   (Doc. 8-3 at 99-102).   Having lost the motion in limine and knowing how gang evidence had been used in Wilson's trial, Westin testified that trial counsel discussed how to handle the gang evidence "thousands and thousands of times." (Doc. 10-16 at 43).   Ultimately, they determined the evidence was "a two-edged sword." (Doc. 10-16 at 8).   Butts was not "implicated deeply in … the gang with the physical evidence that the State had."   (Doc. 10-16 at 8).   Westin testified,

> I knew Mr. Horn was going to testify about gangs, but there was no way to put [Butts] in a gang.   Okay?   He didn't have any, like, other than that stuff on his wall, and that wasn't even his room.   I mean, it's just that the implication was that he was in the gang.   But I don't think … they ever testified that he was or wasn't.

(Doc. 13-1 at 93). However, the fact that Wilson was "deeply involved with the gang was certainly something that [they] … wanted the jury to hear."   (Doc. 10-16 at 8).   Westin

explained, "[T]he worse we made Mr. Wilson look and being associated with the gang, the better I thought it looked for Mr. Butts."   (Doc. 10-16 at 8).

Trial counsel implemented this strategy through cross-examination.   (Doc. 10-16 at 8).   Specifically, Horn testified on cross-examination that he had "a fairly good foundation of information" about who in Milledgeville belonged to gangs, and Butts was not known to be a gang member.   (Doc. 10-7 at 42).   Redding testified on cross-examination that he was familiar with FOLKS, and Butts was not a FOLKS member. (Docs. 10-5 at 154, 157-58, 163-65; 10-6 at 1).   Langford acknowledged that none of the seized gang evidence was directly linked to Butts.   (Doc. 10-15 at 102-04).   Redding testified that he was the one who gave Butts the gang-related writings and graffiti that police seized from Butts's bedroom dresser.[62]   (Doc. 10-5 at 163-165; 10-6 at 1).   He explained that a person called "Skid" gave them to him to give to Butts.   (Doc. 10-5 at 163).   Redding stated that he visited Butts's home often, and prior to the time he gave Butts's these gang-related materials, he had never seen gang paraphernalia in Butts's bedroom.   (Doc. 10-5 at 164).

Butts argues that trial counsel should have called other FOLKS gang members or Butts's family members who could have testified that Tamayo and Dominique were in the FOLKS gang, but Butts was not.   (Doc. 24 at 156-57).   This would have been cumulative of Redding's testimony.   *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009) (explaining trial counsel not ineffective for failing to present cumulative evidence).   Also, trial counsel explained that they were unable to find any family member willing to testify at trial.   (Docs. 10-16 at 27; 13-1 at 123).

---

[62]   Prior to trial, Westin met with Redding to have him view and discuss the gang writings and drawings that police seized from Butts's bedroom dresser and car following Parks's murder.   (Docs. 10-5 at 162-63).

Trial counsel established that Wilson was the leader of FOLKS.   Horn testified that Wilson's name was "at the top of [the] list" of known FOLKS.   (Doc. 10-7 at 42).

Trial counsel challenged Horn's testimony about the violent nature of gangs. Horn acknowledged that young people do not join gangs solely to commit crimes.   Often impoverished youth with low self-esteem join gangs simply because they are looking for a family unit.   (Doc. 13-7 at 103-04).   Horn admitted that "just because one is … in a gang does not necessarily mean that one is predisposed to kill someone," and not all gang members end up committing crimes.    (Doc. 10-7 at 41-42).

Trial counsel established that law enforcement had no evidence that Parks's murder was gang-related.   Horn admitted he had no personal knowledge that Parks was murdered so Butts could be elevated in the gang.   (Doc. 10-7 at 44-45).   Horn also admitted that if a gang member commits a crime to further his interests in the gang or to further the gang's interest in general, he can be charged with a separate "gang-related activity" crime, and Butts was not charged with such a crime.   (Doc. 10-7 at 46-47).

In short, trial counsel developed a reasonable strategy for handling the gang evidence and, through cross-examination of the State's witnesses, established that Butts was not a known member of FOLKS, that the gang paraphernalia might not have belonged to him, and that Wilson was the leader of FOLKS.   Therefore, the state habeas court's decision that trial counsel effectively challenged and handled the gang evidence was not factually or legally unreasonable.

### 4.   Appellate counsel

Butts faults appellate counsel for failing to "conduct any investigation to rebut the gang evidence" and argues that he was prejudiced because they were unable to show

what trial counsel could have presented to the jury.   (Doc. 24 at 141).   Presumably, the best evidence appellate counsel could have presented was admitted at the state habeas evidentiary hearing and the state habeas court, after considering that evidence, found that Butts failed to establish deficient performance on the part of appellate counsel with respect to the gang evidence.   (Doc. 16-23 at 54).   The state habeas court also found that, even if it found deficient performance, no prejudice resulted.   (Doc. 16-23 at 54).   Butts has not shown this was factually unreasonable or that it involved an unreasonable application of *Strickland*.

c.   Trial and appellate counsel's failure to hire a gang expert

Butts concedes his claim that trial counsel were ineffective for failing to hire a gang expert is procedurally defaulted.   (Doc. 24 at 142).   However, he argues the ineffective assistance of appellate counsel constitutes cause to overcome the default.   (Doc. 24 at 142).   The state habeas court considered the conduct of trial counsel as part of its analysis of Butts's ineffective assistance of appellate counsel claim and determined that trial and appellate counsel were not deficient for failing to retain a gang expert.   (Doc. 16-23 at 5 n.2, 54).   The state habeas court also found no prejudice.   (Doc. 16-23 at 54).

Butts argues these findings are factually unreasonable and/or constitute an "unreasonable application of … clearly established Federal law."   28 U.S.C. § 2254(d)(1).   Citing *Wiggins*, Butts argues that because the State had a gang expert (Horn), trial counsel should have hired one.   (Doc. 24 at 150).   *Wiggins* does not stand for the proposition that trial counsel must hire an expert when they know the State plans to call an expert.   In *Wiggins*, one of the factors supporting the Supreme Court's determination that trial counsel were ineffective was their failure, despite the availability of

funds, to hire an expert to prepare a social history report when the preparation of such was "standard practice" in capital cases.   *Wiggins*, 539 U.S. at 524.   In Butts's case, there is no indication that it was "standard practice" to hire a gang expert simply because the State has one.

Citing *Ake v. Oklahoma*, 470 U.S. 68 (1985), Butts claims that the trial court could not have denied him funds for a gang expert, and, therefore, trial counsel were per se ineffective for failing to request funds and hire such an expert.   (Doc. 24 at 143).   In *Ake*, the Supreme Court held that when a defendant carries his burden to show that "sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination...."   *Id*. at 83.   This holding is simply not relevant.   Thus, the state habeas court's decision that trial counsel's performance was not deficient because they failed to hire a gang expert did not involve an unreasonable application of *Ake*.   *Newland v. Hall*, 527 F.3d 1162, 1183 (11th Cir. 2008) (quoting *Williams*, 529 U.S. at 412-13) (explaining that the "'[c]learly established Federal law' consists of the 'holdings, as opposed to dicta, of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision'").

Butts argues trial counsel were ineffective for failing to hire a gang expert because the impressive credentials of an expert such as Hagedorn stand in "stark contrast" to Horn's credentials and would have been useful in a motion in limine challenging the expertise of Horn.   (Doc. 24 at 145).   However, Hagedorn's credentials,[63] would not

---

[63]   Hagedorn holds a PhD in urban studies, is an associate professor of criminal justice at the University of Illinois, Chicago, and a senior research fellow at the Great Cities Institute in Chicago.   (Doc. 13-3 at 43).
At the time of the state habeas evidentiary hearing, he had studied gangs for 25 years, with the majority of his research based in Milwaukee, Wisconsin and Chicago, Illinois.   (Doc. 13-3 at 43, 53).   His book, John

have prevented Horn from qualifying as an expert on gangs in the Milledgeville area.   As

discussed above and in *Wilson*, Horn's "expertise was based primarily on his experience."

*Wilson*, 2013 WL 6795024 at *40.   "Georgia courts, like federal courts, permit law

enforcement officers with sufficient experience to testify as gang experts."   *Id.* (citing

*Burgess v. State*, 292 Ga. 821, 822, 742 S.E.2d 464, 466 (2013); *Williams v. State*, 279

Ga. 731, 732, 620 S.E.2d 816, 818 (2005); and *United States v. Augustin,* 661 F.3d 1105

(11th Cir. 2011)).   Thus, even if trial counsel hired an expert such as Hagedorn, Horn

would have been allowed to testify about the local FOLKS gang.

Butts argues that an expert, such as Hagedorn, could have testified that there was

no evidence that Butts killed Parks so that he could be elevated in the ranks of the gang.

(Doc. 24 at 146-47).   However, Horn's and Hagedorn's testimony on this issue was

virtually identical.   Horn testified that gang members commit crimes to advance their

ranks in the gang.   (Doc. 10-7 at 27).   Hagedorn agreed.   (Doc. 13-3 at 98-99).   Horn

admitted he had no personal knowledge that Parks was killed so that Butts could move up

in rank in the FOLKS gang.   (Doc. 10-7 at 44-45).   Hagedorn agreed, stating, "I agree

with Detective Horn, there was no evidence that this was a gang related crime."   (Doc.

13-3 at 61).   Accordingly, the state habeas court's finding that Hagedorn "corroborated"

Horn's testimony was reasonable.[64]   (Doc. 16-23 at 52).

---

Hagedorn, People and FOLKS:   Gangs, Crime and Underclass in a Rust Belt City (Lakeview, 2d ed. 1998), describes the origins and behavior of gangs in Milwaukee, Wisconsin.   (Doc. 13-3 at 44-45).   He has never lived in Georgia, never visited Milledgeville before being retained in Butts's case, and never met or spoke with any Milledgeville FOLKS gang members before 2005, when he met Wilson.   (Doc. 13-3 at 54-57).   The state habeas court accepted Hagedorn as an expert on gangs in general, explaining that "the specifics of his ability to have … information about Milledgeville particularly within the time frame that we're talking about … goes more to the weight of it than his being able to testify…."   (Doc. 13-3 at 59).

[64] Butts complains that the state habeas court cited Wilson's statement that committing crimes give a gang member "more range" and Angela Johnson's statement that Butts killed Parks to improve his rank within the gang.   (Doc.24 at 150-51) (quoting Doc. 16-23 at 52 n. 23).   He argues that these statements are not admissible because they are both hearsay.   (Doc. 24 at 150-51).   This Court is not sure why the state

Butts argues that an expert, such as Hagedorn, could have testified that FOLKS does not, in fact, stand for "Followers of Our Lord King Satan."   (Doc. 24 at 148-49). While Hagedorn testified he and his associates in Chicago had "never heard of such a thing," he acknowledged that local gangs create their own signs and symbols and have their own identities.   (Doc. 13-3 at 79, 89).   Thus, while Hagedorn could have "provided the jury with an alternative narrative," he did not actually rebut Horns testimony.   (Doc. 24 at 152).   Horn himself provided an "alternative narrative," telling the jury that FOLKS also stands for "followers of Lord King Solomon."   (Doc. 10-7 at 24).

d.  Conclusion

The Georgia Supreme Court's determination that trial counsel were not ineffective for failing to voir dire potential jurors about their views on gangs was not contrary to clearly established federal law or unreasonable, either legally or factually.   The Georgia Supreme Court's determination that evidence about the FOLKS gang and testimony from Horn was admissible was not based on any unreasonable factual determinations.   Thus, that court's determination that trial counsel were not ineffective for failing to object to the evidence and testimony was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, nor was it based on any unreasonable factual determinations. The state habeas court reasonably determined that trial counsel did not perform deficiently in their investigation of gang evidence, their challenge to gang evidence, and their failure to hire a gang expert.   Finding no deficiency in trial counsel's performance, the state habeas court reasonably concluded that appellate counsel were not deficient for, and Butts was not prejudiced by, their failure to raise these claims on direct appeal.

---

habeas court cited this testimony.   But, Horn testified that gang members commit crimes to rise in the ranks of the gang, and Hagedorn agreed.   They both also testified that they could not say that Butts shot Parks to elevate his position in this gang.   (Docs. 10-7 at 27, 44-45; 13-3 at 61, 98).

4.   <u>Claim that trial counsel failed to argue in the sentencing phase that a
sentence of death was disproportionate and, therefore, precluded by
_Enmund v. Florida_, 458 U.S. 782 (1982), and its progeny</u>

Butts argues that trial counsel were ineffective during the sentencing phase of his

trial because they failed to argue that a death sentence is disproportionate punishment

given that the evidence did not conclusively establish he killed Parks.   (Doc. 24 at 160).

He acknowledges that the state habeas court found this claim to be procedurally

defaulted.   (Doc. 24 at 160) (citing Doc. 16-23 at 8).   Without further explanation, he

argues this claim should have been presented on direct appeal but was not due to

ineffective assistance of appellate counsel, which provides the cause to overcome this

default.   (Doc. 24 at 164).   Respondent has not addressed the claim in his briefs.

For ineffective assistance of appellate counsel to constitute cause to overcome

procedural default, the ineffective assistance of appellate counsel claim must be "both

exhausted and not procedurally defaulted."   _Ward_, 592 F.3d at 1157.   In his state

habeas petition, Butts argued that the death sentence in his case was disproportionate

under _Enmund v. Florida_, 458 U.S. 782 (1982).   (Doc. 12-13 at 21).   He also argued,

"[t]o the extent counsel failed to raise this issue on direct appeal or to research, brief, and

argue it effectively, appellate counsel were ineffective."   (Doc. 12-13 at 21 n.6).   The

state habeas court did not specifically address this issue, but rather disposed of it in a

catch-all ruling:   "As to any of [Butts's] ineffective assistance of appellate counsel claims

not directly addressed, this Court finds that [Butts] has failed to establish the deficiency or

the prejudice prong of any of his claims of ineffective assistance of appellate counsel and

they are hereby denied."   (Doc. 16-23 at 58).   Therefore, Butts's claim that appellate

counsel were ineffective for failing to raise the disproportionate sentence allegation has

been exhausted and is not procedurally defaulted.   The remaining issue is whether the

state habeas court reasonably determined the claim was without merit.

In *Enmund v. Florida*, 458 U.S. 782 (1982), the Court held that the death penalty

may not be imposed on a defendant who "aids and abets a felony in the course of which a

murder is committed by others but who does not himself kill, attempt to kill, or intend that

a killing take place or that lethal force will be employed."   *Id.* at 797.   In *Tison v. Arizona*,

481 U.S. 137 (1987), the Supreme Court limited *Enmund*, holding that "major

participation in the felony committed, combined with reckless indifference to human life, is

sufficient to satisfy the *Enmund* culpability requirement."   *Id.* at 158.   Butts concedes he

was a "major participant" in the crime but argues that the State did not show he was

recklessly indifferent to human life.   (Doc. 24 at 162).   A finding of the requisite

culpability may be made by a jury, the trial judge, or an appellate court.   *Cabana v.*

*Bullock*, 474 U.S. 376, 392 (1986).   Under 28 U.S.C. § 2254(d), the factual findings as to

culpability are presumed correct and, unless the petitioner overcomes the presumption,

this Court must hold that the Eighth Amendment is not offended by the death sentence.

*Cabana,* 474 U.S. at 388.

There was evidence that Butts was the actual shooter.   (Doc. 9-14 at 43-45, 102).

The jury was charged as follows:

> I further charge you that the sentence of life imprisonment without parole or
> death shall not and cannot be imposed unless you find beyond a
> reasonable doubt that the defendant either (a) committed the murder; (b)
> attempted to kill the victim; or, (c) intended that deadly force be used by
> another to accomplish the criminal enterprise.

(Doc. 10-7 at 129).   It took the jury less than one hour to make such a finding and

determine Butts should receive a sentence of death.   (Doc. 10-7 at 136).

On direct appeal, the Georgia Supreme Court determined the facts supported the

verdict and sentence:

> We find that, viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize the jury to find beyond a reasonable doubt that Butts was guilty of all charges and that the one statutory aggravating circumstance existed….
>
> ….
>
> Although the trial judge's report indicates that the evidence did not "foreclose all doubt" in this case, we note that the evidence supporting the jury's finding of guilt was very strong.   The fact that Butts asked the victim for a ride, even though he had driven his own automobile to the store, shows that he was involved in the motor vehicle hijacking from the beginning.   The evidence also suggested that Butts carried the shotgun with him into the store as he sought out a victim.   Testimony at trial showed that Butts had worked with the victim previously, suggesting that Butts intended from the beginning to murder the victim in order to ensure the victim's silence.   Several of Butts's former jail mates testified that he had admitted being the triggerman….   These circumstances all might reasonably have urged the jury to impose a death sentence.

*Butts*, 273 Ga. at 762, 771, 546 S.E.2d at 478, 484-85 (footnotes omitted).

Given these findings, it was reasonable for the state habeas court to determine

that appellate counsel were not ineffective for failing to raise the claim that trial counsel

should have argued Butts's sentence was disproportionate under *Enmund*.   Also

reasonable was the state court's finding that there was no reasonable probability of a

different result had the issue been raised during direct appeal.   Because appellate

counsel were not ineffective, Butts cannot overcome the procedural default of his claim

that trial counsel were ineffective for failing to argue that his death sentence was

precluded by *Enmund*.

**B. Claim Two:   The trial court's improper rulings and other errors
deprived Petitioner of a fair trial and reliable sentencing in
violation of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution.**

    1.   <u>The trial court's failure to excuse Juror Charles Osborne, Jr. for cause</u>

Butts argues that the trial court violated his constitutional rights when it failed to

strike Juror Charles Osborne, Jr. for cause.   (Doc. 24 at 166).   At the time of Butts's trial,

Osborne "was the current City Marshal and former 14-year Chief of Police, who had

investigated murders, knew several of the witnesses in [Butts's] trial personally, including

many of the officers, and who still possessed arrest powers in his current position with the

City."   (Doc. 24 at 167).   Butts argues that because he was alleged to have killed a

correctional officer, Osborn had "'such a close connection to the circumstances of the

case that bias must be presumed.'"   (Doc. 24 at 167) (quoting *United States v. Trujillo*,

146 F.3d 838, 842-43 (11th Cir. 1998)).

> The Georgia Supreme Court rejected this argument in Butts's direct appeal.
>
> Butts argues that juror Osborne should have been excused for cause
> because he was serving as City Marshal and had formerly served as Chief
> of Police.   Although we have held that actively-serving full-time police
> officers with arrest powers must be excused upon request in a criminal trial,
> we have refused to extend that automatic disqualification rule to other
> persons who are less-connected with law enforcement.   Juror Osborne
> indicated that he was no longer serving as Chief of Police and that his duties
> as City Marshal concerned "building code [and] other miscellaneous"
> matters. He explained that, although he believed he possessed arrest
> powers, he was not involved in criminal matters.   The trial court properly
> found that this juror was not automatically disqualified, and Butts has failed
> to show that the juror should have been disqualified for favor.

*Butts*, 273 Ga. at 763-64, 546 S.E.2d at 479 (footnotes omitted).

Butts faults the state court for "ignoring" his argument that, in addition to being City

Marshal and former police chief, Osborn had reviewed the witness list and knew quite a

few of the witnesses, particularly those involved with law enforcement.   (Doc. 24 at 167).

State courts are not required to explain all, or any, of the reasons for their decisions.

*Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329-30 (11th Cir. 2013); *Wright*, 278 F.3d

at 1255 (holding that "[r]equiring state courts to put forward rationales for their decision so

that federal courts can examine their thinking smacks of a 'grading papers' approach that

is outmoded in the post-AEDPA era").   This Court cannot simply assume the Georgia

Supreme Court "failed to consider all of the circumstances" because it did not list each of

Butts's arguments regarding juror Osborn.   To the contrary, the Eleventh Circuit has

expressly rejected the argument that a state court's opinion is unreasonable unless it

"actually 'consider[ed] every relevant circumstance' (and every argument) by explicitly

mentioning each one."   *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1211 (11th

Cir. 2013).   Additionally, Butts has pointed to no clearly established Supreme Court case

law that would have required the trial court to strike Osborne for cause because of his

current position, former position, or his knowledge of others in the law enforcement

community.   *See Woods v. Donald*, 135 S. Ct 1372, 1376 (2015) (explaining that "clearly

established Federal law for purposes of § 2254(d)(1) includes only the holdings … of this

Court's decisions") (citations and quotation marks omitted).   For these reasons, the

Court denies relief on this claim.

### 2.   The trial court's admission of photographs of the victim

Butts argues that crime scene photographs[65] of Parks's body should not have

---

[65] These include State's Exhibits 3 through 6 admitted at trial.   State's Exhibit 3 is a photograph of Parks's entire body at the scene (Doc. 9-7 at 126); State's Exhibit 4, which was admitted over objection that it was duplicative of State's Exhibit 3, is a photograph of Parks's body from the waist up (Doc. 9-8 at 9-10); State's Exhibit 5 is a close-up photograph of the wound, which was admitted over objection that it was duplicative of State's Exhibit 4 (Doc. 9-8 at 10-11); State's Exhibit 6 is a photograph of the "pool of blood in relation to the house," which was admitted over objection that it was duplicative and prejudicial.   (Doc. 9-8 at 11).

been admitted because they were irrelevant and duplicative.   (Doc. 24 at 170).   He also

argues that the trial court failed to "carefully screen[] for relevancy" three autopsy

photographs[66] that the Deputy Chief Medical Examiner for the G.B.I. Crime Laboratory

discussed during his testimony regarding Parks's autopsy.   (Doc. 24 at 170-71).

Appellate counsel raised this issue and the Georgia Supreme Court held that

> [p]retermitting the question of waiver raised by trial counsel's failure to raise
> an objection to certain photographs of the victim's wounds, we find that the
> photographs, the originals of which appear in the record of Butts's
> co-perpetrator's trial, were admissible.   We also find that, because the
> photographs were admissible, trial counsel did not render ineffective
> assistance by failing to raise meritless objections to them.

*Butts*, 273 Ga. at 765, 546 S.E.2d at 480 (footnotes omitted).

This Court's review of a state court's decision regarding the admissibility of

evidence is extremely proscribed.

> [I]n reviewing the evidentiary determination of a state trial judge, we
> are mindful of the fact that we do not sit as a super state supreme
> court.   Unlike a state appellate court, we are not free to grant the
> petitioner relief simply because we believe the trial judge has erred.
> The scope of our review is severely restricted.   Indeed, the general
> rule is that a federal court will not review a trial court's actions with
> respect to the admission of evidence.   A state evidentiary violation
> in and of itself does not support habeas corpus relief.   Before such
> relief may be granted, the violation must rise to the level of a denial of
> fundamental fairness

*Shaw*, 695 F.2d at 530 (citations and quotation marks omitted).

In many cases, the Georgia Supreme Court has considered the admissibility of

crime scene photograhs and has held that "unless there are some very exceptional

circumstances[,] the photographs of the deceased are generally admissible to show the

---

[66]   These include State's Exhibits 15, 16, and 18.   (Doc. 24 at 170).   State's Exhibit 15 was a photograph of
lacerations and abrasions to Parks's chin (Doc. 9-10 at 51); State's Exhibit 16 was a photograph of Parks's
eyes and shows the superficial lacerations on Parks's left upper eyelid and the ecchymosis of both eyelids
(Doc. 9-10 at 51-52); State's Exhibit 18 was a photograph of the entrance gunshot wound on the back of
Parks's head (Doc. 9-10 at 52).   The three photographs were admitted without objection.

nature and extent of the wounds, the location of the body, the crime scene, the identity of the victim and other material issues." *Moses v. State*, 245 Ga. 180, 186, 263 S.E.2d 916, 922 (1980) (overruled on other grounds by *Nagel v. State*, 262 Ga. 888, 891 n.1, 427 S.E.2d 490, 492 n.1 (1993) (citing *Godfrey v. State*, 243 Ga. 302, 253 S.E.2d 710 (1979); *Stevens v. State*, 242 Ga. 34, 247 S.E.2d 838 (1978); and *Lamb v. State*, 241 Ga. 10, 243 S.E.2d 59 (1978)).   "Doubtless, photographs of the victim are prejudicial to the accused, but so is most of the state's pertinent testimony.   The picture may be gory, but murder is usually a gory undertaking." *Id.*; s*ee also Russell v. State*, 267 Ga. 865, 867, 485 S.E.2d 717, 719 (1997) (finding that photographs were admitted to show nature and extent of victim's wounds and "[a]ny gruesome or inflammatory aspect of the photographs stemmed entirely from acts of the defendant").   Finally, it appears the autopsy photographs showed "mutilation of the victim resulting from the crime against him" and not "further mutilation of [the] body at autopsy." *Brown v. State*, 250 Ga. 862, 866, 302 S.E.2d 347, 351 (1983).   Therefore, the Georgia Supreme Court's finding that the photographs were properly admitted appears reasonable, both factually and legally.

Even if this Court were to find error occurred, and it does not, habeas relief would be "warranted only when the error 'so infused the trial with unfairness as to deny due process of law.'" *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014) (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)).   "In the context of state evidentiary rulings, the established standard of fundamental fairness is that habeas relief will be granted only if the state trial error was material in the sense of a crucial, critical, highly significant factor." *Shaw*, 695 F.2d at 530 (citations and quotations marks omitted).   Butts has not shown that the trial court's admission of these seven

photographs rendered his trial fundamentally unfair.    Therefore, the Court denies relief

on this claim.

3.  <u>Alleged victim impact testimony and arguments during the guilt and sentencing phases</u>

Trial counsel moved in limine to exclude victim worth, victim impact, and other

inflammatory and prejudicial evidence.   (Doc. 8-1 at 66-71).   During a pretrial hearing,

the district attorney indicated he did not intend to use victim impact evidence, and the

court granted trial counsel's motion.   (Docs. 8-4 at 28; 8-8 at 51).   Butts argues that,

despite this ruling, the trial court improperly allowed the following victim impact and victim

worth evidence:   (1) the district attorney's statement in his guilt phase opening that

Parks's father "saw the body of a man sprawled out, face down, lying there in the middle

of the road, lying in a pool of his own blood, with his brains—part of his brains splattered

on the cement" (Doc.9-7 at 28); (2) the statement in his guilt phase opening that

"somebody was speaking to [Parks's father] maybe and said—maybe an angel, I don't

know—said, Mr. Parks, go on down to the … Baldwin County Hospital [and] find out who

that man was who had his brains splattered in the road there" (Doc. 9-7 at 29); (3) Parks's

father's response, during the guilt phase, to a question about seeing his son's body at the

hospital; (3) the district attorney's various references to the spirituality of Parks and his

family; and (4) the district attorney's various reference to Parks's gentle nature.   (Doc. 24

at 178-87).

Appellate counsel raised these issues on direct appeal and the Georgia Supreme

Court found that

> even in the guilt/innocence phase of a death penalty trial, some facts about
> the victims, including, possibly, some of their personal characteristics, will
> inevitably be developed, not only because the jurors must be provided

those details of context that allow them to understand what is being
described, but also because evidence relating to the victims' character and
personality may be probative of critical aspects of the trial....

Here, the incidental characterizations of the victim as a nice and charitable
person and as being a person who attended services at a religious
establishment were relevant to the facts of the crime.   The victim offered a
ride to persons pretending to be in need, and the victim was identified, in
part, by the semi-formal clothing he was wearing after a religious service.
Likewise, the victim's father's statement in response to a question by the
State about how the victim's remains were identified was an incidental
outgrowth of the relevant fact that the father had, in an extraordinary and
tragic turn of events, discovered his own son's body moments after the
murder.   Pretermitting the waiver involved in the fact that most of the
contested testimony and comments were not objected to, we find that they
were not improper.

*Butts*, 273 Ga. at 767, 546 S.E.2d at 481-82 (footnotes and quotation marks omitted).

*Payne v. Tennessee,* 501 U.S. 808 (1991), provides the clearly established federal
law regarding victim impact evidence and testimony.   To understand *Payne*, however, it
is necessary to review the cases that it overruled.   The Supreme Court first addressed
the issue of victim impact testimony in *Booth v. Maryland*, 482 U.S. 496 (1987), and held
that the Eighth Amendment prohibits a capital sentencing jury from considering victim
impact testimony, which includes descriptions of the victim's personal characteristics,
statements concerning the emotional impact of the crime on the victim's family, and the
family members' opinions about the crime and the defendant.   *Id.* at 508-09.   Next, in
*South Carolina v. Gathers*, 490 U.S. 805 (1987), the Court extended *Booth* to statements
made by the prosecutor about the personal characteristics of the victim.   *Id.* at 811.   In
*Payne,* the Court overruled *Booth* and *Gathers* and held "that if the State chooses to
permit the admission of victim impact evidence and prosecutorial argument on that
subject, the Eighth Amendment erects no *per se* bar."   *Payne,* 501 U.S. at 827.   Instead,
"[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the

trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment

provides a mechanism for relief."[67]   *Id.* at 825 (citing *Darden v. Wainwright*, 477 U.S. 168

(1986)).   In a footnote, the Court explained that its

> holding today is limited to the holdings of *Booth* … and *Gathers* …, that
> evidence and argument relating to the victim and the impact of the victim's
> death on the victim's family are inadmissible at a capital sentencing
> hearing.   *Booth* also held that the admission of a victim's family members'
> characterizations and opinions about the crime, the defendant, and the
> appropriate sentence violates the Eighth Amendment.   No evidence of the
> latter sort was presented at the trial in this case.

*Id.* at 830 n.2 (citations omitted).

Butts argues the prosecutor's remarks about brains on the cement and angels

telling Parks's father to go to the hospital inappropriately characterized the crime scene,

were irrelevant, and were improper because the prosecutor knew Parks's father was not

going to testify to such.   Butts's argument that the prosecutor inappropriately

characterized the crime scene fails.   (Doc. 24 at 184-85).   While a family member's

characterization and opinion of a crime or crime scene may still be impermissible under

*Payne*, the Supreme Court has never held that a district attorney cannot provide a

characterization of a crime scene.[68]

Butts's remaining arguments regarding the district attorney's opening statement

seem more relevant to a claim for prosecutorial misconduct than a claim regarding victim

impact evidence.   Regardless of how the claim is labeled, however, Butts is not entitled

to relief.   "[T]he bar for granting habeas based on prosecutorial misconduct is a high

---

[67] Therefore, the standard of review would be the same as that for other state evidentiary rulings, which is exceedingly "narrow"   *Felker v. Turpin*, 83 F.3d 1303, 1311 (11th Cir. 1996).   As explained previously, a state court's evidentiary rulings are reviewed only to determine whether the error "so infused the trial with unfairness as to deny due process of law."   *Id.* (citations and quotation marks omitted).

[68] At issue in *Gathers* was the prosecutor's "statement … concerning personal characteristics of the victim." *Gathers*, 490 U.S. at 811.   The Court held that a prosecutor may not characterize the victim's personal qualities.   *Id.*   This case did not address whether a prosecutor could provide opinions about or characterize a crime scene.

one." *Land v. Allen*, 573 F.3d 1211, 1220 (11th Cir. 2014).   Just as with evidentiary

errors, habeas relief is warranted only when the improper remarks have "'so infected the

trial with unfairness as to make the resulting conviction [or sentence] a denial of due

process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

643 (1974)).   Butts has not made such a showing.   Looking at the record as a whole, the

prosecutor's remarks, even if inappropriate, did not render Butts's trial fundamentally

unfair.

   With regard to Parks's father's response to a question about seeing his son's body

at the hospital, Parks's father was the first person to arrive at the crime scene.   *Butts*, 273

Ga. at 767, 546 S.E.2d at 482.   However, he did not realize the victim was his son.

(Doc. 9-7 at 89).   He testified that, after speaking with police, he started to drive away

and "what dawned on [him] and what came in [his] mind was that suit that [the victim] had

on … resembled the suit that [his] son left the house with on and that's what got [him]

scared."   (Doc. 9-7 at 90).   He explained that, after trying to locate his son, he went to

the hospital and the deputies informed him his son was dead.   (Doc. 9-7 at 92-93).   The

district attorney asked Parks's father if he viewed his son's body and Mr. Parks

responded, "I wouldn't go back there.   I didn't want to look because I saw enough on

Felton Drive.   What I saw [will] last me a lifetime.   As long as I live, I'll never forget that."

(Doc. 9-7 at 93).   Trial counsel objected "to the impact" testimony, and the district

attorney explained that Parks's father was just testifying to what he saw, but he would

"move on."   (Doc. 9-7 at 93).

   Butts argues this was a family member's characterization of the crime, which

remains impermissible under the Eighth Amendment.   *Payne*, 501 U.S. at 830 n.2

(explaining that *Booth's* Eighth Amendment ban on admission of victim's family members' characterizations and opinions about the crime or the defendant not addressed in *Payne*). Citing *Bryant v. State*, 288 Ga. 876, 708 S.E.2d 362 (2011), Butts maintains that Parks's father's statements are the type of characterization that the Georgia Supreme Court continues, post-*Payne*, to hold impermissible.   *Id.* at 897-98, 708 S.E.2d at 382-83.   In *Bryant*, family members testified that the victims were "'shot and left in a patch of kudzu as if they were a piece of trash on the side of the road,' that the victims were 'left under trash and branches, left to die,' and that the crimes were 'a senseless, selfish act of nothing but wickedness and evil.'"   *Id. a*t 897, 708 S.E.2d at 383.   Noting that the family members had no personal first-hand knowledge of these facts, the Georgia Supreme Court held that the testimony amounted to an impermissible characterization of the crime and the defendant.   *Id.* at 897-98, 708 S.E.2d at 383.

Parks's father, however, had personal first-hand knowledge of the crime scene. As the Georgia Supreme Court found, his statement was an "incidental outgrowth of the relevant fact that the father had, in an extraordinary and tragic turn of events, discovered his own son's body moments after the murder."   *Butts*, 273 Ga. at 767, 546 S.E.2d at 482.   This finding was not unreasonable factually and did not involve an unreasonable application of *Booth* or *Payne*.

Butts complains that the district attorney made numerous references to the spirituality of Parks and his family and to Parks's gentle nature.   (Doc. 24 at 186). Specifically, he complains:   the district attorney, in his opening statement during the guilt phase, referenced an angel telling Parks's father to go to the hospital (Doc. 9-7 at 28-29); the district attorney, in his opening statement during the guilt phase, told the jury that

Parks and his family were active members of the Kingdom Hall of Jehovah Witnesses and that he believed the courtroom was "[l]ike that church that the victim went in" (Doc. 9-7 at 31, 38); the district attorney, during the guilt phase, asked a witness about Parks's nature, and she responded that he was a gentle, non-aggressive person (Doc. 9-8 at 96); the district attorney, during the guilt phase, asked a witness how long Parks had attended church, and she replied that he attended "[p]ractically all his life" (9-8 at 85); the district attorney, during the guilt phase closing argument, referred to Parks as a "nice young man" (Doc. 10-4 at 75); and the district attorney, during the sentencing phase closing argument, stated Parks "chose to worship in the church of his choice on that fateful Thursday.   And, unfortunately, [Parks] made his last and untimely final choice and that was to be a good Christian man and to give two of his fellow men a ride on that rainy night."   (Docs. 10-7 at 104-05; 24 at 181).

The Georgia Supreme Court found these "incidental characterizations … were relevant to the facts of the crime."   *Butts*, 273 Ga. at 767, 546 S.E.2d at 482.   The court reasoned this evidence was relevant because Parks agreed to give a ride to persons who pretended to be in need and Parks was identified, in part, by the semi-formal attire he had worn to a religious service that night.   *Id.*   Butts claims this ruling was unreasonable. (Doc. 24 at 182).   It was not.

Even when it announced a per se rule forbidding testimony concerning the personal characteristics of a crime victim, the Supreme Court acknowledged that its disapproval of such testimony did not mean "that this type of information will never be relevant in any context.   Similar types of information may well be admissible because they relate directly to the circumstances of the crime."   *Booth*, 482 U.S. at 507 n.10.

This is exactly what the Georgia Supreme Court held regarding the testimony about which Butts complains.   This Court cannot find that no reasonable jurist could agree with that determination.   Furthermore, even if there was an evidentiary error, this Court could not find that these victim characterizations were so unduly prejudicial that it rendered Butts's trial fundamentally unfair.   *Payne*, 501 U.S. at 825.   Therefore, habeas relief must be denied.[69]

4.   Trial court's failure to charge the jury on mere presence during the guilt phase

Butts argues that the trial court committed reversible error by failing to charge the jury on mere presence at the scene during the guilt phase.   (Doc. 24 at 190-94).

Appellate counsel raised this issue and the Georgia Supreme Court held:

> Pretermitting the issue of waiver involved in Butts's failure to request a charge on mere presence, we conclude that, because the trial court's charge, as actually given, was full and fair and substantially covered all the legal principles relevant to the determination of appellant's guilt [,] the trial court's failure to charge specifically on mere presence was not reversible error.

*Butts*, 273 Ga. at 768, 546 S.E.2d at 482 (footnotes and quotation marks omitted).

The trial court charged the jury that "[e]very party to a crime may be charged with and convicted of commission of the crime.   A person is a party to a crime only if that person, (a) directly commits the crime; or, (b) intentionally helps in the commission of the crime."   (Doc. 10-4 at 118).   Also, it charged:

> It is for you to say whether under the evidence in this case, the testimony of the witnesses and the facts and circumstances of the case sufficiently

---

[69]  Butts also argues that trial counsel were ineffective for failing to object to the victim impact evidence. (Doc. 24 at 188-90).   The Georgia Supreme Court held that "[b]ecause the testimony and comments complained of by Butts were not improper in their context, Butts's trial counsel did not render ineffective assistance in failing to object to them."   *Butts*, 273 Ga. at 767, 546 S.E.2d at 482.   This ruling was not contrary to, or involve an unreasonable application of, *Strickland*, nor was it based on any unreasonable findings of fact.   Trial counsel are not ineffective for failing to object to evidence that is properly admitted.

identify this defendant beyond a reasonable doubt as the perpetrator of the alleged crime or that the defendant was a party to it.   It is not necessary that the defendant show that another person committed the alleged offense. It is sufficient if there are facts and circumstances in this case which would raise a reasonable doubt whether this defendant is, in fact, the person who committed the crime or was a party to it.

If you do not believe that the defendant has been sufficiently identified as the person who committed the alleged crime or was a party to it, or if you have any reasonable doubt about such, then it would be your duty to acquit the defendant.

(Doc. 10-4 at 119).

"A defective jury charge raises an issue of constitutional dimension only if it renders the entire trial fundamentally unfair." *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983) (citing *Smith v. Smith*, 454 F.2d 572, 579 (5th Cir. 1971)).   An omitted instruction is less likely to be prejudicial than an instruction that misstates the law. *Jacobs v. Singletary*, 952 F.2d 1282, 1290 (11th Cir. 1992).   To determine if a petitioner's trial has been rendered fundamentally unfair because an instruction was omitted, the court considers "the remainder of the charge and the trial as a whole." *Id.* (citing *Lamb v. Jernigan*, 683 F.2d 1332, 1339 (11th Cir. 1982)).   Considering the trial as a whole and the charge given, the Court cannot find that Butts's trial was rendered "fundamentally unfair" because a mere presence instruction was not given.   Certainly, the Georgia Supreme Court's determination of such was not unreasonable factually or legally.[70]

---

[70]  Having found "that the trial court's charge was adequate as given," the Georgia Supreme Court determined that Butts could not "show that his trial counsel's failure to request a charge on mere presence and to reserve objections to the trial court's charges as given created prejudice of constitutional proportions" and, therefore, denied his claim of ineffective assistance of trial counsel with respect to the disputed charge.   *Butts*, 273 Ga. at 768, 546 S.E.2d at 482.   Because this Court finds the Georgia Supreme Court's determination of the underlying failure to charge claim was reasonable, the Court also finds its determination that Butts cannot establish prejudice resulting from counsel's failure to request the charge was reasonable.   Agreeing with the Georgia Supreme Court's prejudice determination, the Court need not address counsel's performance.   *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong … or vice versa.")

**C. Claim Three:   Misconduct by the prosecutor deprived Butts of his constitutional rights to due process and a fair trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Butts argues he is "entitled to a new sentence because the prosecutor unconstitutionally and unethically used irreconcilable and inconsistent theories of the crime to convince two juries to impose death sentences on Mr. Butts and his co-defendant, Marion Wilson."   (Doc. 24 at 198).   Butts alleges the prosecutor told one jury that Wilson shot Parks and later told a second jury that Butts was the triggerman. (Doc. 24 at 199).   The state habeas court found the claim was procedurally defaulted because appellate counsel failed to raise the issue on direct appeal.   (Doc. 16-23 at 11-12).   But the court considered "the merits of this claim concurrently with a determination of whether [Butts] has demonstrated cause and prejudice or a miscarriage of justice sufficient to excuse this default."   (Doc. 16-23 at 12).

The state habeas court made the following findings of fact:   (1) during the guilt phase of Wilson's trial, the prosecutor repeatedly told the jury that the state could not prove Wilson was the triggerman (Doc. 16-23 at 12); (2) after Wilson was found guilty of malice murder, "the prosecutor's arguments that co-defendant Wilson shot the victim were legally correct" (Doc. 16-23 at 12); (3) during the guilt phase of Butts's trial, two inmates testified that Butts admitted he was the triggerman (Doc. 16-23 at 12); (4) in Butts's guilt phase closing argument, the prosecutor argued that Butts told fellow inmates he was the shooter; and (5) the prosecutor further argued that "we don't have to … but we proved that the man that actually, in fact, pulled the trigger and blew out the brains of … Parks is the defendant, Robert Earl Butts, Jr."   (Doc. 16-23 at 12-13).   Having made these factual findings, the state habeas court determined that the "underlying theory of

the State's case remained the same" throughout both trials and the prosecutor's arguments were consistent, "particularly when the arguments at the sentencing phase of Wilson's trial are reviewed in conjunction with the prosecutor's guilt phase argument from ... Wilson's trial."   (Doc. 16-23 at 13).   Therefore, the state habeas court found that neither trial[71] nor appellate counsel rendered deficient performance with respect to the prosecutor's arguments, and Butts failed to establish cause and prejudice or a miscarriage of justice to overcome the procedural default of the claim.   (Doc. 16-23 at 13).

Butts argues that the state habeas court misapplied the cause and prejudice standard for excusing procedural defaults, and, therefore, this Court owes no deference to that ruling.   (Doc. 24 at 201-04).   Butts's argument, though somewhat difficult to follow, is that during the sentencing phase of Wilson's trial, the prosecutor argued that Wilson was the shooter, and Wilson received a death sentence.   (Doc. 24 at 199). Having obtained a death sentence for Wilson by arguing he was the shooter, the prosecutor was estopped from arguing that Butts was the triggerman.   (Doc. 24 at 199-200).   When the prosecutor argued Butts was the shooter, he engaged in an "inherently inconsistent one murder, two shooters theory of the crime."   (Doc. 24 at 204). Thus, according to Butts, "[t]he state habeas court's unreasonable determination that the prosecutor's assertion that Mr. Butts and Mr. Wilson both fired the same gunshot was constitutional *after* Mr. Wilson's death sentence requires no deference from this Court,

---

[71] The state habeas court's order reads:   "Trial counsel did object to the argument at Petitioner's trial and appellate counsel did not raise the issue on direct appeal."   (Doc. 16-23 at 12).   Presumably this is a typographical error and the order should read, "[t]rial counsel did **not** object" because the record shows no objections during the prosecutor's closing argument in Butts's case, and the state habeas court found trial counsel's failure to object did not amount to deficient performance.   (Docs. 10-7 at 99-105; 13-6 at 20-21; 16-15 at 9; 16-23 at 12).

which should thus apply the 'cause and prejudice' analysis *de novo*."   (Doc. 24 at
203-04).

The Eleventh Circuit has explained that "where the state correctly applies a
procedural default principle of state law to arrive at the conclusion that the petitioner's
federal claims are barred, *Sykes* … requires the federal court to respect the state court's
decision."   *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999) (citing *Sykes*, 433 U.S.
72 (1977)).   The state habeas court did not misapply the procedural default principle to
this claim as it is undisputed that the claim was not presented on direct appeal.   *Black v.
Hardin*, 255 Ga. 239, 240, 336 S.E.2d 754, 755 (1985) (explaining that "a failure to make
timely objection to *any* alleged error or deficiency or to pursue the same on appeal
ordinarily will preclude review by writ of habeas corpus").   Thus, this Court cannot
conduct a *de novo* cause and prejudice analysis.   Butts can overcome the procedural
default of this claim only by showing cause and prejudice, and, to the extent the state
court's cause and prejudice findings are based upon determinations of fact, those factual
findings are presumed to be correct and can be rebutted only by clear and convincing
evidence.   28 U.S.C. § 2254(e)(1).

This Court agrees that appellate counsel were not deficient for failing to raise
Butts's "irreconcilable theories of the crime" claim on appeal, and, even if they had, the
claim would not have had a reasonable probability of success on appeal.   *Heath*, 941
F.2d at 1130 (explaining that appellate counsel's performance is prejudicial only if the
neglected claim would have a reasonable probability of success on appeal).   This Court
addressed the same claim in Wilson's case:

> [A]ppellate counsel were not deficient for failing to raise Wilson's
> prosecutorial misconduct claim on appeal.   Wilson's argument that the

prosecutor misled the jury and used "wholly inconsistent arguments to sentence two men to die" is weak at best.

Furthermore, even if appellate counsel performed deficiently when they failed to raise the issue on appeal, Wilson was not prejudiced.   Appellate counsel's performance is prejudicial only if the neglected claim would have a reasonable probability of success on appeal.   The Court sees no reasonable chance this claim would have prevailed on appeal; certainly the state habeas court's lack of prejudice determination was not based on any unreasonable determinations of the facts.   The jury was well aware from the beginning of Wilson's trial that either Wilson or Butts could have fired the shot that killed Parks.   The prosecutor readily acknowledged this at the outset **and he acknowledged the same in Butts's trial**.   Contrary to Wilson's assertion, this is not a "flip-flopping" theory of the crime or "irreconcilable theories of the crimes."

*Wilson*, 2013 WL 6795024 at *8 (emphasis added) (citations and footnotes omitted).

Butts claims his situation is different because his trial took place after Wilson's and "[o]nce [the prosecutor] went on the record in the sentencing phase of the Wilson trial that Mr. Wilson pulled the trigger, … he was simply estopped from arguing to the Butts jury that Mr. Butts pulled the trigger."   (Doc. 24 at 200).   In the sentencing phase of Wilson's trial, the prosecutor did argue that the jury should "show Wilson the same amount of mercy that he granted … Parks when he blew his brains out on the side of the road." *Wilson*, 2013 WL 6795024 at *7 (citations and quotation marks omitted).   He also argued "that man right there took that shotgun and fired it and into the night … it sent 50 pellets … aimed right in the back of that man's head."   *Id.*   However, this was after the prosecutor conceded on numerous occasions that "'the State cannot prove who pulled the trigger in this case'" and specifically told the jurors it "'[v]ery well could have been Butts.'"   *Wilson*, 2013 WL 6795024 at *7.

In Butts's trial, in his opening statement during the guilt phase, the prosecutor told the jury there was

[s]omething called parties to a crime.   The law says if you aid and abet another, if you help another to commit a crime, then not only is your partner guilty of the crime, but if you helped him, you're guilt[y] of it too.   And that's why I say both of them are guilty and I say it doesn't matter which one pulled the trigger.   They are both guilty if they participated in this.   And … both of them were in it from the top of their heads to the bottom of the soles of their feet.

So when I say it doesn't matter which one pulled the trigger, I want that clear in your minds.   But, I'll go one step further… In this case you will hear—and I told you it doesn't matter—but you will hear some evidence from which you … can conclude that the one that held the sawed-off shotgun, the one that aimed it at the back of the head of Donovan Corey Parks, and the one whose finger was on that trigger, that squeezed that trigger … is [Butts's] finger.

(Doc. 9-7 at 35-36).

The "evidence" to which the prosecutor was referring was the three jailhouse informants to whom Butts had allegedly confessed he was the triggerman.[72]   When called to the stand, one of these inmates said he remembered nothing; another testified that Butts said Wilson instructed him to shoot Parks and he did so; and the third testified that Butts said he shot Parks.   (Doc. 9-14 at 43-46, 80-85, 101-02).   In his closing argument during the guilt phase, the prosecutor told the jury that "[i]t legally doesn't even matter which one pulled the trigger" but reminded them that Butts told his cellmates he was the triggerman.   (Doc. 10-4 at 99).   He stated, "We proved—and we don't have to—but we proved that the man that actually, in fact, pulled the trigger and blew out the brains of Donovan Corey Parks is … Butts."   (Doc. 10-4 at 105).

This Court agrees with the state habeas court that the State's arguments were not improper, nor did the State attempt to "flip flop" theories of who was the triggerman,

---

[72] Butts's alleged confession to his three inmates was first mentioned in Wilson's trial.   During the sentencing phase of Wilson's trial, three witnesses—Chief Deputy Howard Sills, Officer Russell Blenk, and defense investigator William Thrasher—testified that three of Butts's cellmates told them that Butts confessed he was the triggerman.   *Wilson*, 2013 WL 6795024 at *7.

particularly in light of the numerous concessions in both trials that the State could not

identify the triggerman.   Certainly, the state court's determinations in this regard were not

based on any unreasonable determinations of fact.   Thus, appellate counsel did not

render deficient performance for failing to raise this issue on appeal, and Butts cannot

overcome the procedural default of prosecutorial misconduct claim.[73]

**D. Claim Five:   A death sentence in this case is disproportionate punishment, and such an arbitrary application of the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution.**

Butts claims the death sentence imposed in his case is excessive and

disproportionate to the penalties imposed on similar cases.   (Doc. 24 at 217).   He

argues that many defendants who have committed similar crimes and who share similar

personal characteristics with him have received a punishment other than death.   (Doc.

24 at 219).   Appellate counsel raised this issue, and Georgia Supreme Court found

> [a]lthough the trial judge's report indicates that the evidence did not "foreclose all doubt" in this case, we note that the evidence supporting the jury's finding of guilt was very strong.   The fact that Butts asked the victim for a ride, even though he had driven his own automobile to the store, shows that he was involved in the motor vehicle hijacking from the beginning.   The evidence also suggested that Butts carried the shotgun with him into the store as he sought out a victim.   Testimony at trial showed that Butts had worked with the victim previously, suggesting that Butts intended from the beginning to murder the victim in order to ensure the victim's silence.   Several of Butts's former jail mates testified that he had admitted being the triggerman.   Evidence presented during the sentencing

---

[73] Also, the Court notes that the state habeas court "concurrently" considered the merits of Butts's prosecutorial misconduct claim when it determined that he could not show cause and prejudice to overcome procedural default.   (Doc. 16-23 at 12).   Because the state court looked at the merits, any review on the merits by this Court would be limited by 28 U.S.C. § 2254(d), which provides that the federal court cannot grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or was based on unreasonable determinations of fact.   *Id.*   The Court has already determined the state habeas court's factual findings were not unreasonable, and, although Butts cites many cases from the appellate courts and the Supreme Court, he has not cited any "clearly established" Supreme Court precedent holding that a prosecutor cannot pursue inconsistent theories at trial.   Thus, even if the Court reviewed the merits of Butts's prosecutorial misconduct claim and found that the prosecutor pursued inconsistent theories, it could not grant relief.

phase showed that Butts had a history of criminal conduct. These circumstances all might reasonably have urged the jury to impose a death sentence.

Our proportionality review "includes special consideration of the sentences received by co-defendants in the same crime."   In this regard, we note that Butts's co-perpetrator, Marion Wilson, Jr., also has received a death sentence.

We find, considering both the crime and the defendant, that the death sentence imposed in this case is neither excessive nor disproportionate to the penalties imposed in similar cases in Georgia.

*Butts*, 273 Ga. at 771-72, 546 S.E.2d at 484-85 (footnotes omitted).   Further, the court

cited 18 Georgia death penalty cases and noted "that each involves an intentional killing

committed during the commission of an armed robbery or a motor vehicle hijacking."   *Id.*

at 772, 546 S.E.2d at 485.

There is no constitutional right to proportionality review, and the Eleventh Circuit

has instructed the district courts not to conduct proportionality reviews in death penalty

habeas corpus cases.   In *Pulley v. Harris*, 465 U.S.37 (1984), the Court held, "[t]here is

… no basis in our cases for holding that comparative proportionality review by an

appellate court is required in every case in which the death penalty is imposed."   *Id.* at

50.   In *Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983), the Eleventh Circuit held:

A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases.   To do so would thrust the federal judiciary into the substantive policy making area of the state.   It is the state's responsibility to determine the procedure to be used, if any, in sentencing a criminal to death.

*Id*. at 1518 (citing *California v. Ramos*, 463 U.S. 992, 996-1001 (1983)).

Accordingly, the Court must decline Butts's request to conduct a proportionality

review.

**E.  Claim Seven:   Execution by lethal injection is cruel and unusual punishment, and Petitioner's sentence violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution.**

Butts complains that Georgia's use of compounding pharmacies to obtain pentobarbital poses a substantial risk of serious harm in violation of Eighth and Fourteenth Amendments.   (Doc. 24 at 222).   He challenged Georgia's lethal injection protocol during his state habeas proceeding, and the state habeas court found the claim was non-cognizable and, alternatively, without merit.   (Doc. 16-23 at 13).

A habeas action is not the appropriate vehicle for attacking Georgia's lethal injection procedures; rather, that challenge must be raised in a 42 U.S.C. § 1983 action. *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015) (clarifying that in *Hill v. McDonough*, 547 U.S. 573 (2006), "[w]e held that a method-of-execution claim must be brought under § 1983"); *McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013) (holding a § 1983 action, not a habeas proceeding, is the correct way to attack lethal injection procedures); T*ompkins v. Sec'y Dep't Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009); *Thomas v. McDonough,* 228 F. App'x 931, 932 (11th Cir. 2007) (holding that "§ 1983 and § 2254 are mutually exclusive" and that if a claim can be brought under § 1983, it "cannot be brought under § 2254").

Accordingly, Butts's claim regarding Georgia's lethal injection procedures is dismissed without prejudice.

**F.  Claim Eight:   Petitioner's trial was fraught with procedural and substantive errors that cannot be harmless when viewed as a whole since the combination of errors deprived him of the fundamentally fair trial guaranteed under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Butts raised a cumulative error challenge during his state habeas proceeding.

The state habeas court found that the claim was not cognizable because it failed "to allege grounds which would establish a constitutional violation in the proceedings which resulted in [Butts's] conviction and sentence" and noted "that the State of Georgia does not recognize cumulative error." (Doc. 16-23 at 13-14). Respondent argues there is no Supreme Court case holding that cumulative error review must be undertaken in habeas proceedings. (Doc. 27 at 147). Additionally, he argues that because Georgia has no cumulative error review, this claim has not been exhausted, and a review by this Court would violate the rules of comity in 28 U.S.C. § 2254.

Even if the Court could conduct a cumulative error analysis, Butts would not be entitled to relief. "For [this Court's] purposes, it is enough to say that [Butts's] cumulative error claim clearly fails in light of the absence of any individual errors to accumulate." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012); *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014).

## IV.   CONCLUSION

For the reasons explained above, Butts's petition for writ of habeas corpus is **DENIED**.

## CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of Appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a [COA] when it enters a final

order adverse to the applicant," and, if a COA is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

The Court can issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To merit a COA, the Court must determine "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations omitted).  If a procedural ruling is involved, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Under this standard, the Court issues a COA on the following issue:   Trial and appellate counsel were ineffective for failing to investigate, develop, and present mitigating evidence during the sentencing phase of Butts's trial.

In relation to all other claims, grounds, and issues raised in Butts's Petition for Writ of Habeas Corpus (Doc. 1), the Court finds the standard shown above for the grant of a COA has not been met.

**SO ORDERED**, this 16th day of October, 2015

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
